IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMO DEVELOPMENT, LLC,<br>AMO MANUFACTURING USA, LLC, and<br>AMO SALES AND SERVICE, INC., | ) ) ) | |
| | ) | **Redacted - Public Version** |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 20-842-CFC-JLH |
| ALCON VISION, LLC, ALCON<br>LABORATORIES, INC., and ALCON<br>RESEARCH, LLC, | ) ) ) ) | |
| Defendants. | ) | |
| ALCON, INC., ALCON RESEARCH, LLC<br>and ALCON VISION, LLC, | ) ) | |
| Defendants and Counterclaim<br>Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| AMO DEVELOPMENT, LLC,<br>AMO MANUFACTURING USA, LLC,<br>AMO SALES AND SERVICE, INC. and<br>JOHNSON & JOHNSON SURGICAL<br>VISION, INC. | ) ) ) ) ) | |
| Plaintiffs and Counterclaim<br>Defendants. | ) ) ) | |

**LETTER TO THE HONORABLE JUDGE HALL**
**FROM ANDREW E. RUSSELL**

OF COUNSEL:
Jeanne M. Heffernan, P.C.
Joshua L. Simmons
Matthew A. Lembo
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Gregg F. LoCascio, P.C.
Sean M. McEldowney
Noah S. Frank
Hannah L. Bedard
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000

Caroline Lourgos
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

Kristen P.L. Reichenbach
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
(415) 439-1400

Dated: December 6, 2021

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Alcon Inc.,*
*Alcon Vision, LLC,*
*Alcon Laboratories, Inc. and*
*Alcon Research, LLC*

Dear Judge Hall:

In September 2020, Plaintiffs/Counterclaim-Defendants ("J&J") amended their complaint for patent infringement to add new claims of copyright infringement, alleging that Defendants/Counterclaimants' ("Alcon's") LenSx device contains copyrighted software code stolen from a J&J predecessor, and seeking an injunction against Alcon on that basis. As the injunction proceedings progressed, however, Alcon independently learned that J&J possessed all of the facts underlying its copyright claims six years earlier, when J&J conducted an investigation of a used LenSx system in 2014. *See* Ex. A at 321:13–23:15. The Court ultimately cited J&J's six-year delay as a primary reason to deny the injunction request. *Id*. at 344:6–18, 348:11–50:6.

But in the seven months since the Court's decision, Alcon has learned little else about J&J's 2014 investigation and decision not to pursue or even provide notice of its claims. J&J only provided a few already-known facts, and privilege log entries ███████████████████████████ ████████████████████████████ J&J improperly refuses to provide any additional, non-privileged information about the 2014 investigation (such as what the investigators did and observed) or its decision not to assert its copyright claims in 2014 (such as any business considerations). Instead, J&J claims such facts are privileged because they were communicated at some point to an attorney. Worse still, it appears J&J may have failed to preserve critical evidence pertaining to the 2014 investigation. Accordingly, Alcon seeks an order compelling J&J to respond to two interrogatories and related requests for production regarding the 2014 investigation, as well as questions concerning its preservation (or destruction) of evidence.

Interrogatory No. 5 seeks non-privileged facts regarding J&J's inspections of LenSx systems, including but not limited to: "the ***quantity*** [of LenSx systems] J&J possessed, inspected, or viewed, the ***people*** at J&J who possessed, inspected, or viewed them," a description of "***all testing, evaluation, analysis, observation, or reverse engineering*** involving [any investigation of LenSx]," as well as the identification of all non-privileged "***[d]ocuments*** referring or relating to [those] facts." Ex. B at 1–2 (emphasis added). Interrogatory No. 17 seeks a description of "J&J's considerations in when to bring suit, including ***how*** and ***when*** J&J first learned of the alleged patent and copyright infringement," and the existence of "***any fact investigation*** conducted of Alcon's products," in part by identifying "***persons most knowledgeable*** of the facts" and all associated documents. Ex. B at 4 (emphasis added). RFP Nos. 23, 36, 80, 81, and 133 similarly seek the underlying documents related to these two interrogatories. Ex. C at 31, 43, 83, 84, 128.

The details of J&J's 2014 investigation and its subsequent delay in bringing suit are relevant to several critical issues, including J&J's failure to mitigate damages and the value J&J placed on its own allegedly copyrighted code. Such information is also relevant to potential affirmative defenses of consent, waiver, acquiescence, estoppel, and/or laches, which all depend on Alcon's ability to identify the facts and circumstances surrounding J&J's delay. Indeed, the Court granted J&J's motion to strike these defenses because they lacked sufficient factual bases at the outset of the case, but without prejudice to Alcon to re-add them on a showing of good cause. *See* D.I. 32; Ex. A at 354:24–56:10; May 14, 2021 Oral Order. Responsive information may also directly undermine J&J's theory that Alcon had an unfair "first mover advantage," which it will presumably use to justify its "immeasurable" request for damages, D.I. 43 at 16 ("The full scope of injury to J&J Vision is immeasurable"), including J&J's actual damages and disgorgement of

Alcon's profits. D.I. 141 at 212. J&J's refusal to answer Alcon's interrogatories concerning these key points improperly prevents Alcon from uncovering facts to support its defenses and challenge J&J's claims.

At each turn of the parties' dispute, J&J tactically provided information that is minimally relevant or already known to Alcon, while withholding the most critical facts. For instance, J&J's first response to Interrogatory No. 5 in February 2021 simply stated that "J&J Vision has inspected a LenSx machine with version 2.20.02 of the LenSx software," Ex. B at 2, a fact already apparent from the complaint. *See* D.I. 16 at ¶ 98. Three weeks later, after J&J filed its preliminary injunction motion, J&J added that "[i]n 2014, [AMO] obtained a used LenSx Laser system" that it inspected "at the direction of counsel," Ex. B at 3, information *Alcon* had already uncovered on its own and disclosed to J&J. *See* D.I. 81 ¶¶ 7–8. As for Interrogatory No. 17, after initially failing to substantively respond (providing only objections), J&J's March supplement improperly incorporated the sparse facts from its amended complaint, its 2020 letter notifying Alcon of its copyright infringement claims, and its response to Interrogatory No. 5, Ex. B at 5–6; *see In re Wilmington Tr. Sec. Litig.*, No. CV 10-990-SLR-SRF, 2017 WL 2457456, at \*2 (D. Del. June 6, 2017) (improper to incorporate pleadings as responses), none of which touch on the facts and circumstances surrounding J&J's delay in bringing suit. For both interrogatories, J&J also asserted a blanket claim of privilege over all other facts related to its 2014 investigation, even though facts are never privileged. *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981).

When Alcon notified J&J that it would bring J&J's deficient responses to the Court's attention, J&J made another inadequate supplementation and provided a privilege log. For Interrogatory No. 5, J&J simply added that, at the direction of counsel, "Brent Schellhase inspected the LenSx Laser system," Ex. B at 3–4, which is the same information *Alcon* provided to J&J in March. *See* D.I. 81 ¶¶ 7–8. J&J also added that Mr. Schellhase looked at object code, a fact it disclosed months earlier at the preliminary injunction hearing.[1] *See* Ex. A at 321:13–23:7. J&J also identified "Matthew Kraai" as inspecting the same system, as well as a handful of documents under Rule 33(d), Ex. D at 3–4, but those were merely the receipts and agreements to obtain the LenSx system in 2014. J&J has no basis to withhold additional non-privileged facts from its investigation, such as what Messrs. Schellhase and Kraai did as part of the investigation, what they observed, what they concluded as a matter of fact, and to whom they provided those conclusions.

As for Interrogatory No. 17, J&J again incorporated Interrogatory No. 5 before setting forth four pages of irrelevant narrative summarizing the parties' pre-suit mediation,[2] J&J's preliminary injunction motion, and discovery to date, Ex. B at 6–10, none of which actually responds to the Interrogatory. J&J also responded that, ███████████████████████████████████████ ████████████████████████████████ " and "in-house counsel Sanjesh Sharma [is] an individual

---

[1] If privilege existed over this factual matter (which it did not), that disclosure constitutes waiver. *See Princeton Digital Image Corp. v. Office Depot Inc.*, C.A. No. 13-239-LPS, 2017 WL 3264068, at \*2 (D. Del. Aug. 1, 2017) (a party cannot "divulge whatever information is favorable to the client's position and assert the privilege to preclude disclosure of the detrimental facts.") (internal marks omitted). The same is arguably true of J&J's decision to not bring suit. (Ex. A at 323:4–24).

[2] ████████████████████████████████████████████████

believed to have knowledge about this situation." *Id.* at 6–7. That response is merely a restatement of J&J's prior assertion of privilege. It strains credulity, however, that J&J's legal department alone made the decision not to bring suit or provide notice to Alcon of the alleged theft, and that no non-privileged business considerations from management contributed to that decision. Any non-legal considerations, along with who else was involved in those decisions, must be disclosed.

During the parties' numerous meet-and-confers, J&J did not claim that it was ***not*** in possession of additional facts, but rather took the untenable position that all facts relayed to or from an attorney for purposes of securing or providing legal advice are privileged. This is contrary to law: the Supreme Court has held that "[t]he privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Upjohn*, 449 U.S. at 395; *In re TQ Delta*, No. CV 17-MC-328-RGA, 2018 WL 5033756, at *3 (D. Del. Oct. 17, 2018) (noting discovery "targeted at non-privileged factual information, rather than communications between attorney and client" is not protected by privilege). J&J also claimed that a more complete response would essentially require J&J to depose its own witnesses (*e.g.*, to interview them), and that Alcon was free to depose the individuals involved to uncover additional non-privileged facts. But Alcon's ability to depose witnesses does not absolve J&J of its obligation to provide non-privileged facts of which it is already aware or could discover upon conducting a reasonable inquiry. Fed. R. Civ. P. 33(b); Fed. R. Civ. P. 26(e), (g)(1). Nor does it absolve J&J of its duty to identify witnesses not otherwise discernable from J&J's privilege log so that Alcon may depose them.

Separate from its deficient responses, J&J's privilege log raises serious concerns that J&J failed to preserve responsive evidence. ███████████████████████████████████████ █████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ *See* Ex. E. For that reason, during a November 9 meet-and-confer, Alcon asked whether J&J was asserting the work-product doctrine over any documents from that time and whether it had issued a litigation hold in 2014. J&J said it was not claiming work product, but conspicuously ignored the second question. ████████████████████████████████████████████████████████████[3]

Alcon is entitled to the non-privileged facts concerning J&J's investigation of the LenSx six years prior to bringing suit and J&J's business decision to sit on its claims. Alcon respectfully requests that the Court compel J&J to provide substantive responses to Alcon's Interrogatory Nos. 5 and 17 and produce all related, non-privileged documents. Alcon further requests that the Court compel J&J to answer two basic questions concerning J&J's document preservation efforts, including (1) whether and when J&J issued a document preservation notice pertaining to the 2014 investigation; and (2) whether any documents pertaining to that investigation have been destroyed.

---

[3] On December 2, 2021, J&J supplemented its privilege log to add ████████████████████ █████████████████████████████████████████████████████████████████████████ ████████████████ Ex. F. J&J has now agreed to produce ████████████████ but continues to refuse to produce all non-privileged facts regarding the 2014 investigation.

Respectfully,

*/s/ Andrew E. Russell*

Andrew E. Russell (No. 5382)

cc:    Clerk of the Court (via hand delivery and electronic delivery)
          Counsel of Record (via electronic mail)

# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                           -  -  -

 4
        AMO DEVELOPMENT, LLC,          :   CIVIL ACTION
 5      AMO MANUFACTURING USA, LLC     :
        and AMO SALES AND SERVICES,    :
 6      INC.,                          :
                                       :
 7      Plaintiffs,                    :
                                       :
 8           vs.                       :
                                       :
 9      ALCON LENSC, INC., ALCON       :
        VISION, LLC, ALCON             :
10      LABORATORIES, INC. and         :
        ALCON RESEARCH, LLC,,          :
11                                     :
        Defendants                     :
12      ---------------------------    :
        ALCON INC., ALCON LENSX,       :
13      INC., ALCON RESEARCH, LLC,     :
        and ALCON VISION, LLC,         :
14                                     :
                                       :
15                                     :
        Counter-Plaintiffs             :
16                                     :
               v.                      :
17                                     :
        AMO DEVELOPMENT, LLC, AMO      :
18      MANUFACTURING USA, LLC, AMO    :
        SALES AND SERVICES, INC.       :
19      And JOHNSON & JOHNSON          :
        SURGICAL VISION, INC.,         :
20                                     :
        Counter-Defendants             :   NO. 20-842-CFC
21

22                           -  -  -

23                          Wilmington, Delaware
                            Thursday, May 13, 2021
24                          9:00 o'clock, a.m.

25
        BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.
```

**APPEARANCES:**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
BY:  JACK B. BLUMENFELD, ESQ. and
BRIAN P. EGAN, ESQ.

-and-

LATHAM & WATKINS LLP
BY:  MICHAEL A. MORIN, ESQ. and
SARANG V. DAMLE, ESQ.
(Washington, D.C.)

-and-

LATHAM & WATKINS LLP
BY:  ROGER J. CHIN, ESQ. and
(San Francisco, California)

-and-

LATHAM & WATKINS LLP
BY:  RACHEL WEINER COHEN, ESQ.
CAROLYN HOMER, ESQ. and
HOLLY VICTORSON, ESQ.
(Washington, D.C.)

Counsel for Plaintiffs

SHAW KELLER LLP
BY:  JOHN W. SHAW, ESQ.

-and-

3

**APPEARANCES (Continued):**

KIRKLAND & ELLIS LLP
BY:  JEANNE HEFFERNAN, ESQ.
(New York, New York)

-and-

KIRKLAND & ELLIS LLP
BY:  GREGG F. LoCASCIO, ESQ.
NOAH S. FRANK, ESQ.
(Washington, D.C.)

Counsel for Defendants

- - -

PROCEEDINGS

THE COURT:  All right.  Good morning.  Please be seated.

All right.  So this is my first civil proceeding, I think it's my first civil proceeding certainly in a patent case, so welcome everybody.

Let's have introductions.  Mr. Blumenfeld?

MR. BLUMENFELD:  Thank you, Your Honor.  Good to see you again.

THE COURT:  Likewise.

MR. BLUMENFELD:  Jack Blumenfeld for the plaintiff from Morris Nichols.

At counsel table, Mike Morin, Roger Chin and Rachel Cohen from Latham & Watkins.  Behind them, Sarang Damle, who's also from Latham & Watkins.

And then we have a number of people, Denise DeFranco from Johnson & Johnson sitting in the corner, Holly Victorson from Latham & Watkins, Carolyn Homer, Chris Cuzick and Dr. Vellturo sitting behind him, and then Brian Egan, my partner.

THE COURT:  All right.  Thank you.

MR. BLUMENFELD:  And that's most of the cast here today, Your Honor.

THE COURT:  Sounds good.

5

MR. BLUMENFELD:  Thank you.

THE COURT:  Thank you very much.  Mr. Shaw?

MR. SHAW:  Good morning, Your Honor.  John Shaw for defendants.

Joining me from Kirkland & Ellis starting at counsel table, Gregg LoCascio, Jeanne Heffernan, Noah Frank, Hannah Bedard, and then from Alcon, Chris cook and Jeff Prokop.

THE COURT:  All right.  Thanks.

Let's deal with how you want to do the masks.  First of all, we're going to have live testimony?

MR. MORIN:  We are, Your Honor.  We're going to have live testimony from what I understand from all four witnesses that you asked for and everyone is live for both sides.

THE COURT:  All right.

MR. LoCASCIO:  Correct, Your Honor.  And to your question on masks, obviously, we follow your lead.

THE COURT:  No, no.  Actually, this is where I don't want the power of the office to make people uncomfortable.  Right?  You know, people think my jokes are funny now.  Like I said, my wife and I talk all the time.

See, I really do want to invite candid.  Nobody should be at all uncomfortable in saying I don't want to take my mask off.  For instance, I mean, I've been

314

1  You have a market where there's few opportunities for sales,

2  Your Honor, so it's not this bazillion number of sales.

3  There's a smaller number of overall units and you take that

4  away and that, at that point in time, it's another linchpin

5  of irreparable harm.

6          So you heard Mr. Cuzick testify, and he was

7  explaining that they sell one of these things.  And that is

8  a perpetual toehold into that client, to see them, to talk

9  to them, to service the equipment, to talk to them about

10  other product offerings.  You heard them talking about

11  innovation.  It was effectively forever when they lose one

12  of these sales, effectively forever.

13          I cannot imagine.  I think if you had a law

14  school exam, Your Honor, and you were saying to somebody,

15  what would be the ideal irreparable harm case, I really mean

16  this.  It would be something where there's not that many

17  sales of the units up for grabs.  It's a competitive market

18  marketplace.  That every time you sell one of those things,

19  it's so sticky, the person becomes a lifetime customer of

20  your competitor and don't forget about the equities, by the

21  way.  When you balance the whole thing out, they're

22  competing against our software.

23          So they've used our software, stolen our

24  client --

25          THE COURT:  Don't get to the equities yet.  Let

315

1  me tell you what I'm struggling with?

2          MR. MORIN:  Yes.

3          THE COURT:  Here's one thing I'm struggling

4  with.  You're not asking -- right, your whole thesis is that

5  you're incapable of quantifying.  Right?  That is what the

6  bottom line is.  Right?  Correct?

7          MR. MORIN:  Correct.

8          THE COURT:  Correct.

9          MR. MORIN:  Fully quantified, yes.

10          THE COURT:  Okay.  But you are not asking me to

11  put an injunction in place to remove machines that were put

12  in yesterday.

13          MR. MORIN:  Right.  I will tell you this.  We're

14  being --

15          THE COURT:  Do you think that you can go to

16  trial and quantify damages for that, something that occurred

17  yesterday, but you're not in a position to quantify a sale

18  that is going to occur tomorrow?

19          MR. MORIN:  Not exactly.

20          THE COURT:  And on top of it, just let me

21  finish.  Sorry.  But I think you all agree, or it's

22  undisputed maybe we're talking ▮ potential machines

23  probably that were sold in that period?

24          MR. MORIN:  Right.  That's their estimate.

25          THE COURT:  You didn't dispute it.  Right?

316

1          MR. MORIN:  I don't.

2          THE COURT:  You get ▮ of them.  Right?

3  So ▮ machines, and yet we know as of 2019 they've

4  got over a thousand already installed.

5          MR. MORIN:  Correct.

6          THE COURT:  Right.  So you think you are

7  irreparably harmed because of these ▮ machines that are

8  potentially, because they can't predict it, going to be put

9  in place in the next 24 months, that is irreparable harm,

10  but I'm not irreparably harmed because I can quantify it,

11  all the thousands, more than a thousand machines I sold as

12  of yesterday?

13          MR. MORIN:  I disagree.

14          THE COURT:  All right.

15          MR. MORIN:  Can I explain why?

16          THE COURT:  Please.

17          MR. MORIN:  All right.  We have been irreparably

18  harmed and we have to live with that by those thousand

19  sales.  They have gotten those accounts.  We saw the

20  accounts equate to other things.  We got killed on that.

21          We are where we are, but what we wouldn't do is

22  J&J and I will say it here in this Court.  And, by the way,

23  they raised an issue saying they might strip it out in two

24  years.  I will represent on the record J&J will not ask the

25  Court to go and rip machines out of doctors' offices for all

317

1  the reasons we've been irreparably harmed, which is they

2  like the machines, they worked with them.  They've gotten

3  used to them, they're working with patients.

4          We have been as just irreparably harmed by all

5  the stuff that happened in the past.  Just as irreparably

6  harm if not more, because they're going to be out there

7  longer.  But we have to decide what injunction we're going

8  to ask for, Your Honor.  When we came to this Court, there's

9  a public interest factor.

10          First of all, J&J wouldn't do it.  I don't think

11  Alcon would either, quite frankly.  Alcon is either, they're

12  a known company in the market.  I don't think either company

13  would go and say, Your Honor, we'd like you to rip laser

14  systems out of doctors' offices and take them away from them

15  when they've been trained on.

16          I don't want to take Mr. Tipperman -- I'm going

17  to ask for damages, but I'm not going to take his laser

18  system away.

19          THE COURT:  That's a good argument, but then

20  your expert said that he could quote likely derive reliably

21  conservative estimates of the necessary inputs to determine

22  a reasonable lower bound for damages of ongoing copyright

23  infringement.

24          MR. MORIN:  Yes.  So let me give an example of

25  that.  May I give an example of that?

318

1    We know the devices last at least ten years.
2  Right?  So maybe he says, maybe we compute -- please don't
3  hold me to this if we get to trial.  But maybe he says for
4  some period of time less than that, let's assume the lowest
5  ever use of the machine.
6    You have heard sometimes machines are a 40 a year.
7  We'll assume some really low procedure fee, something that's
8  lower to the boundary.  It's all going to leave us not fully
9  compensated in addition to all the lost other things that
10 we're going to get.  And I will tell you, you saw the big
11 driver, for example, of IOL.  You saw how much it bounced
12 from 2015 to '18?
13   I will represent to this Court, we are losing.
14 There's no question we are losing IOL sales when we lose one
15 of these sales.  We're not going to be asked to be
16 compensated in terms of lost profits for those IOL sales
17 because it's too speculative.
18   I don't know how many IOL sales we're going to
19 lose in seven years, I can't do that.  But the quick and
20 concise answer to your question is we have absolutely been
21 irreparably harmed by all the sales in the past, but J&J and
22 Alcon, I'm not trying to sit on my soapbox, but it is a good
23 company.
24   They've been here in Covid relief.  Alcon, other
25 aspects of the company are probably great.  Not thrilled

319

1  with what they did here.  But the point is we are in the
2  medical community.  We do have a credo.  We're not going to
3  ask you to rip out machines that they already have and take
4  a tool away from a doctor.  We are not asking for that.
5    And if we lose an injunction when they are out
6  there knowingly selling pirated software because I made the
7  decision, or we made the decision collectively that we are
8  going to not rip all the other machines off.  If that's used
9  against us in the analysis when there's such clear
10 irreparable harm.
11   By the way, you heard we notified them about the
12 copyright infringement in 2015.  They are still resisting
13 this injunction and Ms. Davis' approach says --
14   THE COURT:  I thought the first notice was
15 July 14, 2020.
16   MR. MORIN:  It was.  What did I say?
17   THE COURT:  You said 2015.
18   MR. MORIN:  Oh, that would be a mistake.
19   THE COURT:  Let me turn it on you.
20   MR. MORIN:  Yes.
21   THE COURT:  So you filed a complaint in this
22 action.  You didn't allege copyright infringement.
23   MR. MORIN:  We did not.
24   THE COURT:  Your witness admitted.  Credible
25 witnesses, everybody.  So the witness admitted, CFO, that

320

1  they didn't gain any information.  Basically, you had in
2  your pocket the same information, July 14th of 2020 that you
3  did when you filed the lawsuit.  Right?
4    MR. MORIN:  Correct.
5    THE COURT:  You didn't bring a copyright
6  infringement case and mediation doesn't go well.  You
7  threaten it.  And then in September is when you finally
8  register for the copyright?
9    MR. MORIN:  Well, the copyright registration is
10 a sound bite that they try to go to.  Sarang Damle was the
11 general counsel, my colleague, of the U.S. Copyright Office.
12 Registrations are a formality.  You have to do it before you
13 file suit.  Nothing about you don't respect.  We learned
14 this in copyright law, in IP law in law school.  You
15 register before you file suit.  That's what you have to do.
16 It doesn't affect it.
17   There are presumptions that can weigh in by when
18 you register it.  That doesn't mean anything.  It just
19 doesn't.  We went and registered it and we filed the suit.
20 By the way, once we got into the suit -- I take some issue.
21 I worked really hard.  Mr. Frankel will tell you, I'm
22 working nights, I'm working weekends.  We get the source
23 code around Thanksgiving.  It's this massive source code.
24 Then we put our experts to it.  He's starting at
25 Thanksgiving.

321

1    The idea that February 4th, which is ten weeks
2  later, we file what I hope was a comprehensive PI motion, I
3  think that's pretty darn fast.  I don't think there's any
4  delay in the two-and-a-half months with all the work that
5  had to be done on the analysis.
6    We're damned if you do, damned if you don't.  If
7  we hadn't done all of that, they would say you didn't do
8  enough analysis for the whole thing.
9    I will represent to you --
10   THE COURT:  I think what troubles me most in
11 terms of the timing, I'm with you on the Thanksgiving.
12   MR. MORIN:  Yes.
13   THE COURT:  But the fact that, you know, you
14 raise it for the first time in July of 2020, when it's
15 undisputed that as of 2011 to '14, during that time frame
16 you did have some access and at that point had formed the
17 same opinion that you had when you sent the letter on
18 July 14th of 2020.  That is the delay that, you know, I
19 think is more concerning.
20   MR. MORIN:  And, Your Honor, two things.  One
21 is, I think Your Honor observed, you don't want people
22 running into Court and filing for preliminary injunctions.
23   THE COURT:  Right.  That's different than filing
24 a claim.
25   MR. MORIN:  I understand that.  I understand

322

1  that. But the delay point, and this is what we knew at the
2  time. We had some object code. And like I said, you could
3  explain the object code. It was copying. There were
4  telltale signs. They used some of the same directory
5  features.
6          But if I leave from Latham & Watkins and
7  Kirkland were kind enough to hire me, I know I could never
8  get a job there and I use some of the same sentences and
9  lingo that I used before and it might be copyright
10  infringement, which it was.
11          But then you go into this thing. You know,
12  that's basically the nature of the evidence that we cited.
13  It wasn't 26,000, it wasn't a thousand, it wasn't anything
14  like that lines of code.
15          So someone walks out of your house with your
16  book. It's different than driving your kid's 529 plan. We
17  learned about this when we got the source code. And whether
18  we lined up the source code, it was not only different, they
19  say quantitatively different versus qualitatively.
20          If you look at difference between petty larceny
21  and grand theft auto, if you look at the different rents in
22  kind of what we were dealing with, there's no doubt there is
23  had enough that could you say looks like copyright
24  infringement. But what changed when we got the source code,
25  you find out they were copying and hiding 26,000 lines of

323

1  code, that they were deliberately deceptive on that. At
2  that point in time, we acted quickly. We acted very, very
3  quickly.
4          So, you know, the bottom line is, yes, we had
5  every bit of knowledge or at least the ability to know in
6  2014 what we knew when we filed the complaint. Were we not
7  litigious enough?
8          Did we look at it and think had a might not have
9  been enough at the time that we wanted to pursue a lawsuit
10  for some reason? Again, you can't get into the privilege
11  reasons and all of that. Maybe we weren't litigious enough.
12  Maybe we didn't do it. We had a patent case going. We saw
13  what is patent infringement and we added it to the case.
14  And then, holy cow, they stole your stuff and beat you to
15  market and got the first mover advantage.
16          What else were we to do at that point in time,
17  Your Honor? And the delay cases are very important. Think
18  about why they are there. They are there because the reason
19  we waited six years, it might show that we could tolerate
20  them copying some directly names, then walking out. None of
21  that suggests that we would tolerate. Can you imagine in
22  2014 if you had known that your competitor had copied 26,000
23  lines of code? We did not sit on that information, Your
24  Honor.
25          THE COURT: All right. Let me ask you a couple

324

1  other things.
2          MR. MORIN: Yes.
3          THE COURT: You're not alleging loss of
4  reputation, are you?
5          MR. MORIN: We are actually.
6          THE COURT: Really?
7          MR. MORIN: Yes.
8          THE COURT: How has the reputation of J&J Vision
9  been harmed?
10          MR. MORIN: You can only talk about the delta in
11  reputation and reputation is a consideration.
12          THE COURT: That's not loss. That's basically
13  loss of potential future good reputation. In fact, I don't
14  know if you can in light of the CFO's testimony. How has
15  your reputation been harmed to date? I don't think there's
16  any evidence on that.
17          MR. MORIN: I will admit and probably someone
18  will flog me and say they disagree, but for purposes of
19  this, I will admit when I speak of reputation, I speak of
20  the delta between the lawful reputation that would have
21  happened --
22          THE COURT: I'm going to rule against you on
23  that. There has been a lost trade?
24          MR. MORIN: Absolutely.
25          THE COURT: Future profits.

325

1          MR. MORIN: Absolutely.
2          THE COURT: All right. And the goodwill that
3  you would allege. Again, it's really future goodwill. You
4  have not lost goodwill to date. Correct?
5          MR. MORIN: I disagree with that.
6          THE COURT: How? Isn't that really the same
7  thing as reputation?
8          MR. MORIN: You know what, it's not. I will
9  agree with my friend. It is not a knockoff Hermes bag.
10  It's not a knockoff saying someone looks at it and says I
11  don't know what I had. I think when you talk about that and
12  I think it's cognizable in the law, but when you talk about
13  that, lots of patent cases talk about goodwill and
14  reputation because it's connected with the loss of market
15  share and opportunity, but that's a delta.
16          No one went out there and said, if you are
17  talking about reputation saying people are saying people are
18  running around saying, look at J&J, they're so lame, they
19  let Alcon copy their source code, no. That didn't happen.
20  It may happen now, but that didn't happen. That is not
21  something we're alleging. It's really the delta in the
22  goodwill and the reputation.
23          THE COURT: But that delta -- that's where we
24  come back to. Ultimately, really, it's all about your
25  contention that you are unable to adequately quantify the

326

1   damages.

2          MR. MORIN: Yes.

3          THE COURT: That's really the end of the day.

4          MR. MORIN: Well, there are two ways to look at

5   that. I hate to get pedantic, but there are two ways to

6   look at that.

7          There are dollar financial harms that we're not

8   able to fully quantify. I told you we're not going to go

9   after future IOL sales, for example. Those are actual

10  dollar damages that you can't fully quantify. And we don't

11  know -- it's ten years, 15, it's 20. We don't know that.

12  Those are things that are dollar damages but that we don't

13  know the amount.

14         We have a whole other category --

15         THE COURT: At trial you're going to ask for LOI

16  losses?

17         MR. MORIN: Oh, for sure.

18         THE COURT: Right.

19         MR. MORIN: I don't know how long in the future

20  and how we're going to do that. We won't be able to capture

21  it all.

22         THE COURT: You're going to have a damages

23  expert say to the jury, these machines last a long time. I

24  feel really comfortable for telling you that, for sure, they

25  last for ten years. And by the time we're at trial you're

327

1   going to say, and probably credibly, they last 15 years.

2   Then you can say, we can't predict what future procedures

3   are going to be, but, you know, we can look to historical

4   figures and we can approximate.

5          MR. MORIN: Ten years out? Ten years out, I'm

6   not going to tell you that. I will represent in front of

7   this Court -- by the way I heard on cross-examination, when

8   you talk about paltry sales, they put up a chart for

9   procedure, said it's ▮ for a procedure versus a ▮

10  difference when you implant a Catalys. That's a ▮

11  jump, ▮

12         THE COURT: That was not a probative point for

13  me. What's probative, the correlation was much stronger

14  with phaco than the --

15         MR. MORIN: Oh, but that is a sideshow. My

16  friend is a wonderful cross-examiner. You do understand

17  that doesn't matter at all. There can be four or five

18  things, each of which has an effect on how you're going to

19  do it, the count. It doesn't mean cutting the legs off of

20  one where we showed it probatively doesn't mean it caused

21  you irreparable harm. That's like saying you stole my watch

22  or you stole my car. One of them is a bigger deal than the

23  other. They're both hurting you. They're both irreparable

24  harm.

25         That was elegantly done as a parlor trick, but

328

1   they won't find one --

2          THE COURT: I didn't think it was a parlor

3   trick. If anything, maybe it is that the expert went a

4   little too far suggesting, if not explicitly saying that the

5   causal nexus was tied specifically to that as opposed to it

6   was tied or correlated to a bunch of different things.

7   Anyway, let's not get hung up on that.

8          MR. MORIN: That's what I think he would say he

9   meant.

10         THE COURT: All right.

11         MR. MORIN: But I've never seen a better case of

12  irreparable harm.

13         THE COURT: Look, that doesn't carry the day.

14  I don't know you. You've done a great job. That's

15  vouching.

16         MR. MORIN: Forget the vouching. Show me a case

17  with a stickier market. Show me a case where the customer

18  of sale matters that much. Show me a case where the product

19  is there so long? Razor-razor blade as Dr. Vellturo said,

20  you change razors, you change phones, you change all these

21  things. Forget I have never seen it. Show me a better case

22  of irreparable harm where that customer is lost forever in a

23  relatively small universe of potential sales? I want to see

24  that case.

25         THE COURT: It's not my burden to do that.

329

1          MR. MORIN: But it's a negative issue. Right?

2   I've shown you a lot of cases where it's only based on past.

3   I've shown you cases where the competition is enough.

4          There's a whole series of those cases

5   incidentally from the Federal Circuit that the direct

6   competition strongly suggests that -- we're out of the gate

7   at the 80 yard line with the fact that there's lost profits,

8   maybe they're 90, and then you add in all these other

9   factors. So, no, I can't vouch for it. That's not a fair

10  way to go. And we didn't cite cases that were worse,

11  because I'm not aware of any cases that are worse, but they

12  didn't either.

13         One of the best experts in the United States

14  says she has never seen a stickier case. I mean, what more

15  is there for irreparable harm? What more is there than an

16  enormous product that's going to be there for a minimum of

17  ten years they say and some indiscriminate length of time.

18  In 400 cases she has never seen anything stickier.

19         THE COURT: All right.

20         MR. MORIN: I think this is the high watermark

21  of the irreparable harm. The only, the only thing -- when

22  you look at this case, the only thing -- I'm talking against

23  my interests, Your Honor, and I hope I've proven my case and

24  I hope this comes across as credible rather than weakness.

25         I think there are only two things to talk

330

1  about -- delay, which I think we've blown out of the water
2  by showing you we didn't know that at the time.  It's a
3  difference in kind and the law behind it.  And the nexus
4  point that you made, which I think I showed five different
5  ways, it was wrong on the facts, wrong on the law.
6         But those are the only things worth discussing.
7  I think irreparable conduct or harm at this point in time,
8  more likely than not irreparable harm in the stickiest
9  market ever.  More likely than not where it's going to be
10 there they think a minimum of ten years as a client base?  I
11 mean, more likely than not I think is easily satisfied.
12 Then you get to balancing, Your Honor, and then the merits
13 come in and the copying comes in.
14        THE COURT:  All right.  Thank you.
15        MR. MORIN:  Thank you.
16        MR. LoCASCIO:  A question of irreparable harm
17 has at its base, is it quantifiable, and Your Honor
18 continues to come back to that and I think the reason we
19 didn't -- obviously, I think Mr. Leoni would have added a
20 lot of valuable things, but the reason I expect you wanted
21 to hear from Ms. Davis and we heard it from Dr. Velluro, is
22 this harm that they're alleging something that can be
23 addressed and rectified at trial?  And the question before
24 Your Honor is, is that irreparable, and there are three
25 points that go into.

331

1         The first, and, again, I will say similar to
2  what Mr. Morin said.  One of the cases we had, happens to be
3  yours, but there are plenty, which is the Genentech case.
4  Undue delay in seeking a preliminary injunction "negates
5  dates the idea of irreparability in multiple ways."
6         First, it suggests if you know what is going on
7  and you don't act on it.  Well, that tells us the person who
8  is in your shoes doesn't think it's irreparably injuring you
9  in the marketplace.  And they didn't have to run it on a
10 P.I.  In 2014, they could have done at least three things I
11 will come up with.  One, these businesses know each other
12 and run into each other constantly.  They could have picked
13 up a phone and had a conversation.
14        Two, the parties already had an agreement that
15 required this agreement to be addressed between them before
16 you ran to court.  They didn't do that either.
17        And, three, they ultimately could have chosen to
18 sue.  I would suggest that that is something they could have
19 also sought a P.I. but by no means did they have to.
20        And the harm they complain of now would have
21 been rectified years ago if they were truly right and this
22 copying that they allege entitles to them to take an entire
23 product off the market even though it's the market leader
24 or -- they pointed, and they've got a special deck on this,
25 Your Honor.  The Schmidt 50 pages.

332

1         Well, there's a hundred pages of Wicker and I
2  agree the amount of pages doesn't make one wit of
3  difference, but they continually showed you references that
4  said, the LenSx code.  And by that in the -- in the
5  paragraph almost before each of them, it's the LenSx created
6  code, meaning code that people at Alcon after the alleged
7  copying wrote.  It says calls the iFS code.  Each of those
8  slides they handed you, every one said calls to iFS code.
9         What every one points to is like a single
10 subroutine that they call.  It isn't the one that does the
11 work.  So if this truly believed that the code was a copy,
12 which they knew then because they alleged it verbatim based
13 on the same data in their mind, they should have acted, and
14 the fact that they didn't, one, ends the inquiry as to
15 whether it truly can be irreparable.
16        Could they get relief?  Sure.  Could they get a
17 permanent injunction?  Your Honor, the f'real case Mr. Morin
18 talks about is a post-trial permanent injunction.  Could
19 they get that?  We -- there's all sorts of factors we would
20 go into, but that is not the question.  There has not been
21 demonstrated calculable lost profits and all the other
22 things that you would need now to get.  It's irreparable
23 now.  They cannot prove it's irreparable.
24        In addition to the, if they knew then, it's
25 okay, has the harm changed?  This idea, we hear from the

333

1  other side, well, it's different now, because we saw it in
2  November except that is not the law.  We cited the Court to
3  the Fritz case, the Borne case.
4         THE COURT:  Actually, I want to pick up on this
5  permanent versus preliminary.  Your colleague says you have
6  to treat them exactly the same.  Do you agree with that?
7         MR. LoCASCIO:  I don't agree that they need to
8  be treated exactly the same and what I say is, if I delayed
9  in seeking my permanent injunction, okay, if I now have my
10 case and it went to trial, I don't think, for instance, just
11 as an example, I don't believe that you need to seek a
12 preliminary injunction always to go get a permanent
13 injunction in a damages case.  And I think if we were
14 talking about delay in the same way, you might have to.  So
15 I do not believe they are identical questions, Your Honor,
16 and I think the question here is, on the timing we have, is
17 this irreparable?  And there are three buckets.
18        The first is delay.  The second is the nature of
19 the harm.  Has it changed?  And we heard from J&J's side.
20 Their oral argument is, yes, it's totally different except
21 the case law we cited, this was on slide 14 we had, is more
22 harm is not necessarily any more irreparable so long as it
23 is not qualitatively different.  And we have also allegedly
24 new use does not inflict harm qualitatively different than
25 the harm flowing from the prior infringement.

334

1      And how do we know what they knew at the time?
2  Well, we heard Mr. Cuzick.  He admitted a couple key points.
3  He said, and we can find it in the transcript, the harm
4  today is the same harm from 2014 to 2019.  I wrote that down
5  when he testified.  The harm today is the same harm.
6      He also said he's not aware of any lost sale
7  because of this copyrighted code.  He is the fact witness,
8  the only one we heard from J&J.  And on this issue, okay.
9  Is the harm the same?  And if it is, under the second piece
10 of my irreparable injury argument, if you wait and the harm
11 is the same type of harm, there's just more of it, you can't
12 say, I've had enough now and you can't say, well, I thought
13 it wasn't going to be that big a deal.  I knew about it, but
14 now it's kind of getting under my skin, or I thought we were
15 going to beat them in the marketplace and we didn't, so now
16 I'm going to bring the claim.  You have to act.
17     You don't have to act ultimately to prevail at
18 trial.  You would only be subject to the statute at that
19 point, Your Honor, as to how long you waited.  But if you
20 are going to come in and seek the extraordinary relief
21 of a preliminary injunction and not prevent the house from
22 being torn down and preserve the status quo, but take the
23 house, the marketplace that has been existed for a decade
24 where Alcon has 50 percent of the market and say from now
25 on, between now and trial, because we didn't act for six

335

1  years, we're going to say, you don't get to be in the
2  marketplace.
3      Let's talk about reputational injury.  They're
4  concerned --
5      THE COURT:  Wait.  They are not asserting
6  reputational injury.
7      MR. LoCASCIO:  The harm to Alcon financially and
8  the reason for the bond --
9      THE COURT:  I don't want to get into that.  I'm
10 only on step two of the case.
11     MR. LoCASCIO:  It is -- the other aspect then
12 you come back to is, okay.  Even if they hadn't delayed, and
13 even if the same harm they're alleging now wasn't there at
14 the time.  Okay.  Is it immeasurable?  Is it peculiar?  And
15 it's certainly not peculiar enough that they are going to go
16 under or any of those sorts of things Your Honor asked
17 about.
18     So the only question is, can you calculate it?
19 And essentially, they dropped things along the way.  Maybe
20 they are not seeking IOL convoyed sales.  I'm not going to
21 take that to the bank.  We'll wait and see on that.  But is
22 it measurable?  It does not have to be certainty.
23     And, yes, Ms. Davis is a lovely woman and a
24 credible expert and an honest person and she will be the
25 first to admit, I cannot guarantee you what will happen in

336

1  the future, but she can say what happens in courtrooms like
2  this all the time, hopefully more often now than they did
3  for the last year, where people testify and jury's and
4  judges make fact determinations of who is credible and what
5  do I believe.
6      And --
7      THE COURT:  And the standard really is what?  I
8  mean, it's reasonable.  Right?  That's really what it boils
9  down to.
10     MR. LoCASCIO:  Right, correct.  It's not
11 precision and all sorts of assumptions, inferences, and
12 things experts rely on and this is why you frankly rely on
13 the crucible of cross-examination from lawyers like this,
14 where if an expert, you know, goes too far or doesn't have
15 the assumptions or is relying on someone who is not
16 credible, you know, ultimately, on the issue of
17 apportionment that will come up in damages, they'll have to
18 rely on certain things and testify to that.
19     And the jury will decide or Your Honor.  I also
20 think to make a point on this, this idea that this is now
21 really important to them if they didn't act on it.  Like,
22 well, if they had brought this in a standalone case, not
23 only much earlier but at any time, I would harken a guess
24 that as opposed to attaching it to a case with 18 patents,
25 it probably would go faster.

337

1      Maybe we should sever it and get right after it
2  and we don't have to figure about what happens in two years
3  from now.  We can solve that in 2022 instead of 2023.
4      THE COURT:  Wait.  You're willing to sever it?
5      MR. LoCASCIO:  I'm absolutely willing to serve
6  it.
7      THE COURT:  I'm shocked because I would have
8  thought you would welcome the spillover effect that the
9  copying is going to have on your patent case.
10     MR. LoCASCIO:  It will make it harder for me to
11 argue that they're copying the patents, but thank you.
12     THE COURT:  I suggested to my clerk, I said,
13 well, maybe the way to resolve this is we'll expedite the
14 copyright case, but if I were the plaintiff, I would never
15 agree to that.
16     MR. LoCASCIO:  They seem to feel pretty strongly
17 with the patent case, too, so maybe they will, Your Honor.
18 If Your Honor says, okay, this needs to be addressed or
19 dealt with, that's fine, but a preliminary injunction, the
20 reason irreparable injury standard exists is you don't get
21 to change the current status quo until you have had a trial
22 on the merits other than in a situation that is
23 extraordinary and cannot be fixed later by money, because if
24 you can, the inquiry is over.  It could be the most
25 egregious thing possible.

338

1    You could have, and you indeed have in some of
2    the cases they point to. Apple/Franklin. You have a
3    defendant who says, I did it. Okay? I did it and it is a
4    copy, it is a pure knockoff. We do not say that because it
5    is not. Okay?
6         But even in those cases, they still say, well,
7    we have to go through this exercise to see, because if you
8    can be remedied monetarily, we're going to -- so be it.
9    That's the result. And if you've chosen to sit on your
10   rights and wait and not raise it, well, now you're really
11   asking for us to do something extraordinary and it's take a
12   market that has existed for at least six years with their
13   knowing position that they never shared with us and throw
14   that up and say we're going to take the market leader out of
15   the market.
16        This is not a new launch that copies their
17   software and it's the same thing on the same machine and
18   this is not Franklin where we took -- they took the exact
19   thing. It booted up and worked and ran and looked like an
20   Apple machine. That is not this case.
21        One other point I want to make about a piece of
22   case law that came up, Apple/Samsung. There's a reference
23   to battery. That's an example, Your Honor. That's not a
24   case of a power cord or battery. That case, where the
25   preliminary injunction was granted and then reversed on

339

1    abuse of discretion, Federal Circuit, not Third Circuit, was
2    because the nexus there was actually relating to Siri, which
3    was a pre-zip code and program on that phone and the
4    question was, is there enough of a nexus there to the
5    ultimate sale because the injunction was to try to go after
6    the phone. Okay. So it's a piece of it, but it's not, you
7    know, a power cord or something like that.
8         So that was the story in that. There are
9    multiple Apple/Samsung cases. We represent both. But at
10   face, Your Honor, the irreparable injury question that I
11   think -- two fine lawyers who can disagree on a lot here and
12   Your Honor asked a lot of good questions. The question that
13   matters most at this stage is, is the relief quantifiable,
14   because if it is, it's over, and even if it was somehow a
15   little opaque or vague around the edges, I don't think that
16   would mean they've shown more likely than not it's
17   irreparable because it's not peculiar, and layer on top of
18   that the fact that they didn't say anything for six years
19   and now ask for relief that is still, as you can imagine for
20   everybody on the outcome side, people on the sales force who
21   have customers that literally have one in place and there's
22   a contract to be signed but not yet signed and other people
23   who are asking for orders would be monumentally disruptive,
24   I don't want to get to the next factor.
25        THE COURT: Okay. All right. Give me a second.

340

1    All right. Let's do this. Let's take like a ten-minute
2    break and I will come out.
3         MR. LoCASCIO: Thank you, Your Honor.
4         MR. MORIN: Thank you, Your Honor. I have more
5    to say, but I'm sure you don't want to hear from me.
6         MR. LoCASCIO: We could both go on for awhile.
7         THE COURT: Are you guys appealing it if you
8    lose?
9         MR. LoCASCIO: I expect that -- I'm not going to
10   speak out of school. I may speak to my client during the
11   break, but if Your Honor ruled that we had to not sell
12   products in the next two years on the market share, I expect
13   we will. We would seek a stay obviously as well.
14        MR. MORIN: May I talk to my client? Just don't
15   go anywhere for a second, Your Honor, if that's okay.
16        THE COURT: No. I very much appreciate it.
17   Yes. Let me just share for the clients while you're here
18   why I'm doing this. It's because depending on which way I
19   rule, and I haven't made up my mind, but if a person, if a
20   party is going to appeal an adverse ruling, I'm going to
21   read into the record something that I might not otherwise
22   read into the record and, you know, and I -- anyway, that's
23   what I'm thinking.
24        I don't fault the parties. To the contrary. It
25   was an absolutely legitimate motion to bring. I've already

341

1    expressed on the telephone what I thought about that. Go
2    ahead.
3         MR. MORIN: Your Honor, I can't -- I hope you
4    don't hold this against me, I can't say that we're not going
5    to appeal it.
6         THE COURT: That's fine.
7         MR. MORIN: I will say that we recognize that it
8    would be an abuse of discretion appeal.
9         THE COURT: Right. And so I'm basically, I
10   understand you can't say that. I will keep that in mind in
11   terms of the length of my recitation of legal principles and
12   whatnot and even the length of anything else I might recite
13   into the record. We'll break for ten minutes.
14        MR. MORIN: Thank you, Your Honor.
15        MR. LoCASCIO: Thank you, Your Honor.
16        (Short recess taken.)
17             - - -
18        (Proceedings resumed after the short recess.)
19        THE COURT: All right. Be seated. Okay. Well,
20   thank you again. I was very impressed with counsel, all
21   four, and it was a meritorious motion to bring in the sense
22   that it was understandable somebody would bring it. I'm
23   going to deny it, but I in no way fault the plaintiff for
24   bringing this motion.
25        And just because of the potential for appeal and

342

1  to make clear to the appellate court that my review of the
2  record, some preliminary back background information.
3        The plaintiffs, which are part of Johnson &
4  Johnson, sued defendant Alcon for patent and copyright
5  infringement stemming from Alcon's manufacture, use and
6  sales of the LenSX system.
7        J&J Vision, I am going to call it J&J just as
8  the parties did, and Alcon compete in the FLACS market, the
9  femtosecond laser assisted cataract surgery market.  J&J
10 manufactures the Catalys precision laser system and Alcon
11 measure the competing LenSX system.  The Catalys system is
12 mostly purchased by hospitals and ambulatory surgery centers
13 and the customers pay a per-procedure fee for each
14 treatment.
15       J&J also sells other consumable products for
16 cataract products and they had established today a
17 correlation between their sales of the Catalys and other
18 related products, so their pull-through theory has some
19 evidentiary basis to it.  That doesn't mean I have accepted
20 it.  It's a colorable theory.
21       Most of their evidence from the Catalys system
22 comes from the per-operation fees and there's a direct
23 correlation there.  I don't think there's any dispute about
24 that.
25       The motion for the preliminary injunction

343

1  concerns J&J's assertion of its copyright in the iFS
2  femtosecond laser operating software.
3        It's undisputed that there's overlapping
4  copyright.  Right?  And there's a credible case to be made,
5  very credible, that the overlapping software lines were
6  intentionally copied.  There's powerful evidence of that.
7  There's powerful evidence that it was knowingly concealed.
8        Now, whether that knowledge can be attributed to
9  Alcon today or current employees of Alcon, a completely
10 unanswered question.  And as I understand it, again,
11 undisputed, the individuals who were in the employ of the
12 predecessor, I guess J&J that had the design software are no
13 longer with Alcon.  That's undisputed.
14       MR. MORIN:  Yes, but after February 23rd, after
15 we filed the motion.
16       THE COURT:  Okay.
17       MR. MORIN:  One of them left we were told on
18 February 23rd.
19       THE COURT:  Got you.  Didn't know that or didn't
20 recall that.
21       MR. LoCASCIO:  Yes, but none of the others.
22       THE COURT:  All right.  The source code was
23 produced.  Again, I think it's undisputed, it was in
24 November of last year.  It's part of discovery in this case.
25       The preliminary injunction was sought in early

344

1  February and I don't attribute, I don't think that's a delay
2  and I don't fault J&J.  In fact, I actually welcome that
3  kind of review before a party takes an extraordinary step of
4  seeking the extraordinary remedy that a preliminary
5  injunction would find.
6        Now, the copyright claim was added to the case,
7  a pre-existing patent case in this court, and it was added
8  in September of 2020, I believe.  Correct?  September of
9  '20?  I can't recall the exact date, but that's my
10 recollection.  And J&J first apprised Alcon of J&J's
11 knowledge and belief that copying had occurred on July 14th,
12 2020.
13       It's also undisputed, I believe, that as of
14 2014, J&J had in its possession all of the knowledge that
15 formed a basis of its assertion on July 14th, 2020 that
16 Alcon or former employees of Alcon had unlawfully copied the
17 challenged source code.  Again, I think that's all
18 undisputed.
19       In deciding whether to a grant a preliminary
20 injunction, first of all, I apply the Third Circuit law.
21 The parties agree on that and I consider four factors -- the
22 likelihood of success on the merits, irreparable harm to the
23 moving party if the injunction is denied, irreparable harm
24 to the non-moving party if the injunction is granted, and,
25 four, the public interest.  And I quote there from Ramsay

345

1  against National Board of Medical Examiners, 968 F3d. At
2  page 256.
3        Now, that test is perhaps the most common
4  articulation of the test by the Third Circuit in the last
5  five to ten years.  I think in prior years, and as other
6  circuits do, the Third Circuit had referred to the third
7  prong involving a balancing of the equities between the
8  parties and the fourth prong, an overall balancing of the
9  public interest along with the other factors.  But either
10 way I think it has been demonstrated by the record today,
11 counsel all agree what are the legal tests, that I must
12 apply the four prongs.  And I think counsel agree as well
13 and it's certainly clear from Third Circuit case law that
14 the first two factors, the irreparable harm and the
15 likelihood of success on the merits and the irreparable harm
16 that is to the moving party, if injunction were to be
17 denied, those are gateway factors.  That's the terminology
18 the Third Circuit used, and so both of those must be
19 established before the Court proceeds to consideration of
20 the third and the fourth factors.
21       As far as the first factor, the likelihood of
22 success, the moving party must make that demonstration with
23 evidence that's significantly better than negligible.
24 That is, they have to demonstrate a significantly better
25 than negligible chance of success on the merits.

346

1     As far as the second factor, irreparable harm,
2  there, the movant must demonstrate that it is more likely
3  than not to suffer irreparable harm in the absence of the
4  preliminary relief it seeks.
5     A continuing copyright violation does not give
6  rise to presumption of irreparable harm, and that's a quote.
7  It's not a quote, but that principle was articulated by the
8  Third Circuit in the TD Bank case found at 928 F3d. 259,
9  pages 280 to 81.  And there the Court said, and I quote, "A
10  bare violation of a statutory right enshrined in the
11  copyright act does not establish irreparable harm."
12     Now, let me speak first to the likelihood of
13  success factor.  I think this factor has been established.
14  I think really the only question out there is the causation
15  factor that you all have discussed.  And I'm not satisfied
16  that inoperability by itself isn't sufficient.  I tend to
17  think it is in a preliminary injunction phase involving
18  software where over 26,000 lines have been copied and,
19  frankly, the evidence is overwhelming that it was
20  intentionally copied.
21     I think the fact there was intentional copying
22  speaks to the importance of the software that's at issue,
23  and although not -- we didn't really address very much in
24  the argument, but I think the fact that, even if one aspect
25  of a copyrighted work infringes renders the work in its

347

1  entirety at least under certain circumstances to be a
2  violation of the act.  I think that also informed my
3  decision.
4     To prove copyright infringement, two elements
5  must be proven.  The ownership of the valid copyright and
6  the copying of constituent elements of the work that are
7  original.  I think that's what we have here.  We have
8  constituent elements.  Showing unlawful copying itself has
9  two elements.  The plaintiff must show there was actual
10  copying and material appropriation, and that's from a
11  Third Circuit decision in Tanksley at 902 F3d. 165, page
12  173.
13     And because not all aspects of a creative work
14  are legally protected, for example, the ideas underlying
15  particular expression, the material appropriation prong asks
16  whether there is substantial similarity between the original
17  and the copy once legally unprotectible elements are
18  filtered out, and I just think that has been consistently
19  demonstrated here.
20     There has been unrebutted evidence that the iFS
21  Version 2.02 was created by agents of J&J Vision, that the
22  program in question required at least a modicum of
23  creativity, and I think every indication is that the
24  plaintiffs possessed a valid copyright.  As I said, the
25  parties acknowledge, both of them, that the LenSx system

348

1  contains overlapping code and I think the creative choices
2  inherent in the design, structure and implementation of the
3  software are protected by the copyright act.
4     Alcon may have reasonable arguments on precise
5  scope of the infringement, but I do think sufficient
6  evidence in the Schmidt declaration demonstrates the core
7  functions of, or some core functions, and that's really all
8  that's required, of the LenSx system were built on top of
9  the appropriate code.  So I would find in favor of the
10  movant as far as the first factor.
11     But it's on the second factor that the movant I
12  think cannot meet its burden.  So let's talk about really
13  why that is.
14     So, first, I do think there was delay that
15  counsels against irreparable harm and, again, I don't think
16  that delay occurred between November and February.  The
17  delay that I think counsels against a finding of irreparable
18  harm is the fact that -- and, again, the credible testimony
19  of the CFO, Mr. Cuzick, I believe, was that J&J was in
20  possession as of 2014, of all the information it had that
21  justified in its mind its assertion as of July 14, 2020,
22  that there was a copyright violation.
23     By that time there were over a thousand machines
24  that had been installed by Alcon, but no claim had been
25  brought.  There is no evidence that was adduced that would

349

1  even suggest that prior to July of 2020, J&J took steps to
2  give notice to Alcon that its software was in violation of
3  the copyright act to allow it to correct the situation, to
4  threaten it with a lawsuit, with a preliminary injunction.
5  No letter, no phone calls, nothing suggests that.
6     And it's true that delay caused by a plaintiff's
7  good-faith effort to investigate an infringement or to
8  determine how serious an infringement is does not preclude a
9  finding of irreparable harm.  I'm citing there the Third
10  Circuit case in BP Chemical at 229 F3d. 254, page 264.  But
11  that's not what we have here.  I mean, we had arguably,
12  right, a good-faith effort sometime before 2014 to take a
13  look at the code and limit it to the object code, but you
14  don't see anything else that, any further effort beyond
15  that.  And as I say, and I find it very compelling what we
16  didn't see was any effort whatsoever to try to tell Alcon
17  that they were engaging in any kind of violation or
18  copyright, to stop that, and that's especially telling since
19  the parties were already engaged in litigation and
20  apparently had set up a procedure by which they could
21  arbitrate or resolve disputes between the parties.  So the
22  delay I find probative of a lack of irreparable harm.
23     The second factor is, and really, the basis, as
24  I see it, the central core of the argument made by the
25  movant that irreparable harm, is that it's unable to

350

1  reasonably quantify damages, and I find to the contrary,
2  that there can be reasonable estimates put forward, and
3  ultimately that I'm sure will be put forward to a trier of
4  fact in this case about the damages that have occurred if,
5  in fact, it were to be determined ultimately a copyright
6  violation.
7          Under the Third Circuit law, an economic loss
8  does not constitute irreparable harm, and the parties agree,
9  if you can quantify the loss under the Third Circuit case
10  law, irreparable harm does not exist.
11          So typically, what do we look for to establish
12  irreparable harm?  Well, loss of control of reputation, loss
13  of reputation, but that hasn't occurred here.  And, again, I
14  credit counsel for maintaining his credibility before the
15  Court by acknowledging that and, again, I would also credit
16  the testimony of the CFO and the argument that was being
17  made.  And it's a creative argument to suggest that the
18  delta, as you say, the loss of, or I should say the
19  difference between the current reputation and the enhanced
20  reputation that could have been gained, which is
21  unpredictable since it's in the future in a sense.  So there
22  hasn't been a loss of reputation, and for that reason I
23  don't think there has been a loss of goodwill.
24          Now, then we get to the case of lost profits,
25  and it's really, the question boils down to can you quantify

351

1  that not with certainty, but to a reasonable degree of
2  certainty.  And I think you can.  I think Ms. Davis
3  presented credible testimony that you can do that.  And I
4  think that -- I don't want to mispronounce the name
5  here -- I apologize.  Having a name like Colm, I'm
6  sensitive to how people pronounce names.  Dr. Vellturo
7  essentially in my mind, especially with Footnote 222,
8  concedes that it's an ability to come up with a reasonable
9  estimate of damages.
10          J&J argues that its injuries are difficult or
11  impossible, and they can be challenging, that's for sure, to
12  measure, because the amount of any lost revenue inherently
13  depends on unknowable future conditions, and those
14  conditions include the lifespan of the FLACS system, future
15  demand for operations and all sorts of other conditions that
16  we can't even fathom what might exist.  But Dr. Vellturo
17  himself cites the future demand estimates and placement
18  forecasts in his declaration, and J&J relied on historical
19  data for a per procedure fee profit it generates.
20          J&J, as we heard the testimony from the CFO,
21  itself produces estimates.  It has expectation about the
22  performance of J&J's vision.  Compensation of the executives
23  of the, of J&J Vision, including the CFO, are tied in part
24  to the performance relative to those expectations, which
25  tells you that J&J believes that they're reasonable, there's

352

1  a degree of reasonableness to them.
2          As I say, and I will just point to, just so the
3  record is sufficient, I'm going to cite DI 48, paragraph 29
4  through 31 in Figure 2 and 3.  DI 44, paragraph 11, and DI
5  44, paragraph I think are examples of where J&J itself
6  relies on estimates and suggests strongly to me that there's
7  a reasonable basis for those estimates and that it would be,
8  in fact, expected that a damages expert could come up with a
9  reasonable estimate of damages that would compensate J&J
10  adequately.
11          J&J did establish that we have a sticky product
12  here.  I don't think there's any question.  But it hasn't
13  demonstrated to my satisfaction that that stickiness would
14  result in a loss of goodwill or reputation, and at most I
15  think it established that there are challenges to estimating
16  lost profits and monetary damages, but not that it would --
17  that such damages could not be calculated on a reasonable
18  basis.
19          J&J has implicitly acknowledged that its harms
20  can be adequately remedied with damages.  In its opening
21  brief it made it "clear" that it will seek damages for all
22  of Alcon's infringing activity unquote, including for
23  copyright infringement from the already installed LenSX
24  system.
25          I do take J&J's point and a credit to the

353

1  culture of the company and, frankly, it sounds like Alcon,
2  from what I understand, cooperative efforts to deal with the
3  recent health crisis we all face.  Both companies I think
4  are not in the business of trying to harm doctors and, more
5  importantly, their patients by taking healthcare devices
6  like this off the street.  So I don't hold that against --
7  the fact I brought up the point that I thought it was
8  probative or informative that J&J somehow thought it could
9  calculate damages to a sufficient degree for machines put on
10  the street yesterday but not tomorrow.  I understand why J&J
11  took the position and it should be commended not only -- and
12  not punished for doing that.
13          But I still remain on the point and I go back to
14  what Dr. Vellturo acknowledges in a footnote, is he can come
15  up with a range and a conservative estimate of damages that
16  would account for even lost profit streams that would stem
17  from the existing installations, and that tells me that he
18  could do it for the installations that will occur between
19  now and the date of a verdict.
20          So considering the evidence in its entirety and
21  in its entirety, I find that J&J has not met its burden to
22  demonstrate, that it will more likely than not suffer
23  irreparable harm.  That's not to say it won't be able to
24  demonstrate that it has suffered significant harm, but it
25  will be quantifiable to a reasonable degree in my

354

1  estimation. All right?
2         Now, before you all leave, let's hear quickly
3  and then I'm going to take a couple minutes. I'm going to
4  rule on a pending motion I will ask you about.
5         MR. MORIN: I just wanted to thank the Court for
6  its attention and to have us back in here. It's good to be
7  back in person and we appreciate your audience and spending
8  the whole day with us.
9         THE COURT: All right.
10        MR. LoCASCIO: Of course, from both sides. I
11  think this is the first time I've been in a live courtroom
12  in a year. You have been really hospitable.
13        THE COURT: I feel the same way. We've had
14  actually proceedings. I've never stopped coming to work.
15  My kids joke I'm the only person not affected by Covid in
16  the United States, but I was, and I'm sure everybody has
17  been. It's actually so refreshing to see faces.
18        And, in fact, do you all know? I saw one of my
19  kids. Did the CDC just come out today with a ruling about
20  masks or something? And what did it rule? They're gone.
21  Right? Yes.
22        MS. VICTORSON: Fully vaccinated, you can go
23  outside, anywhere. Any environment without a mask.
24        THE COURT: All right. Well, and I was hesitant
25  to do it this morning, but I am so far away from you, that I

355

1  thought that was safe.
2         Anyway, okay. So let's just quickly turn to the
3  other pending motion. All right. I'm not going to rule on
4  the motion to dismiss, but there's a motion to strike
5  affirmative defenses.
6         Now, we've got -- you know, here's the thing.
7  There's nothing but conclusory assertions in these
8  affirmative defenses and some number of them at the very
9  least in fraud.
10        So does anyone want to voluntarily withdraw
11  these affirmative defenses and move on? I'm happy to read
12  them into the record. I'm going to basically grant the
13  motion to strike. I'm going to give you leave to amend.
14  And, you know, there's different case law out there. You
15  can find district courts across the country, some allow
16  conclusory things to move forward, some don't. Judge
17  Farnan, Judge Andrews tended to strike them and that's my
18  inclination.
19        MR. LoCASCIO: Given Your Honor's guidance on
20  this, consistent with the motion for leave to amend, we will
21  voluntarily withdraw them providing that obviously we could
22  come back to the Court in the event that we wish to add one.
23        THE COURT: Well, I mean, I will just grant it.
24  Okay.
25        MR. LoCASCIO: Fine.

356

1         THE COURT: If you want further exposition, I'm
2  happy to give it to you.
3         MR. LoCASCIO: I don't think we need it.
4         THE COURT: I think you need to establish good
5  cause if you want to proceed with one of these defenses,
6  okay, and, you know, if you had good cause, you would be
7  able to set forth in some detail the nature of the
8  allegations to comport with Rule 9 and I guess we can debate
9  whether Rule 9 applies. I think they have to be -- the rule
10  is ambiguous, is it sufficiently pled. All right.
11        MR. LoCASCIO: Understood, Your Honor.
12        THE COURT: Understood. All right. That takes
13  care of the motion to strike. I've got the motion to
14  dismiss I have not looked at. All right. Anything else?
15        MR. MORIN: Not from J&J, Your Honor, other than
16  to repeat the thanks for the courtesy of you and the
17  courtroom staff and the court reporter.
18        THE COURT: All right. Well, thank you all.
19  Yes. My court reporter is the best.
20        MR. LoCASCIO: The same, Your Honor.
21        THE COURT: All right. And so I would also
22  reiterate, because it's so refreshing in these cases, to
23  have reasonable counsel, is keep it up, and you've got
24  really good Delaware counsel who have reputations for that,
25  so if you just maintain that. Now, I don't know. Maybe

357

1  you've had terrible discovery disputes in front of a
2  magistrate judge that I'm not aware of.
3         MR. LoCASCIO: No.
4         MR. MORIN: No.
5         THE COURT: Great. It's really refreshing and I
6  think the clients are really well served by it, you know.
7  It's a better way to litigate.
8         MR. MORIN: Appreciate you saying that when we
9  lost the motion.
10        THE COURT: Well, it was a good motion. Okay.
11  Thank you, all.
12        (Counsel respond, "Thank you, Your Honor.")
13        (Hearing concluded at 5:36 p.m.)
14             - - -
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT B



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMO DEVELOPMENT, LLC, AMO MANUFACTURING USA, LLC and AMO SALES AND SERVICE, INC., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 20-842 (CFC) (JLH) |
| ALCON VISION, LLC, ALCON LABORATORIES, INC. and ALCON RESEARCH, LLC, | ) ) ) ) | ██████████████ |
| Defendants. | ) | |
| ALCON INC., ALCON RESEARCH, LLC, and ALCON VISION, LLC, | ) ) ) | |
| Defendants and Counterclaim Plaintiffs, | ) ) ) ) | |
| v. | ) ) | |
| AMO DEVELOPMENT, LLC, AMO MANUFACTURING USA, LLC, AMO SALES AND SERVICE, INC. and JOHNSON & JOHNSON SURGICAL VISION, INC., | ) ) ) ) ) ) ) ) | |
| Plaintiffs and Counterclaim Defendants. | ) ) ) | |

**PLAINTIFFS' SECOND SUPPLEMENTAL RESPONSE TO
DEFENDANTS' INTERROGATORY NOS. 5 AND 17**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs and Counterclaim Defendants AMO Development, LLC, AMO Manufacturing USA, LLC, AMO Sales & Service, Inc., and Counterclaim Defendant Johnson & Johnson Surgical Vision, Inc. (collectively, "J&J Vision") hereby provide their second supplemental response to Defendants and Counterclaim Plaintiffs Alcon Vision, LLC and Alcon Research, LLC, Defendant Alcon Laboratories, Inc., and Counterclaim Plaintiff Alcon, Inc.'s (collectively, "Alcon") Interrogatories Nos. 5 and 17.

## GENERAL OBJECTIONS

1.      J&J Vision incorporates by reference its General Objections to Alcon's First Set of Interrogatories (Nos. 1-20) served on February 10, 2021.

## INTERROGATORY RESPONSES

### INTERROGATORY NO. 5:

Identify each and every LenSx system or component, or software, including but not limited to Source Code, that J&J has ever possessed, inspected, or viewed, and provide the following information about each of them: the quantity J&J possessed, inspected, or viewed, the people at J&J who possessed, inspected, or viewed them, the date, source, and other circumstances under which each Person at J&J came to possess, inspect, or view them, every use of them, all testing, evaluation, analysis, observation, or reverse engineering involving them, and all Documents

referring or relating to them, and the identity by production number of all Documents referring or relating to the facts requested herein.

## RESPONSE TO INTERROGATORY NO. 5:

J&J Vision incorporates its General Objections as if fully asserted herein. J&J Vision objects to the Interrogatory as overbroad and unduly burdensome in that it seeks information concerning "each and every" LenSx system or component that "any Person" at J&J Vision has ever "viewed," as well as "all Documents" concerning the same. J&J Vision further objects to the term "viewed" as vague and ambiguous. J&J Vision objects to the Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, work product immunity, or any other applicable privilege or protection.

Subject to and without waiving its General and Specific Objections, J&J Vision responds as follows: J&J Vision has inspected a LenSx machine with version 2.20.02 of the LenSx software installed.

J&J Vision expressly reserves all rights to supplement, revise, and/or amend its response to this Interrogatory as its investigation and discovery proceeds in accordance with the Federal Rules of Civil Procedure and the Scheduling Order.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5 (MARCH 3, 2021):

J&J Vision incorporates by reference its objections and responses to this Interrogatory as set forth above.

Subject to and without waiving its objections, J&J Vision provides the following further response:  In 2014, Abbott Medical Optics, Inc. ("AMO") obtained a used LenSx Laser system with version 2.20.02 of the LenSx software, ███████

████████████████████████████████████████████████████

After receipt, AMO inspected the LenSx system at the direction of counsel.  The first time that J&J Vision had access to and could inspect any version of the LenSx source code was in late November 2020, subject to the parties' confidentiality agreement.

J&J Vision expressly reserves all rights to supplement, revise, and/or amend its response to this Interrogatory as its investigation and discovery proceeds in accordance with the Federal Rules of Civil Procedure and the Scheduling Order.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5 (OCTOBER 29, 2021):

J&J Vision incorporates by reference its objections and responses to this Interrogatory as set forth above.

Subject to and without waiving its objections, J&J Vision provides the following further response:  In April 2014, at the direction of and in connection with discussions with legal counsel, Brent Schellhase inspected the LenSx Laser system, installed with the object code for LenSx version 2.20.02, that Abbott Medical Optics obtained from ████████████████████  However, J&J Vision did not have, and

could not inspect, any version of the LenSx source code until it was exchanged in this litigation in November 2020.

J&J Vision understands that Georg Schuele may have viewed the same LenSx machine that Abbott Medical Optics obtained from █████████████

Pursuant to Fed. R. Civ. P. 33(d), J&J Vision states that information responsive to this Interrogatory can be found at least in the following documents: JJSV_00449380; JJSV_00449381; JJSV_00449382; JJSV_00449407; JJSV_00456669; JJSV_00456671; JJSV_00456673.

J&J Vision's investigation is ongoing.  J&J Vision expressly reserves all rights to supplement, revise, and/or amend its response to this Interrogatory as its investigation and discovery proceeds in accordance with the Federal Rules of Civil Procedure and the Scheduling Order.

**INTERROGATORY NO. 17:**

Describe in detail J&J's considerations in when to bring suit, including how and when J&J first learned of the alleged patent and copyright infringement and any fact investigation conducted of Alcon's products or programs, identify persons most knowledgeable of the facts requested herein and the subject matter of each person's knowledge, and identify all Documents by production number referring or relating to the facts requested herein.

**RESPONSE TO INTERROGATORY NO. 17:**

J&J Vision incorporates its General Objections as if fully asserted herein. J&J Vision objects to the Interrogatory as compound, conjunctive, and containing subparts—specifically, in seeking information concerning both J&J Vision's patent and copyright claims in a single interrogatory, when they should be counted as two. J&J Vision objects to the Interrogatory as overbroad and unduly burdensome, for example, in seeking "all Documents." J&J Vision objects to the phrase "Alcon's products or programs" as vague and ambiguous. J&J Vision objects to the Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, work product immunity, or any other applicable privilege or protection.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17 (MARCH 8, 2021):**

J&J Vision incorporates by reference its objections and responses to this Interrogatory as set forth above.

Subject to and without waiving its objections, and solely to the extent that the Interrogatory seeks information concerning any non-privileged facts relating to J&J Vision's pre-suit investigation of Alcon's infringement of J&J Vision's copyrights, J&J Vision provides the following further response: J&J Vision refers Alcon to Mr. Warren Foust's July 14, 2020 letter to Mr. David Endicott, its Amended Complaint (D.I. 16), and Plaintiffs' First Supplemental Response to Defendants' Interrogatory

No. 5, served on March 3, 2021, all which detail the non-privileged facts relating to J&J Vision's pre-suit investigation into Alcon's infringement of J&J Vision's copyrights.

J&J Vision expressly reserves all rights to supplement, revise, and/or amend its response to this Interrogatory as its investigation and discovery proceeds in accordance with the Federal Rules of Civil Procedure and the Scheduling Order.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17 (OCTOBER 29, 2021):**

J&J Vision incorporates by reference its objections and responses to this Interrogatory as set forth above.

Subject to and without waiving its objections, J&J Vision provides the following further response:

In April 2014, at the direction of and in connection with discussions with legal counsel, Brent Schellhase inspected the LenSx Laser system, installed with the object code for LenSx version 2.20.02, that Abbott Medical Optics obtained from ████████████████████ J&J Vision did not have, and could not inspect, any version of the LenSx source code until it was exchanged in this litigation in November 2020. ████████████████████████████████

████████████████████████████████

████████████. Abbott Medical Optics did not proceed with litigation at that time.

In February 2017, Johnson & Johnson completed the acquisition of Abbott Medical Optics.

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████. ████████

██████████████████████████   ██████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████   J&J Vision thereafter filed the complaint alleging infringement of the Palanker Patents on June 23, 2020.  D.I. 1.

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████      ██████████████████████

████████████████    J&J Vision filed an amended complaint adding

allegations of infringement of the Culbertson Patents and of copyrights covering the

IntraLase FS Model 2/Model 3 Software and the iFS Advanced Femtosecond Laser

Software.  D.I. 16.

     After J&J Vision filed its First Amended Complaint, the parties engaged in a

pre-discovery exchange of source code, through which the parties' outside counsel

and approved experts received access on a highly confidential basis to both LenSx

and iFS/IntraLase code in November 2020.  The amount of code copied by Alcon,

revealed by the source code review, was staggering: the independent experts

discovered over 25,000 lines of code in the LenSx source code that were exactly

identical to lines of code in earlier-developed iFS source code.  D.I. 52 at 1, 6.  That

initial review further revealed that Alcon actively tried to cover its tracks by

changing dates and comments in the code to make it seem like the code originated

at Alcon, including changing comments in the code to remove references to dates in

the code before the founding of LenSx Lasers Inc.  *Id.* at 1, 6–7.  However, because

the copying was so pervasive, Alcon left other tell-tale signs of copying, such as

identical typos and references to dates prior to the founding of LenSx Lasers Inc.

*Id.* at 7–8.  Alcon could not, and did not, dispute the significant amount of

"overlapping" code, and the Court found that there is "powerful evidence" that "the

overlapping software lines were intentionally copied" and "knowingly concealed." D.I. 132-2 at 343:3–7. Accordingly, the Court determined that J&J Vision was likely to succeed on the merits on its software copyright claims. *Id.* at 346:12–13.

During discovery in this case, J&J Vision for the first time uncovered further theft of its intellectual property in connection with Alcon's technical documentation and FDA filings, which are submitted confidentially to the FDA and not publicly released. On May 19, 2021, third party Peter Goldstein produced certain documents purporting to be documentation relating to the LenSx system. Examination of such documentation, and further investigation of documentation later produced by Alcon, revealed striking similarities to the iFS system documentation. For example, a "Software Architecture Description" document submitted by Alcon to the FDA in 2009 (ALCON_LENSX044001) has pages of content identical to that included in an iFS document (JJSV_00133829), including technical and architectural diagrams that bear similarities that can only reasonably be explained by copying. D.I. 141 ¶ 113. Examination of metadata within such documents also indicated that certain such documents originated at IntraLase Corp., not LenSx Lasers Inc. or Alcon. *Id.* As another example, the operator's manual for the LenSx system included warnings and descriptions of safety features identical to the iFS Laser operator's manual. *Id.* ¶ 115. J&J Vision amended its complaint to add copyright infringement claims

to address this copying of certain LenSx FDA 510(k) submissions and technical documentation. *Id.* ¶¶ 112–117, 456–464.

J&J Vision identifies in-house counsel Sanjesh Sharma as an individual believed to have knowledge about this situation, however, Ms. Sharma is not believed to have material non-privileged information.

J&J Vision expressly reserves all rights to supplement, revise, and/or amend its response to this Interrogatory as its investigation and discovery proceeds in accordance with the Federal Rules of Civil Procedure and the Scheduling Order.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Anthony D. Raucci*

_____
Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com
araucci@morrisnichols.com

OF COUNSEL:

Michael A. Morin
Matthew J. Moore
Sarang V. Damle
Rachel Weiner Cohen
Susan Y. Tull
Carolyn M. Homer
Holly K. Victorson
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004
(202) 637-2200

*Attorneys for Plaintiffs and*
*Counterclaim-Defendants*
*AMO Development, LLC,*
*AMO Manufacturing USA, LLC,*
*AMO Sales and Service, Inc. and*
*Johnson & Johnson Surgical Vision, Inc.*

Roger J. Chin
Joseph R. Wetzel
Kristine W. Hanson
Allison Harms
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA  94111
(415) 491-0600

S.Giri Pathmanaban
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA  94025
(650) 328-4600

October 29, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2021, copies of the foregoing were caused

to be served upon the following in the manner indicated:

John W. Shaw, Esquire                          *VIA ELECTRONIC MAIL*
Karen E. Keller, Esquire
David M. Fry, Esquire
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Defendants*
*and Counterclaim-Plaintiffs*


Jeannie Heffernan, Esquire                     *VIA ELECTRONIC MAIL*
Joshua L. Simmons, Esquire
Matthew A. Lembo, Esquire
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
*Attorneys for Defendants*
*and Counterclaim-Plaintiffs*


Caroline Lourgos, Esquire                      *VIA ELECTRONIC MAIL*
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
*Attorneys for Defendants*
*and Counterclaim-Plaintiffs*


Kristen P.L. Reichenbach, Esquire              *VIA ELECTRONIC MAIL*
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA  94104
*Attorneys for Defendants*
*and Counterclaim-Plaintiffs*

Noah S. Frank, Esquire                    *VIA ELECTRONIC MAIL*
Gregg LoCascio, Esquire
Sean M. McEldowney, Esquire
Hannah L. Bedard, Esquire
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC  20004
*Attorneys for Defendants*
*and Counterclaim-Plaintiffs*


                              */s/ Anthony D. Raucci*
                              _____
                              Anthony D. Raucci (#5948)

2

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

AMO DEVELOPMENT, LLC,
AMO MANUFACTURING USA, LLC,
and AMO SALES AND SERVICE, INC.,

       Plaintiffs,

    v.

ALCON LENSX, INC.,
ALCON VISION, LLC,
ALCON LABORATORIES, INC., and
ALCON RESEARCH, LLC,

       Defendants.

       C.A. No. 20-842 (CFC)

ALCON INC., ALCON LENSX, INC.,
ALCON RESEARCH, LLC, and
ALCON VISION, LLC,

       Counter-Plaintiffs,

    v.

AMO DEVELOPMENT, LLC,
AMO MANUFACTURING USA, LLC,
AMO SALES AND SERVICE, INC.,
and JOHNSON & JOHNSON
SURGICAL VISION, INC.,

       Counter-Defendants.

## PLAINTIFFS' RESPONSES TO DEFENDANTS' FIRST SET OF
## REQUESTS FOR PRODUCTION (NOS. 1-152)

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs AMO Development, LLC, AMO Manufacturing USA, LLC, AMO Sales & Service, Inc., and Counterclaim Defendants AMO Development, LLC, AMO Manufacturing USA, LLC, AMO Sales & Service, Inc., and Johnson & Johnson Surgical Vision, Inc. (collectively, "J&J Vision") respond to Defendants and Counterclaim Plaintiffs Alcon, Inc., Alcon LenSx, Inc., Alcon Vision, LLC, Alcon Laboratories, Inc., and Alcon Research, LLC's (collectively, "Alcon") First Set of Requests for Production of Documents (Nos. 1-152) ("Requests").

## GENERAL OBJECTIONS

The following General Objections are expressly incorporated into each Specific Objection and Response as if fully set forth therein.  Failure to refer to the General Objections in any Specific Objection and Response should not be construed as a waiver of those objections.

1.     J&J Vision objects to each Request to the extent that it purports to impose upon J&J Vision discovery obligations that exceed those provided for in the Federal Rules of Civil Procedure or the Local Rules for the United States District Court for the District of Delaware, orders entered in this case, agreements among the parties, or other applicable law.

2.     J&J Vision objects to each Request, definition, and instruction to the extent it is vague, ambiguous, overbroad, unduly burdensome, or seeks information

1

that is not relevant to the claims or defenses of any party or proportional to the needs of the case.   Insofar as Alcon's instructions, definitions, and Requests seek confidential design, development, marketing, and business information regarding products or services not alleged by Alcon to infringe U.S. Patent No. 8,398,236, U.S. Patent No. 9,849,036, U.S. Patent No. 9,622,913, U.S. Patent No. 9,456,925, or U.S. Patent No. 9,427,356 (collectively, the "Alcon Asserted Patents"), J&J Vision objects to such Requests as overly broad and unduly burdensome.

3.      J&J Vision objects to each Request, definition, and instruction to the extent that it is not reasonably limited in time or otherwise not limited to a time frame relevant to this litigation on the grounds that such Request is overly broad, unduly burdensome, and seeks the discovery of information or documents that are neither relevant to the claim or defense of any party, nor to the subject matter of this litigation, nor reasonably calculated to lead to the discovery of admissible evidence.

4.      J&J Vision objects to each Request, definition, and instruction to the extent that it is not reasonably limited in geography or otherwise not limited to jurisdiction relevant to this litigation on the grounds that such Request is overly broad, unduly burdensome, and seeks the discovery of information or documents that are neither relevant to the claim or defense of any party, nor to the subject matter of this litigation, nor reasonably calculated to lead to the discovery of admissible evidence.

5.     J&J Vision objects to each Request, definition, and instruction to the extent that it seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine, the common-interest privilege, Fed. R. Civ. P. 26(b)(4)(A), or any other privilege or immunity.  The inadvertent production of any privileged document or information shall not constitute a waiver of any applicable objection or privilege.  For the purposes of responding to these Requests, J&J Vision will interpret each Request, definition, and instruction as excluding information subject to privilege or immunity.

6.     J&J Vision objects to each Request, definition, and instruction to the extent that it seeks to elicit third-party confidential and/or proprietary information and/or information that is subject to or precluded by restrictions of confidentiality imposed by, or pursuant to, agreements between J&J Vision and third parties.  J&J Vision will cooperate with Alcon to identify what confidential third-party information is relevant and reasonably necessary for investigation of the claims and defenses herein.  J&J Vision will then seek consent from the third party to produce such confidential information in accordance with the terms of a protective order entered by this Court.

7.     J&J Vision objects to each Request, definition, and instruction to the extent it seeks confidential or proprietary information pertaining to J&J Vision's business, trade secrets, and/or economic relationships.  J&J Vision will only provide

such information subject to D.Del. LR 26.2 or the terms of a protective order issued by the Court.

8.      J&J Vision objects to each Request, definition, and instruction to the extent that it calls for a legal conclusion.  Any response by J&J Vision shall not be construed as providing a legal conclusion regarding the meaning or application of any terms or phrases used in Alcon's Requests, definitions, or instructions.

9.      J&J Vision objects to each Request, definition, and instruction to the extent it calls for construction of the claim terms in the Alcon Asserted Patents or in U.S. Patent No. 8,394,084, U.S. Patent No. 8,403,921, U.S. Patent No. 8,425,497, U.S. Patent No. 8,500,724, U.S. Patent No. 8,709,001, U.S. Patent No. 9,095,415; U.S. Patent No. 9,101,448, U.S. Patent No. 9,107,732, U.S. Patent No. 9,125,725, U.S. Patent No. 9,233,023, U.S. Patent No. 9,233,024, U.S. Patent No. 9,474,648, U.S. Patent No. 9,693,903, U.S. Patent No. 9,693,904, U.S. Patent No. 10,376,356, or U.S. Patent No. 10,709,548 (collectively, the "J&J Vision Asserted Patents," and together with the Alcon Asserted Patents, the "Patents-in-Suit") on the grounds that such Request, definition, or instruction is premature; the Court has not yet construed the claims of the Patents-in-Suit, and it is not known what invention(s) will be held to be claimed or disclosed in the Patents-in-Suit.  Any response by J&J Vision shall not be construed as an admission that any patent claim term has any particular meaning.

10.     J&J Vision objects to each Request, definition, and instruction to the extent that it seeks information not currently in J&J Vision's possession, custody, or control, or refers to persons, entities, or events not known to J&J Vision.

11.     J&J Vision objects to each Request, definition, and instruction to the extent that it seeks discovery concerning J&J Vision's contentions in this matter before J&J Vision has had the opportunity to conduct full discovery.

12.     J&J Vision objects to each Request, definition, and instruction to the extent that it is cumulative and duplicative of other forms of discovery that are more convenient and less burdensome.

13.     J&J Vision objects to each Request, definition, and instruction to the extent that it seeks to require J&J Vision to do more than conduct an examination of those files or sources that reasonably may be expected to yield responsive information, or an inquiry of those persons who may be reasonably expected to possess responsive information.

14.     J&J Vision objects to each Request, definition, and instruction to the extent that it prematurely requests discovery of materials and information in advance of their respective deadlines under the Scheduling Order governing this case.

15.     J&J Vision objects to each Request, definition, and instruction to the extent that it improperly and prematurely seeks discovery of expert opinions.  Such

information will be disclosed within the time frame outlined by the Scheduling Order governing this case.

16.    J&J Vision objects to each Request, definition, and instruction to the extent that it purports to place an obligation on J&J Vision to obtain or provide information that is publicly available or otherwise as readily available to Alcon as it is to J&J Vision.

17.    J&J Vision objects to each Request, definition, and instruction to the extent that it purports to impose procedures for the preservation, collection, search, and/or production of information that conflicts with appropriate ESI procedures—including the protocol for searching ESI, including identification of custodians, number of custodians, search terms, and time periods to search—to be agreed upon by the parties.  J&J Vision will limit its search for electronic documents in accordance with the procedures to be agreed upon by the parties or as ordered by the Court.

18.    J&J Vision objects to the definition of "J&J," "Plaintiffs," "You," and "Your" as vague, ambiguous, overly broad, unduly burdensome, and invasive of the attorney-client and attorney-work-product privileges and protections, to the extent that the definition includes counsel.  In responding to these Requests, J&J Vision will respond on the basis that "J&J," "Plaintiffs," "You," and "Your" refer only to AMO Development LLC, AMO Manufacturing USA, LLC, AMO Sales and

Service, Inc., and Johnson & Johnson Surgical Vision, Inc., and such persons authorized to act on their behalf and within the proper scope of their respective authorized capacities.

19.     J&J Vision objects to the definitions of the terms "Person," "Communication," "Documents," "including," "concerning," and "relating to" as vague and ambiguous, overly broad, and unduly burdensome to the extent that the definitions (in combination with the individual Requests):  (i) seek to encompass information that is neither relevant, reasonably calculated to lead to the discovery of admissible evidence, nor proportional to the needs of the case; (ii) are not reasonably limited in time or scope; (iii) seek to encompass information not within J&J Vision's possession, custody, or control; and/or (iv) seek to encompass information protected from disclosure by the attorney-client privilege, the work product doctrine, the common interest privilege, the joint defense privilege, Fed. R. Civ. P. 26(b)(4)(A), or any other applicable privilege or immunity.  J&J Vision also objects to these definitions to the extent that they presume that J&J Vision has knowledge of each of the persons or entities within the scope of the definition.

20.     J&J Vision objects to the definitions of the terms "Alcon Asserted Patents," "J&J Asserted Patents," and "J&J Asserted Works" as vague and ambiguous to the extent that they encompass "any other patents" or "any other works" beyond those currently asserted by the respective parties in this litigation.

J&J Vision will respond to each Request based on the patents and/or works  asserted in this case.

21.     J&J Vision objects to the definition of the term "CATALYS" as vague, ambiguous, and overly broad to the extent that it encompasses "any product identified as an accused product in any infringement contention served by Alcon in this litigation."   J&J Vision will respond to each Request based on the accused Catalys® Precision Laser System alleged to infringe the Alcon Asserted Patents.

22.     J&J Vision objects to the term "Accused J&J Products" as vague, ambiguous, overly broad, and unduly burdensome because it has not been sufficiently defined and covers technology not alleged to infringe the Alcon Asserted Patents.

23.     J&J Vision objects to the definition of the term "Prior Art" to the extent that it includes the phrase "any other information … that could relate to the validity" of the Patents-in-Suit, which is vague and ambiguous.  J&J Vision further objects to the definition as potentially unduly burdensome, insofar as it encompasses on its face each and every document, thing, act, or event that predates the priority date of a patent.

24.     Discovery is ongoing in this action, and J&J Vision has not completed its discovery or investigation into the parties' claims and defenses.  J&J Vision therefore objects and responds to these Requests based upon information in its

possession after diligent inquiry at the time of preparation of these responses. J&J Vision reserves the right to amend, supplement, and/or correct its objections or responses as additional information becomes available to J&J Vision in the course of its ongoing discovery and investigation.

25.    J&J Vision incorporates by reference the General Objections set forth above into the specific objections set forth below. J&J Vision may repeat a General Objection for emphasis or other reasons. The failure to repeat any General Objection does not waive any General Objection to the Request. Moreover, J&J Vision does not waive its right to amend its objections.

## RESPONSES TO REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

All Documents relating to the design, development, operation, engineering, or structure of CATALYS, including all prototypes, alternative designs, and features considered and rejected.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

J&J Vision objects to this request to the extent it seeks information and documents protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or immunity. J&J Vision objects that this request is overly broad, unduly burdensome, vague, and ambiguous, and seeks information that is not relevant to any party's claim or defense in this case, is not likely to lead to the

Subject to the foregoing Specific and General Objections, J&J Vision responds as follows:   J&J Vision will produce non-privileged documents in its possession, custody, or control sufficient to show analysis comparing or contrasting the pertinent features of the Catalys System with other FLACS systems to the extent such documents exist and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 23:**

All Documents referring or relating to any analysis of the structure, function, performance, or any other property of LenSx, including but not limited to notes, memoranda, photos, diagrams, and reports, and all Documents showing, referring, or relating to the dates and circumstances under which anyone at J&J came to possess, inspect, or view a LenSx device, including its source code.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

J&J Vision objects to this request to the extent it seeks information and documents protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or immunity.  J&J Vision also objects that this request is overly broad, unduly burdensome, and seeks information that is not relevant to any party's claim or defense in this case, is not likely to lead to the discovery of admissible evidence, or is not proportional to the needs of the case.  For example, it seeks "all" documents referring or relating to "any other property of LenSx."  J&J Vision further objects to the term "view" as vague and ambiguous.  J&J Vision

objects to the request to the extent that it seeks documents already in Alcon's possession, custody or control, including the parties' pre-discovery exchange of source code pursuant to the Pre-Discovery Confidentiality Agreement.

Subject to the foregoing Specific and General Objections, J&J Vision responds as follows:  J&J Vision will produce non-privileged documents in its possession, custody, or control sufficient to show analysis of LenSx systems to the extent such documents exist and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 24:**

All Documents stating, suggesting, implying, or otherwise indicating that CATALYS is superior to LenSx or any other FLACS device, CATALYS has advantages compared to LenSx or any other FLACS device, or that CATALYS can treat patients not treatable by LenSx or any other FLACS device, including but not limited to all Documents referring or relating to any and all patient considerations, including anatomic considerations, that may render a patient unsuitable for surgery using LenSx or any other FLACS device, or may result in poor outcomes from such surgery and/or may increase the risk of a serious adverse event following such surgery.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

J&J Vision objects to this request to the extent it seeks information and documents protected by the attorney-client privilege, work product doctrine, or any

other applicable privilege or immunity.  J&J Vision objects that this request is overly broad, unduly burdensome, vague and ambiguous, and seeks information that is not relevant to any party's claim or defense in this case, is not likely to lead to the discovery of admissible evidence, or is not proportional to the needs of the case for example, in its use of the terms/phrases "patent search" and "subject matter of Catalys."

Subject to the foregoing Specific and General Objections, J&J Vision responds as follows:  J&J Vision is willing to meet and confer regarding the scope of this request.

**REQUEST FOR PRODUCTION NO. 36:**

All Documents referring or relating to any attempt by J&J or any employee, consultant, affiliate, or contractors to reverse-engineer or s udy LenSx's design or functionality.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 36:**

J&J Vision objects to this request to the extent it seeks information and documents protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or immunity.  J&J Vision objects that this request is overly broad, unduly burdensome, vague and ambiguous, and seeks information that is not relevant to any party's claim or defense in this case, is not likely to lead to the

discovery of admissible evidence, or is not proportional to the needs of the case. for example, in its use of the terms "design" and "functionality."

Subject to the foregoing Specific and General Objections, J&J Vision responds as follows:  J&J Vision did not attempt to "reverse-engineer" the LenSx, and accordingly has no responsive documents in its possession, custody or control regarding such alleged reverse engineering.  After a reasonable search and inquiry, J&J Vision has not been able to locate any non-privileged documents in its possession, custody, or control that are responsive to the remainder of this request.

**REQUEST FOR PRODUCTION NO. 37:**

All Documents relating to any patent, other than the Alcon Asserted Patents, that You allege relates to or is practiced by CATALYS.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 37:**

J&J Vision objects to this request to the extent it seeks information and documents protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or immunity.  J&J Vision also objects to the extent that this request purports to place an obligation on J&J Vision to obtain or provide information that is not in J&J Vision's possession, custody, or control, or that is publicly available or otherwise as readily available to Alcon as it is to J&J Vision.

Subject to the foregoing Specific and General Objections, J&J Vision responds as follows:  J&J Vision will produce non-privileged documents in its

**REQUEST FOR PRODUCTION NO. 79:**

All Documents concerning Source Code You have made available to third parties, including without limitation submissions to standards bodies, the Federal Drug Administration, other government agencies, or other Persons.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 79:**

J&J Vision objects to this request to the extent it seeks information and documents protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or immunity. J&J Vision also objects to the extent that this request purports to place an obligation on J&J Vision to obtain or provide information that is not in J&J Vision's possession, custody, or control, or that is publicly available or otherwise as readily available to Alcon as it is to J&J Vision.

Subject to the foregoing Specific and General Objections, J&J Vision responds as follows: J&J Vision will produce non-privileged documents in its possession, custody, or control concerning communications with governmental agencies, including the U.S. Copyright Office and the U.S. Food and Drug Administration, concerning the iFS Source Code, to the extent such documents exist and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 80:**

All Documents concerning the LenSx Source Code.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 80:**

J&J Vision objects to this request to the extent it seeks information and documents protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or immunity. J&J Vision objects that this request is overly broad and unduly burdensome, and on the grounds that it seeks information already in Alcon's possession, custody or control.

Subject to the foregoing Specific and General Objections, J&J Vision responds as follows: J&J Vision will produce non-privileged documents in its possession, custody, or control sufficient to show documents concerning the LenSx Source Code, to the extent such documents exist and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 81:**

All Documents concerning Your investigation or reverse engineering of the LenSx Source Code, including without limitation the factual bases for the allegations in Mr. Warren Foust's July 14, 2020 correspondence to Alcon and the Amended Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 81:**

J&J Vision objects to this request to the extent it seeks information and documents protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or immunity.

Subject to the foregoing Specific and General Objections, J&J Vision responds as follows:  J&J Vision did not attempt to "reverse-engineer" the LenSx, and accordingly has no responsive documents in its possession, custody or control regarding such alleged reverse engineering.  J&J Vision will produce non-privileged documents in its possession, custody, or control evidencing the factual basis of the allegations in Mr. Warren Foust's July 14, 2020 correspondence to Alcon.

**REQUEST FOR PRODUCTION NO. 82:**

All Documents concerning Your purchase of IntraLase Corp. and Abbott Medical Optics, Inc., including without limitation any valuations of the J&J Asserted Works, purchase agreements, and agreements not to use any IntraLase Corp. or Abbott Medical Optics, Inc. information.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 82:**

J&J Vision objects to this request to the extent it seeks information and documents protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or immunity.  J&J Vision objects that this request is overly broad, unduly burdensome and vague and ambiguous, and seeks information that is not relevant to any party's claim or defense in this case, is not likely to lead to the discovery of admissible evidence, or is not proportional to the needs of the case, for example, in seeking "all Documents" concerning the purchases of IntraLase Corp. and Abbott Medical Optics, Inc.

and labor, to the extent such documents exist and are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 133:**

All Documents relating to the dates and circumstances of J&J's knowledge of alleged infringement of J&J Intellectual Property by any Alcon product or technology.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 133:**

J&J Vision objects to this request to the extent it seeks information and documents protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or immunity. J&J Vision objects that this request is overly broad, unduly burdensome, vague, and ambiguous, for example, in its use of the term "knowledge."

Subject to the foregoing Specific and General Objections, J&J Vision responds as follows: J&J Vision is willing to meet and confer regarding the scope of this request.

**REQUEST FOR PRODUCTION NO. 134:**

All Documents concerning Your awareness of any and all third-party use of J&J Intellectual Property.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer A. Ward*

OF COUNSEL:

Michael A. Morin
Matthew J. Moore
Sarang V. Damle
Rachel Weiner Cohen
Carolyn M. Homer
Krupa Parikh
Holly K. Victorson
Ashley Finger
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Roger J. Chin
Joseph R. Wetzel
Kristine W. Hanson
Allison Harms
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 491-0600

S. Giri Pathmanaban
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 328-4600

February 10, 2021

Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
Jennifer A. Ward (#6476)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com
jward@morrisnichols.com

*Attorneys for Plaintiffs and*
*Counterclaim Defendants*
*AMO Development, LLC,*
*AMO Manufacturing USA, LLC,*
*AMO Sales and Service, Inc., and*
*Johnson & Johnson Surgical Vision, Inc.*

145

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 10, 2021, copies of the foregoing were

caused to be served upon the following in the manner indicated:

John W. Shaw, Esquire                           *VIA ELECTRONIC MAIL*
Karen E. Keller, Esquire
David M. Fry, Esquire
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Defendants and*
*Counterclaim Plaintiffs*

Jeannie Heffernan, Esquire                      *VIA ELECTRONIC MAIL*
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
*Attorneys for Defendants and*
*Counterclaim Plaintiffs*

Caroline Lourgos, Esquire                       *VIA ELECTRONIC MAIL*
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
*Attorneys for Defendants and*
*Counterclaim Plaintiffs*

Kristen P.L. Reichenbach, Esquire               *VIA ELECTRONIC MAIL*
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA  94104
*Attorneys for Defendants and*
*Counterclaim Plaintiffs*

Noah S. Frank, Esquire                              *VIA ELECTRONIC MAIL*
Gregg LoCascio, Esquire
Sean M. McEldowney, Esquire
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC  20004
*Attorneys for Defendants and*
*Counterclaim Plaintiffs*


                                    */s/ Jennifer A. Ward*
                                    _____
                                    Jennifer A. Ward (#6476)

# EXHIBIT D



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMO DEVELOPMENT, LLC, AMO MANUFACTURING USA, LLC and AMO SALES AND SERVICE, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 20-842 (CFC) (JLH) |
| ALCON VISION, LLC, ALCON LABORATORIES, INC. and ALCON RESEARCH, LLC, | ) ) ) ) | ███████████ |
| Defendants. | ) | |
| ALCON INC., ALCON RESEARCH, LLC, and ALCON VISION, LLC, | ) ) ) | |
| Defendants and Counterclaim Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| AMO DEVELOPMENT, LLC, AMO MANUFACTURING USA, LLC, AMO SALES AND SERVICE, INC. and JOHNSON & JOHNSON SURGICAL VISION, INC., | ) ) ) ) ) ) ) | |
| Plaintiffs and Counterclaim Defendants. | ) ) ) | |

**PLAINTIFFS' THIRD SUPPLEMENTAL RESPONSE TO
DEFENDANTS' INTERROGATORY NO. 5**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs and Counterclaim Defendants AMO Development, LLC, AMO Manufacturing USA, LLC, AMO Sales & Service, Inc., and Counterclaim Defendant Johnson & Johnson Surgical Vision, Inc. (collectively, "J&J Vision") hereby provide their third supplemental response to Defendants and Counterclaim Plaintiffs Alcon Vision, LLC and Alcon Research, LLC, Defendant Alcon Laboratories, Inc., and Counterclaim Plaintiff Alcon, Inc.'s (collectively, "Alcon") Interrogatory No. 5.

## **GENERAL OBJECTIONS**

1.      J&J Vision incorporates by reference its General Objections to Alcon's First Set of Interrogatories (Nos. 1-20) served on February 10, 2021.

## **INTERROGATORY RESPONSES**

## **INTERROGATORY NO. 5:**

Identify each and every LenSx system or component, or software, including but not limited to Source Code, that J&J has ever possessed, inspected, or viewed, and provide the following information about each of them: the quantity J&J possessed, inspected, or viewed, the people at J&J who possessed, inspected, or viewed them, the date, source, and other circumstances under which each Person at J&J came to possess, inspect, or view them, every use of them, all testing, evaluation, analysis, observation, or reverse engineering involving them, and all Documents

referring or relating to them, and the identity by production number of all Documents referring or relating to the facts requested herein.

## RESPONSE TO INTERROGATORY NO. 5:

J&J Vision incorporates its General Objections as if fully asserted herein. J&J Vision objects to the Interrogatory as overbroad and unduly burdensome in that it seeks information concerning "each and every" LenSx system or component that "any Person" at J&J Vision has ever "viewed," as well as "all Documents" concerning the same. J&J Vision further objects to the term "viewed" as vague and ambiguous. J&J Vision objects to the Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, work product immunity, or any other applicable privilege or protection.

Subject to and without waiving its General and Specific Objections, J&J Vision responds as follows: J&J Vision has inspected a LenSx machine with version 2.20.02 of the LenSx software installed.

J&J Vision expressly reserves all rights to supplement, revise, and/or amend its response to this Interrogatory as its investigation and discovery proceeds in accordance with the Federal Rules of Civil Procedure and the Scheduling Order.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5 (MARCH 3, 2021):

J&J Vision incorporates by reference its objections and responses to this Interrogatory as set forth above.

Subject to and without waiving its objections, J&J Vision provides the following further response:  In 2014, Abbott Medical Optics, Inc. ("AMO") obtained a used LenSx Laser system with version 2.20.02 of the LenSx software, ███████

████████████████████████████████████████████████

After receipt, AMO inspected the LenSx system at the direction of counsel.  The first time that J&J Vision had access to and could inspect any version of the LenSx source code was in late November 2020, subject to the parties' confidentiality agreement.

J&J Vision expressly reserves all rights to supplement, revise, and/or amend its response to this Interrogatory as its investigation and discovery proceeds in accordance with the Federal Rules of Civil Procedure and the Scheduling Order.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5 (OCTOBER 29, 2021):**

J&J Vision incorporates by reference its objections and responses to this Interrogatory as set forth above.

Subject to and without waiving its objections, J&J Vision provides the following further response:  In April 2014, at the direction of and in connection with discussions with legal counsel, Brent Schellhase inspected the LenSx Laser system, installed with the object code for LenSx version 2.20.02, that Abbott Medical Optics obtained from ███████████████████  However, J&J Vision did not have, and

could not inspect, any version of the LenSx source code until it was exchanged in this litigation in November 2020.

J&J Vision understands that Georg Schuele may have viewed the same LenSx machine that Abbott Medical Optics obtained from ██████████████.

Pursuant to Fed. R. Civ. P. 33(d), J&J Vision states that information responsive to this Interrogatory can be found at least in the following documents: JJSV_00449380; JJSV_00449381; JJSV_00449382; JJSV_00449407; JJSV_00456669; JJSV_00456671; JJSV_00456673.

## THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5 (NOVEMBER 4, 2021):

J&J Vision incorporates by reference its objections and responses to this Interrogatory as set forth above.

Subject to and without waiving its objections, J&J Vision provides the following further response:  Matthew Kraai viewed the same LenSx Laser system in conjunction with Brent Schellhase.

J&J Vision's investigation is ongoing.  J&J Vision expressly reserves all rights to supplement, revise, and/or amend its response to this Interrogatory as its investigation and discovery proceeds in accordance with the Federal Rules of Civil Procedure and the Scheduling Order.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Anthony D. Raucci*

_____
Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiffs and*
*Counterclaim-Defendants*
*AMO Development, LLC,*
*AMO Manufacturing USA, LLC,*
*AMO Sales and Service, Inc. and*
*Johnson & Johnson Surgical Vision, Inc.*

OF COUNSEL:

Michael A. Morin
Matthew J. Moore
Sarang V. Damle
Rachel Weiner Cohen
Susan Y. Tull
Carolyn M. Homer
Holly K. Victorson
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004
(202) 637-2200

Roger J. Chin
Joseph R. Wetzel
Kristine W. Hanson
Allison Harms
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA  94111
(415) 491-0600

S.Giri Pathmanaban
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA  94025
(650) 328-4600

November 4, 2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 4, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on November 4, 2021, upon the following in the manner indicated:

| | |
|---|---|
| John W. Shaw, Esquire<br>Karen E. Keller, Esquire<br>David M. Fry, Esquire<br>SHAW KELLER LLP<br>I.M. Pei Building<br>1105 North Market Street, 12th Floor<br>Wilmington, DE  19801<br>*Attorneys for Defendants*<br>*and Counterclaim-Plaintiffs* | *VIA ELECTRONIC MAIL* |
| Jeannie Heffernan, Esquire<br>Joshua L. Simmons, Esquire<br>Matthew A. Lembo, Esquire<br>KIRKLAND & ELLIS LLP<br>601 Lexington Avenue<br>New York, NY  10022<br>*Attorneys for Defendants*<br>*and Counterclaim-Plaintiffs* | *VIA ELECTRONIC MAIL* |
| Caroline Lourgos, Esquire<br>KIRKLAND & ELLIS LLP<br>300 North LaSalle<br>Chicago, IL  60654<br>*Attorneys for Defendants*<br>*and Counterclaim-Plaintiffs* | *VIA ELECTRONIC MAIL* |

Kristen P.L. Reichenbach, Esquire          *VIA ELECTRONIC MAIL*
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA  94104
*Attorneys for Defendants*
*and Counterclaim-Plaintiffs*

Noah S. Frank, Esquire                     *VIA ELECTRONIC MAIL*
Gregg LoCascio, Esquire
Sean M. McEldowney, Esquire
Hannah L. Bedard, Esquire
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC  20004
*Attorneys for Defendants*
*and Counterclaim-Plaintiffs*

                              */s/ Anthony D. Raucci*
                              _____
                              Anthony D. Raucci (#5948)

# EXHIBIT E



# EXHIBIT F

