# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**

**IN AND FOR THE DISTRICT OF DELAWARE**

**- - -**

| | | |
|---|---|---|
| **AMO DEVELOPMENT, LLC, AMO MANUFACTURING USA, LLC and AMO SALES AND SERVICES, INC.,** | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| **vs.** | : | |
| **ALCON LENSC, INC., ALCON VISION, LLC, ALCON LABORATORIES, INC. and ALCON RESEARCH, LLC,,** | : | |
| **Defendants** | : | |
| **--------------------------** | : | |
| **ALCON INC., ALCON LENSX, INC., ALCON RESEARCH, LLC, and ALCON VISION, LLC,** | : | |
| **Counter-Plaintiffs** | : | |
| **v.** | : | |
| **AMO DEVELOPMENT, LLC, AMO MANUFACTURING USA, LLC, AMO SALES AND SERVICES, INC. And JOHNSON & JOHNSON SURGICAL VISION, INC.,** | : | |
| **Counter-Defendants** | : | **NO. 20-842-CFC** |

**- - -**

**Wilmington, Delaware**
**Thursday, May 13, 2021**
**9:00 o'clock, a.m.**

**BEFORE: HONORABLE COLM F. CONNOLLY, U.S.D.C.J.**

APPEARANCES:

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
BY: JACK B. BLUMENFELD, ESQ. and
BRIAN P. EGAN, ESQ.

-and-

LATHAM & WATKINS LLP
BY: MICHAEL A. MORIN, ESQ. and
SARANG V. DAMLE, ESQ.
(Washington, D.C.)

-and-

LATHAM & WATKINS LLP
BY: ROGER J. CHIN, ESQ. and
(San Francisco, California)

-and-

LATHAM & WATKINS LLP
BY: RACHEL WEINER COHEN, ESQ.
CAROLYN HOMER, ESQ. and
HOLLY VICTORSON, ESQ.
(Washington, D.C.)

Counsel for Plaintiffs

SHAW KELLER LLP
BY: JOHN W. SHAW, ESQ.

-and-



APPEARANCES (Continued):

KIRKLAND & ELLIS LLP
BY: JEANNE HEFFERNAN, ESQ.
(New York, New York)

-and-

KIRKLAND & ELLIS LLP
BY: GREGG F. LoCASCIO, ESQ.
NOAH S. FRANK, ESQ.
(Washington, D.C.)

Counsel for Defendants

- - -



P R O C E E D I N G S

THE COURT: All right. Good morning. Please be seated.

All right. So this is my first civil proceeding, I think it's my first civil proceeding certainly in a patent case, so welcome everybody.

Let's have introductions. Mr. Blumenfeld?

MR. BLUMENFELD: Thank you, Your Honor. Good to see you again.

THE COURT: Likewise.

MR. BLUMENFELD: Jack Blumenfeld for the plaintiff from Morris Nichols.

At counsel table, Mike Morin, Roger Chin and Rachel Cohen from Latham & Watkins. Behind them, Sarang Damle, who's also from Latham & Watkins.

And then we have a number of people, Denise DeFranco from Johnson & Johnson sitting in the corner. Holly Victorson from Latham & Watkins, Carolyn Homer, Chris Cuzick and Dr. Vellturo sitting behind him, and then Brian Egan, my partner.

THE COURT: All right. Thank you.

MR. BLUMENFELD: And that's most of the cast here today, Your Honor.

THE COURT: Sounds good.



MR. BLUMENFELD: Thank you.

THE COURT: Thank you very much. Mr. Shaw?

MR. SHAW: Good morning, Your Honor. John Shaw for defendants.

Joining me from Kirkland & Ellis starting at counsel table, Gregg LoCascio, Jeanne Heffernan, Noah Frank, Hannah Bedard, and then from Alcon, Chris cook and Jeff Prokop.

THE COURT: All right. Thanks.

Let's deal with how you want to do the masks. First of all, we're going to have live testimony?

MR. MORIN: We are, Your Honor. We're going to have live testimony from what I understand from all four witnesses that you asked for and everyone is live for both sides.

THE COURT: All right.

MR. LoCASCIO: Correct, Your Honor. And to your question on masks, obviously, we follow your lead.

THE COURT: No, no. Actually, this is where I don't want the power of the office to make people uncomfortable. Right? You know, people think my jokes are funny now. Like I said, my wife and I talk all the time.

See, I really do want to invite candid. Nobody should be at all uncomfortable in saying I don't want to take my mask off. For instance, I mean, I've been

massive copying, that that delay only says that maybe if our injunction were about that little bit of copying, we waited too long, but we acted quickly upon knowing about that massive amount of copying.

So our point is this. It's only an evidentiary thing. It's not a penalty. It's not laches. It's not estoppel. Your Honor, it's just saying, it's logical. Look at what you did based on what you know. And I will tell you, we knew that there were similarities in the object code. There were telltale signs of copying in the object code. And if we came to this Court now and said we want a preliminary injunction and the nature of the theft were only that little bit of the object code, maybe we'd have a delay problem.

Our point is all of those years later, we never waited on our laurels, rested on our laurels when we had a reason to know or reason to believe that they had massively pirated our software.

Does that answer your question, Your Honor?

THE COURT: Yes.

MR. MORIN: Okay. So in any event, we asked for this modest tailored injunction, and I think what the other side is asking you to do is remarkable. Even though they don't dispute that they stole tens of thousands of lines of code, there's no explanation there is a dispute on that,



they want to keep selling pirated software. That's what they are asking the Court to do. It's like they are asking the Court if it were knock off Louis Vuitton bags or knockoff Air Jordans or pirated DVDs, that is what we have here. We have stolen software, and worse yet, they are using it to compete against their biggest competitor, J&J.

Now, turning to the merits, of course, you've asked us to focus on irreparable harm and so that's what we're going to do.

And as Mr. Blumenfeld indicated, we've brought two witnesses at Your Honor's request to speak on that issue. First we have Christian Cuzick, who is the CFO of J&J Vision. If you would please stand up, Mr. Cuzick. He'll be our first witness.

And then we brought Chris Vellturo, an expert economist. Can you please stand, Chris. And they will talk about the irreparable harm in this case.

And Mr. Cuzick will explain, Your Honor, that not only are J&J and Alcon the biggest competitors in the field, number 1 and 2, they hold more than 80 percent of this market combined, the laser surgery market combined.

And as Your Honor observed just last year in the f'real Foods case, when a patentee is forced to compete against products that incorporate and infringe its own -- it was a patent case -- patented inventions, the patentee



suffers a harm that is often irreparable. And you continued, Your Honor. An award of lost profits squarely supports a finding of irreparable harm. It may seem odd that a monetary award supports a finding of irreparable injury. But a finding of lost profits demonstrates that a plaintiff was deprived of market share and business opportunities in addition to lost profits.

And they don't dispute that we lost profits. You'll hear from Ms. Davis, their expert, later on, and she may disagree with the amount, the quantity, Your Honor, of lost profits, but she doesn't disagree with the fact, the fact that we are -- for every sale, for sales that they make in total, that we lose opportunities to make those sales. She does not dispute the fact that we lose profits.

Now --

THE COURT: Incidentally, just so though, supporting a finding of irreparable harm is different than constituting irreparable harm. I want to make sure. Number one, does Third Circuit law applies?

MR. MORIN: It basically does, Your Honor.

THE COURT: All right. Number two, economic damages alone is insufficient under Third Circuit law to justify the insufficiency of an injunction?

MR. MORIN: Purely economic, yes.

THE COURT: I want to make sure we're on the



same page.

MR. MORIN: I think if that's all you had. Of course, there's reputational, there's all sorts of other things. If all you had was economic and quantifiable economic harm, compensable economic arm, then I have to concede that.

THE COURT: Okay.

MR. MORIN: But I think, Your Honor, I learned early on, as you probably know, I'm not going to tell you that this means that it's a per se rule. It's your decision. You're familiar with that decision, but you do say and we do agree, and you cite the case law that it strongly supports a lost profits finding.

THE COURT: Squarely?

MR. MORIN: I don't want to overstate it. Squarely supports a finding of irreparable harm. That's not an outlier. You cite a number of cases for that in your decision, Your Honor.

There is a difference in f'real Foods. It was a permanent injunction case, Your Honor. You entered that at the conclusion of the decision. But if you look to the next slide, Apple v. Samsung, the Federal Circuit has made it clear that the irreparable harm analysis that you did is the same. It applies equally. That irreparable harm is the same in a preliminary and permanent injunction. And what

else did they say that's interesting here?

THE COURT: First of all, they said it's essentially the same. They didn't say it's the same.

MR. MORIN: That's fair. No. It says at the end, these considerations, counsel must treat the irreparable harm factor respectfully the same in both of them.

THE COURT: I'm looking at the first sentence.

MR. MORIN: Oh, sure. And what the --

THE COURT: Anyway, go ahead.

MR. MORIN: Please, Your Honor.

THE COURT: No.

MR. MORIN: We could say essentially the same would be fine also. The point of the first sentence is this, is that once you find the likelihood of success on the merits, everything else is the same, and we would encourage, and we would submit that in a case with such a lock-tight case on the merits, that effectively, you could view this case as would you enter a permanent injunction at the end of the trial based on the record we have in this case, and that's what the Supreme Court is saying. Essentially the same. Let me make sure I'm clear. It's essentially the same when you take the merits out of it, and here I think you could take the merits out of it. We saw that with our own eyes.



And this just isn't any competitor case, Your Honor. The dynamics of this market -- and by the way, it's sometimes referred to, Your Honor, as the FLACS market, the laser cataract surgery market, make the harm in this case particularly irreparable harm.

As Your Honor, we discussed last week, these products are sold on a razor-razor blade type of a model where the initial sale of the product brings only small, if any, profit, and that the money at the end of the day, it paves the way for the downstream sales. But unlike razors, Your Honor, these FLACS systems are massive and huge investments. They cost hundreds of thousands of dollars. They often require building of separate rooms. Their entire facility is dedicated to these and they're, of course, sophisticated medical products, Your Honor, that are used by surgeons and their staff. They require lots of training, practices and experience. So in that way, they are not like the razor-razor blade.

And unlike razors, Your Honor, once the staff and the center get used to using that machine in a purchase, they are unlikely to ever change. And I use the word "ever" here, Your Honor.

If we look at the next slide, here's when the companies came out with their products in 2011. Here we are ten years later. You will see no evidence. They say it's a



ten-year lifespan. You will see no evidence that the hundreds of machines sold in 2011 and 2012 are being taken offline, disabled or traded in in massive numbers. You will see no such evidence.

We don't know how long these surgery centers will keep the products. Will it be 15 years? Will it be 20? We do not know at this point in time. We do know it's longer than ten because they're out there, operational, and still going.

And you know what else you'll know? You'll hear this on cross-examination, Your Honor. You will find out that around one percent of most of customers get rid of their machines in any given year or switch to another competitor. One percent go to another competitor at most if you credit their numbers.

So once you've bought this machine, it's there to stay. It's a foothold in the door and it's just going to stay there for as long as that center keeps it, which is an unknown period of time.

Your Honor, we'll further prove to you that the full effect of these sales is nearly impossible to quantify, and you're going to hear Dr. Vellturo talk about this, so I won't spend of time about it. I will agree with our friends, that at the time of trial, the number of placements will be known. When we get to trial, they'll know how many



units they sold. But then the question is: What's the total, what's the full extent of the future revenues that are going to come off of that unit? That depends on how long it will be sold, how many procedures are done ten years from now.

In other geographies, Your Honor, they just got approved in China. We don't know how many procedures they're going to be doing on average in China in eight years, and most of these sales are OUS, Your Honor, outside the U.S. We don't know how many accessories and components are going to be sold, how many IOLs or OVDs are sold. Of course, the business opportunities are impossible to quantify. And you're going to hear Dr. Vellturo explain that.

You're also going to hear Mr. Cuzick explain that selling one of these machines has many other benefits that are not readily quantifiable. We're all familiar with the iPhone and we're all familiar with the ecosystem that comes around it as an example. People buy iPhone or Android and then they get hooked on those devices. By the way, you can use a Bose headphone instead of Air Pods. You can use a Garmin watch instead of an Apple watch. You can use Spotify instead of Apple Music, but we all know that it creates an ecosystem.

Now, there are differences. I'm sure, I'm sure

my very good counsel on the other side will say it's not like an iPhone for this and not like an iPhone for that, but that's the essential idea, that you create an ecosystem and it applies to the FLACS machine.

If we go to the next one here, you see that these machines have an ecosystem effect also, and Mr. Cuzick will explain this. That selling each of these units creates all sorts of other opportunities. For how long? 10, 15, 20 years. We don't even know. By the way, just like when trade in your BMW, perhaps or your Ford or whatever you drive, you may be more likely to get another one. We don't know if they're more likely to purchase their next machine from Alcon given that they purchased one today. The ecosystem effects are real and they are real significant.

THE COURT: Wait. You don't know?

MR. MORIN: You don't know. We don't know. What we can assume and what we believe based on what we've seen is people build up brand loyalty, but we can't quantify that right now. We don't know what the ultimate effect, how big they will be. We know that they will happen, we know that brand loyalty is a thing. We know that people get attached to their units. We know statistically that these units drive sales of other products, but the exact amount or even a ballpark amount years into the future is nearly



impossible or impossible to quantify.

THE COURT: So, wait. I'm a little confused.

MR. MORIN: Sure.

THE COURT: Is there brand loyalty or is there not brand loyalty?

MR. MORIN: There is brand loyalty. There is absolutely brand loyalty that you will hear about.

THE COURT: But when you said we don't know whether they are inclined to buy, if they are using an Alcon machine, another Alcon machine, how do you square that with --

MR. MORIN: It's a good cross-examination question. I misspoke. My point is we know there's brand loyalty, but the extent of it is what percentage of people are going to return to the same company ten years from now when they renew your units, just like for a BMW --

THE COURT: Well, how do you say there's confidence and you know there's brand loyalty?

MR. MORIN: Because we're going to see there's brand loyalty. Your Honor, that gets to a really good question. When people start using one of these devices, they start getting hooked on those devices. They get experience with it and they end up having preferences for those devices.

How do we know that, Your Honor? We had a



microcosm of it in the declarations of this case. Think about the declarations from the surgeons. You had two fine surgeons, Tipperman on the one hand and Hatch on the other. Dr. Tipperman on their side, Dr. Hatch on the other. They are very well-known and very good surgeons and I'm sure both of them were trying to testify as honestly as they could.

And you read Dr. Tipperman's report and Alcon can do no wrong. Alcon's machines are faster, according to him. They are easier to use. The service people are wonderful and he likes everything about the Alcon machine. And I'm not saying he's making that up or being fraudulent.

You take a look at Dr. Hatch, a Harvard professor and doctor, and she thinks just the same, but about J&J. Her experience is that one is faster. She gets used to it. She finds it easier to use. She finds it faster. She finds the service people at least as good as the Alcon people.

The perspectives of people are based on the experiences that they have and those end up reflecting -- we saw a microcosm of it in the declaration, but those are real, and Mr. Cuzick will explain how that happened and he'll prove to you that that happened.

And we'll see in this slide, the next slide, just a representation. We could build this out, Dave. But we see how this happens and, again, this is not esoteric or



theoretical. We see examples of it in the declarations that we saw.

People end up -- surgery centers buy the units. Everyone gets trained on them. The surgeons get trained on them, PAs get trained on them, the staff. They do all of this stuff, then they are using them and then they are writing articles on them and talking to their colleagues about them and lecturing about them. You see what ends up happening is similar to the microcosm that we saw from Tipperman and Hatch.

So the bottom line is, we will prove to you, hopefully, we have in the papers, but you hear from Mr. Cuzick and from Dr. Vellturo as well that there's irreparable harm.

Before I close, I do want to briefly address a question Your Honor asked on Thursday, and if Your Honor has questions before I do, you -- I do want to address a question that you asked last Thursday, Your Honor, which is whether J&J's size cuts against injunctive relief. You asked that question, how that plays in. We'll expand and we have more cases in the argument section later today. Of course, I will answer your questions now.

But we offer two points here. The first is that there's no question, large companies are, of course, entitled to injunctions. The question whether there's

We know the devices last at least ten years. Right? So maybe he says, maybe we compute -- please don't hold me to this if we get to trial. But maybe he says for some period of time less than that, let's assume the lowest ever use of the machine.

You have heard sometimes machines are 40 a year. We'll assume some really low procedure fee, something that's lower to the boundary. It's all going to leave us not fully compensated in addition to all the lost other things that we're going to get. And I will tell you, you saw the big driver, for example, of IOL. You saw how much it bounced from 2015 to '18?

I will represent to this Court, we are losing. There's no question we are losing IOL sales when we lose one of these sales. We're not going to be asked to be compensated in terms of lost profits for those IOL sales because it's too speculative.

I don't know how many IOL sales we're going to lose in seven years, I can't do that. But the quick and concise answer to your question is we have absolutely been irreparably harmed by all the sales in the past, but J&J and Alcon, I'm not trying to sit on my soapbox, but it is a good company.

They've been here in Covid relief. Alcon, other aspects of the company are probably great. Not thrilled



with what they did here. But the point is we are in the medical community. We do have a credo. We're not going to ask you to rip out machines that they already have and take a tool away from a doctor. We are not asking for that.

And if we lose an injunction when they are out there knowingly selling pirated software because I made the decision, or we made the decision collectively that we are going to not rip all the other machines off. If that's used against us in the analysis when there's such clear irreparable harm.

By the way, you heard we notified them about the copyright infringement in 2015. They are still resisting this injunction and Ms. Davis' approach says --

THE COURT: I thought the first notice was July 14, 2020.

MR. MORIN: It was. What did I say?

THE COURT: You said 2015.

MR. MORIN: Oh, that would be a mistake.

THE COURT: Let me turn it on you.

MR. MORIN: Yes.

THE COURT: So you filed a complaint in this action. You didn't allege copyright infringement.

MR. MORIN: We did not.

THE COURT: Your witness admitted. Credible witnesses, everybody. So the witness admitted, CFO, that



they didn't gain any information. Basically, you had in your pocket the same information, July 14th of 2020 that you did when you filed the lawsuit. Right?

MR. MORIN: Correct.

THE COURT: You didn't bring a copyright infringement case and mediation doesn't go well. You threaten it. And then in September is when you finally register for the copyright?

MR. MORIN: Well, the copyright registration is a sound bite that they try to go to. Sarang Damle was the general counsel, my colleague, of the U.S. Copyright Office. Registrations are a formality. You have to do it before you file suit. Nothing about you don't respect. We learned this in copyright law, in IP law in law school. You register before you file suit. That's what you have to do. It doesn't affect it.

There are presumptions that can weigh in by when you register it. That doesn't mean anything. It just doesn't. We went and registered it and we filed the suit. By the way, once we got into the suit -- I take some issue. I worked really hard. Mr. Frankel will tell you, I'm working nights, I'm working weekends. We get the source code around Thanksgiving. It's this massive source code. Then we put our experts to it. He's starting at Thanksgiving.



The idea that February 4th, which is ten weeks later, we file what I hope was a comprehensive PI motion, I think that's pretty darn fast. I don't think there's any delay in the two-and-a-half months with all the work that had to be done on the analysis.

We're damned if you do, damned if you don't. If we hadn't done all of that, they would say you didn't do enough analysis for the whole thing.

I will represent to you --

THE COURT: I think what troubles me most in terms of the timing, I'm with you on the Thanksgiving.

MR. MORIN: Yes.

THE COURT: But the fact that, you know, you raise it for the first time in July of 2020, when it's undisputed that as of 2011 to '14, during that time frame you did have some access and at that point had formed the same opinion that you had when you sent the letter on July 14th of 2020. That is the delay that, you know, I think is more concerning.

MR. MORIN: And, Your Honor, two things. One is, I think Your Honor observed, you don't want people running into Court and filing for preliminary injunctions.

THE COURT: Right. That's different than filing a claim.

MR. MORIN: I understand that. I understand

that. But the delay point, and this is what we knew at the time. We had some object code. And like I said, you could explain the object code. It was copying. There were telltale signs. They used some of the same directory features.

But if I leave from Latham & Watkins and Kirkland were kind enough to hire me, I know I could never get a job there and I use some of the same sentences and lingo that I used before and it might be copyright infringement, which it was.

But then you go into this thing. You know, that's basically the nature of the evidence that we cited. It wasn't 26,000, it wasn't a thousand, it wasn't anything like that lines of code.

So someone walks out of your house with your book. It's different than driving your kid's 529 plan. We learned about this when we got the source code. And whether we lined up the source code, it was not only different, they say quantitatively different versus qualitatively.

If you look at difference between petty larceny and grand theft auto, if you look at the different rents in kind of what we were dealing with, there's no doubt that we had enough that could you say looks like copyright infringement. But what changed when we got the source code, you find out they were copying and hiding 26,000 lines of



code, that they were deliberately deceptive on that. At that point in time, we acted quickly. We acted very, very quickly.

So, you know, the bottom line is, yes, we had every bit of knowledge or at least the ability to know in 2014 what we knew when we filed the complaint. Were we not litigious enough?

Did we look at it and think had a might not have been enough at the time that we wanted to pursue a lawsuit for some reason? Again, you can't get into the privilege reasons and all of that. Maybe we weren't litigious enough. Maybe we didn't do it. We had a patent case going. We saw what is patent infringement and we added it to the case. And then, holy cow, they stole your stuff and beat you to market and got the first mover advantage.

What else were we to do at that point in time, Your Honor? And the delay cases are very important. Think about why they are there. They are there because the reason we waited six years, it might show that we could tolerate them copying some directly names, then walking out. None of that suggests that we would tolerate. Can you imagine in 2014 if you had known that your competitor had copied 26,000 lines of code? We did not sit on that information, Your Honor.

THE COURT: All right. Let me ask you a couple



other things.

MR. MORIN: Yes.

THE COURT: You're not alleging loss of reputation, are you?

MR. MORIN: We are actually.

THE COURT: Really?

MR. MORIN: Yes.

THE COURT: How has the reputation of J&J Vision been harmed?

MR. MORIN: You can only talk about the delta in reputation and reputation is a consideration.

THE COURT: That's not loss. That's basically loss of potential future good reputation. In fact, I don't know if you can in light of the CFO's testimony. How has your reputation been harmed to date? I don't think there's any evidence on that.

MR. MORIN: I will admit and probably someone will flog me and say they disagree, but for purposes of this, I will admit when I speak of reputation, I speak of the delta between the lawful reputation that would have happened --

THE COURT: I'm going to rule against you on that. There has been a lost trade?

MR. MORIN: Absolutely.

THE COURT: Future profits.



MR. MORIN: Absolutely.

THE COURT: All right. And the goodwill that you would allege. Again, it's really future goodwill. You have not lost goodwill to date. Correct?

MR. MORIN: I disagree with that.

THE COURT: How? Isn't that really the same thing as reputation?

MR. MORIN: You know what, it's not. I will agree with my friend. It is not a knockoff Hermes bag. It's not a knockoff saying someone looks at it and says I don't know what I had. I think when you talk about that and I think it's cognizable in the law, but when you talk about that, lots of patent cases talk about goodwill and reputation because it's connected with the loss of market share and opportunity, but that's a delta.

No one went out there and said, if you are talking about reputation saying people are saying people are running around saying, look at J&J, they're so lame, they let Alcon copy their source code, no. That didn't happen. It may happen now, but that didn't happen. That is not something we're alleging. It's really the delta in the goodwill and the reputation.

THE COURT: But that delta -- that's where we come back to. Ultimately, really, it's all about your contention that you are unable to adequately quantify the

326

damages.

MR. MORIN: Yes.

THE COURT: That's really the end of the day.

MR. MORIN: Well, there are two ways to look at that. I hate to get pedantic, but there are two ways to look at that.

There are dollar financial harms that we're not able to fully quantify. I told you we're not going to go after future IOL sales, for example. Those are actual dollar damages that you can't fully quantify. And we don't know -- it's ten years, 15, it's 20. We don't know that. Those are things that are dollar damages but that we don't know the amount.

We have a whole other category --

THE COURT: At trial you're going to ask for LOI losses?

MR. MORIN: Oh, for sure.

THE COURT: Right.

MR. MORIN: I don't know how long in the future and how we're going to do that. We won't be able to capture it all.

THE COURT: You're going to have a damages expert say to the jury, these machines last a long time. I feel really comfortable for telling you that, for sure, they last for ten years. And by the time we're at trial you're

327

going to say, and probably credibly, they last 15 years. Then you can say, we can't predict what future procedures are going to be, but, you know, we can look to historical figures and we can approximate.

MR. MORIN: Ten years out? Ten years out, I'm not going to tell you that. I will represent in front of this Court -- by the way I heard on cross-examination, when you talk about paltry sales, they put up a chart for procedure, said it's [redacted] for a procedure versus a [redacted] difference when you implant a Catalys. That's a [redacted] jump, [redacted].

THE COURT: That was not a probative point for me. What's probative, the correlation was much stronger with phaco than the --

MR. MORIN: Oh, but that is a sideshow. My friend is a wonderful cross-examiner. You do understand that doesn't matter at all. There can be four or five things, each of which has an effect on how you're going to do it, the count. It doesn't mean cutting the legs off of one where we showed it probatively doesn't mean it caused you irreparable harm. That's like saying you stole my watch or you stole my car. One of them is a bigger deal than the other. They're both hurting you. They're both irreparable harm.

That was elegantly done as a parlor trick, but

328

they won't find one --

THE COURT: I didn't think it was a parlor trick. If anything, maybe it is that the expert went a little too far suggesting, if not explicitly saying that the causal nexus was tied specifically to that as opposed to it was tied or correlated to a bunch of different things. Anyway, let's not get hung up on that.

MR. MORIN: That's what I think he would say he meant.

THE COURT: All right.

MR. MORIN: But I've never seen a better case of irreparable harm.

THE COURT: Look, that doesn't carry the day. I don't know you. You've done a great job. That's vouching.

MR. MORIN: Forget the vouching. Show me a case with a stickier market. Show me a case where the customer of sale matters that much. Show me a case where the product is there so long? Razor-razor blade as Dr. Vellturo said, you change razors, you change phones, you change all these things. Forget I have never seen it. Show me a better case of irreparable harm where that customer is lost forever in a relatively small universe of potential sales? I want to see that case.

THE COURT: It's not my burden to do that.

329

MR. MORIN: But it's a negative issue. Right? I've shown you a lot of cases where it's only based on past. I've shown you cases where the competition is enough.

There's a whole series of those cases incidentally from the Federal Circuit that the direct competition strongly suggests that -- we're out of the gate at the 80 yard line with the fact that there's lost profits, maybe they're 90, and then you add in all these other factors. So, no, I can't vouch for it. That's not a fair way to go. And we didn't cite cases that were worse, because I'm not aware of any cases that are worse, but they didn't either.

One of the best experts in the United States says she has never seen a stickier case. I mean, what more is there for irreparable harm? What more is there than an enormous product that's going to be there for a minimum of ten years they say and some indiscriminate length of time. In 400 cases she has never seen anything stickier.

THE COURT: All right.

MR. MORIN: I think this is the high watermark of the irreparable harm. The only, the only thing -- when you look at this case, the only thing -- I'm talking against my interests, Your Honor, and I hope I've proven my case and I hope this comes across as credible rather than weakness.

I think there are only two things to talk

to make clear to the appellate court that my review of the record, some preliminary back background information.

The plaintiffs, which are part of Johnson & Johnson, sued defendant Alcon for patent and copyright infringement stemming from Alcon's manufacture, use and sales of the LenSX system.

J&J Vision, I am going to call it J&J just as the parties did, and Alcon compete in the FLACS market, the femtosecond laser assisted cataract surgery market. J&J manufactures the Catalys precision laser system and Alcon measure the competing LenSX system. The Catalys system is mostly purchased by hospitals and ambulatory surgery centers and the customers pay a per-procedure fee for each treatment.

J&J also sells other consumable products for cataract products and they had established today a correlation between their sales of the Catalys and other related products, so their pull-through theory has some evidentiary basis to it. That doesn't mean I have accepted it. It's a colorable theory.

Most of their evidence from the Catalys system comes from the per-operation fees and there's a direct correlation there. I don't think there's any dispute about that.

The motion for the preliminary injunction



concerns J&J's assertion of its copyright in the iFS femtosecond laser operating software.

It's undisputed that there's overlapping copyright. Right? And there's a credible case to be made, very credible, that the overlapping software lines were intentionally copied. There's powerful evidence of that. There's powerful evidence that it was knowingly concealed.

Now, whether that knowledge can be attributed to Alcon today or current employees of Alcon, a completely unanswered question. And as I understand it, again, undisputed, the individuals who were in the employ of the predecessor, I guess J&J that had the design software are no longer with Alcon. That's undisputed.

MR. MORIN: Yes, but after February 23rd, after we filed the motion.

THE COURT: Okay.

MR. MORIN: One of them left we were told on February 23rd.

THE COURT: Got you. Didn't know that or didn't recall that.

MR. LoCASCIO: Yes, but none of the others.

THE COURT: All right. The source code was produced. Again, I think it's undisputed, it was in November of last year. It's part of discovery in this case.

The preliminary injunction was sought in early



February and I don't attribute, I don't think that's a delay and I don't fault J&J. In fact, I actually welcome that kind of review before a party takes an extraordinary step of seeking the extraordinary remedy that a preliminary injunction would find.

Now, the copyright claim was added to the case, a pre-existing patent case in this court, and it was added in September of 2020, I believe. Correct? September of '20? I can't recall the exact date, but that's my recollection. And J&J first apprised Alcon of J&J's knowledge and belief that copying had occurred on July 14th, 2020.

It's also undisputed, I believe, that as of 2014, J&J had in its possession all of the knowledge that formed a basis of its assertion on July 14th, 2020 that Alcon or former employees of Alcon had unlawfully copied the challenged source code. Again, I think that's all undisputed.

In deciding whether to a grant a preliminary injunction, first of all, I apply the Third Circuit law. The parties agree on that and I consider four factors -- the likelihood of success on the merits, irreparable harm to the moving party if the injunction is denied, irreparable harm to the non-moving party if the injunction is granted, and, four, the public interest. And I quote there from Ramsay



against National Board of Medical Examiners, 968 F3d. At page 256.

Now, that test is perhaps the most common articulation of the test by the Third Circuit in the last five to ten years. I think in prior years, and as other circuits do, the Third Circuit had referred to the third prong involving a balancing of the equities between the parties and the fourth prong, an overall balancing of the public interest along with the other factors. But either way I think it has been demonstrated by the record today, counsel all agree what are the legal tests, that I must apply the four prongs. And I think counsel agree as well and it's certainly clear from Third Circuit case law that the first two factors, the irreparable harm and the likelihood of success on the merits and the irreparable harm that is to the moving party, if injunction were to be denied, those are gateway factors. That's the terminology the Third Circuit used, and so both of those must be established before the Court proceeds to consideration of the third and the fourth factors.

As far as the first factor, the likelihood of success, the moving party must make that demonstration with evidence that it's significantly better than negligible. That is, they have to demonstrate a significantly better than negligible chance of success on the merits.

As far as the second factor, irreparable harm, there, the movant must demonstrate that it is more likely than not to suffer irreparable harm in the absence of the preliminary relief it seeks.

A continuing copyright violation does not give rise to presumption of irreparable harm, and that's a quote. It's not a quote, but that principle was articulated by the Third Circuit in the TD Bank case found at 928 F3d. 259, pages 280 to 81. And there the Court said, and I quote, "A bare violation of a statutory right enshrined in the copyright act does not establish irreparable harm."

Now, let me speak first to the likelihood of success factor. I think this factor has been established. I think really the only question out there is the causation factor that you all have discussed. And I'm not satisfied that inoperability by itself isn't sufficient. I tend to think it is in a preliminary injunction phase involving software where over 26,000 lines have been copied and, frankly, the evidence is overwhelming that it was intentionally copied.

I think the fact there was intentional copying speaks to the importance of the software that's at issue, and although not -- we didn't really address very much in the argument, but I think the fact that, even if one aspect of a copyrighted work infringes renders the work in its



entirety at least under certain circumstances to be a violation of the act. I think that also informed my decision.

To prove copyright infringement, two elements must be proven. The ownership of the valid copyright and the copying of constituent elements of the work that are original. I think that's what we have here. We have constituent elements. Showing unlawful copying itself has two elements. The plaintiff must show there was actual copying and material appropriation, and that's from a Third Circuit decision in Tanksley at 902 F3d. 165, page 173.

And because not all aspects of a creative work are legally protected, for example, the ideas underlying particular expression, the material appropriation prong asks whether there is substantial similarity between the original and the copy once legally unprotectible elements are filtered out, and I just think that has been consistently demonstrated here.

There has been unrebutted evidence that the iFS Version 2.02 was created by agents of J&J Vision, that the program in question required at least a modicum of creativity, and I think every indication is that the plaintiffs possessed a valid copyright. As I said, the parties acknowledge, both of them, that the LenSx system



contains overlapping code and I think the creative choices inherent in the design, structure and implementation of the software are protected by the copyright act.

Alcon may have reasonable arguments on precise scope of the infringement, but I do think sufficient evidence in the Schmidt declaration demonstrates the core functions of, or some core functions, and that's really all that's required, of the LenSX system were built on top of the appropriate code. So I would find in favor of the movant as far as the first factor.

But it's on the second factor that the movant I think cannot meet its burden. So let's talk about really why that is.

So, first, I do think there was delay that counsels against irreparable harm and, again, I don't think that delay occurred between November and February. The delay that I think counsels against a finding of irreparable harm is the fact that -- and, again, the credible testimony of the CFO, Mr. Cuzick, I believe, was that J&J was in possession as of 2014, of all the information it had that justified in its mind its assertion as of July 14, 2020, that there was a copyright violation.

By that time there were over a thousand machines that had been installed by Alcon, but no claim had been brought. There is no evidence that was adduced that would



even suggest that prior to July of 2020, J&J took steps to give notice to Alcon that its software was in violation of the copyright act to allow it to correct the situation, to threaten it with a lawsuit, with a preliminary injunction. No letter, no phone calls, nothing suggests that.

And it's true that delay caused by a plaintiff's good-faith effort to investigate an infringement or to determine how serious an infringement is does not preclude a finding of irreparable harm. I'm citing there the Third Circuit case in BP Chemical at 229 F3d. 254, page 264. But that's not what we have here. I mean, we had arguably, right, a good-faith effort sometime before 2014 to take a look at the code and limit it to the object code, but you don't see anything else that, any further effort beyond that. And as I say, and I find it very compelling what we didn't see was any effort whatsoever to try to tell Alcon that they were engaging in any kind of violation or copyright, to stop that, and that's especially telling since the parties were already engaged in litigation and apparently had set up a procedure by which they could arbitrate or resolve disputes between the parties. So the delay I find probative of a lack of irreparable harm.

The second factor is, and really, the basis, as I see it, the central core of the argument made by the movant that irreparable harm, is that it's unable to

reasonably quantify damages, and I find to the contrary, that there can be reasonable estimates put forward, and ultimately that I'm sure will be put forward to a trier of fact in this case about the damages that have occurred if, in fact, it were to be determined ultimately a copyright violation.

Under the Third Circuit law, an economic loss does not constitute irreparable harm, and the parties agree, if you can quantify the loss under the Third Circuit case law, irreparable harm does not exist.

So typically, what do we look for to establish irreparable harm? Well, loss of control of reputation, loss of reputation, but that hasn't occurred here. And, again, I credit counsel for maintaining his credibility before the Court by acknowledging that and, again, I would also credit the testimony of the CFO and the argument that was being made. And it's a creative argument to suggest that the delta, as you say, the loss of, or I should say the difference between the current reputation and the enhanced reputation that could have been gained, which is unpredictable since it's in the future in a sense. So there hasn't been a loss of reputation, and for that reason I don't think there has been a loss of goodwill.

Now, then we get to the case of lost profits, and it's really, the question boils down to can you quantify



that not with certainty, but to a reasonable degree of certainty. And I think you can. I think Ms. Davis presented credible testimony that you can do that. And I think that -- I don't want to mispronounce the name here -- I apologize. Having a name like Colm, I'm sensitive to how people pronounce names. Dr. Vellturo essentially in my mind, especially with Footnote 222, concedes that it's an ability to come up with a reasonable estimate of damages.

J&J argues that its injuries are difficult or impossible, and they can be challenging, that's for sure, to measure, because the amount of any lost revenue inherently depends on unknowable future conditions, and those conditions include the lifespan of the FLACS system, future demand for operations and all sorts of other conditions that we can't even fathom what might exist. But Dr. Vellturo himself cites the future demand and estimates and placement forecasts in his declaration, and J&J relied on historical data for a per procedure fee profit it generates.

J&J, as we heard the testimony from the CFO, itself produces estimates. It has expectation about the performance of J&J's vision. Compensation of the executives of the, of J&J Vision, including the CFO, are tied in part to the performance relative to those expectations, which tells you that J&J believes that they're reasonable, there's



a degree of reasonableness to them.

As I say, and I will just point to, just so the record is sufficient, I'm going to cite DI 48, paragraph 29 through 31 in Figure 2 and 3. DI 44, paragraph 11, and DI 44, paragraph I think are examples of where J&J itself relies on estimates and suggests strongly to me that there's a reasonable basis for those estimates and that it would be, in fact, expected that a damages expert could come up with a reasonable estimate of damages that would compensate J&J adequately.

J&J did establish that we have a sticky product here. I don't think there's any question. But it hasn't demonstrated to my satisfaction that that stickiness would result in a loss of goodwill or reputation, and at most I think it established that there are challenges to estimating lost profits and monetary damages, but not that it would -- that such damages could not be calculated on a reasonable basis.

J&J has implicitly acknowledged that its harms can be adequately remedied with damages. In its opening brief it made it "clear" that it will seek damages for all of Alcon's infringing activity unquote, including for copyright infringement from the already installed LenSX system.

I do take J&J's point and a credit to the



culture of the company and, frankly, it sounds like Alcon, from what I understand, cooperative efforts to deal with the recent health crisis we all face. Both companies I think are not in the business of trying to harm doctors and, more importantly, their patients by taking healthcare devices like this off the street. So I don't hold that against -- the fact I brought up the point that I thought it was probative or informative that J&J somehow thought it could calculate damages to a sufficient degree for machines put on the street yesterday but not tomorrow. I understand why J&J took the position and it should be commended not only -- and not punished for doing that.

But I still remain on the point and I go back to what Dr. Vellturo acknowledges in a footnote, is he can come up with a range and a conservative estimate of damages that would account for even lost profit streams that would stem from the existing installations, and that tells me that he could do it for the installations that will occur between now and the date of a verdict.

So considering the evidence in its entirety and in its entirety, I find that J&J has not met its burden to demonstrate, that it will more likely than not suffer irreparable harm. That's not to say it won't be able to demonstrate that it has suffered significant harm, but it will be quantifiable to a reasonable degree in my

estimation. All right?

Now, before you all leave, let's hear quickly and then I'm going to take a couple minutes. I'm going to rule on a pending motion I will ask you about.

MR. MORIN: I just wanted to thank the Court for its attention and to have us back in here. It's good to be back in person and we appreciate your audience and spending the whole day with us.

THE COURT: All right.

MR. LoCASCIO: Of course, from both sides. I think this is the first time I've been in a live courtroom in a year. You have been really hospitable.

THE COURT: I feel the same way. We've had actually proceedings. I've never stopped coming to work. My kids joke I'm the only person not affected by Covid in the United States, but I was, and I'm sure everybody has been. It's actually so refreshing to see faces.

And, in fact, do you all know? I saw one of my kids. Did the CDC just come out today with a ruling about masks or something? And what did it rule? They're gone. Right? Yes.

MS. VICTORSON: Fully vaccinated, you can go outside, anywhere. Any environment without a mask.

THE COURT: All right. Well, and I was hesitant to do it this morning, but I am so far away from you, that I



thought that was safe.

Anyway, okay. So let's just quickly turn to the other pending motion. All right. I'm not going to rule on the motion to dismiss, but there's a motion to strike affirmative defenses.

Now, we've got -- you know, here's the thing. There's nothing but conclusory assertions in these affirmative defenses and some number of them at the very least in fraud.

So does anyone want to voluntarily withdraw these affirmative defenses and move on? I'm happy to read them into the record. I'm going to basically grant the motion to strike. I m going to give you leave to amend. And, you know, there's different case law out there. You can find district courts across the country, some allow conclusory things to move forward, some don't. Judge Farnan, Judge Andrews tended to strike them and that's my inclination.

MR. LoCASCIO: Given Your Honor's guidance on this, consistent with the motion for leave to amend, we will voluntarily withdraw them providing that obviously we could come back to the Court in the event that we wish to add one.

THE COURT: Well, I mean, I will just grant it. Okay.

MR. LoCASCIO: Fine.



THE COURT: If you want further exposition, I'm happy to give it to you.

MR. LoCASCIO: I don't think we need it.

THE COURT: I think you need to establish good cause if you want to proceed with one of these defenses, okay, and, you know, if you had good cause, you would be able to set forth in some detail the nature of the allegations to comport with Rule 9 and I guess we can debate whether Rule 9 applies. I think they have to be -- the rule is ambiguous, is it sufficiently pled. All right.

MR. LoCASCIO: Understood, Your Honor.

THE COURT: Understood. All right. That takes care of the motion to strike. I've got the motion to dismiss I have not looked at. All right. Anything else?

MR. MORIN: Not from J&J, Your Honor, other than to repeat the thanks for the courtesy of you and the courtroom staff and the court reporter.

THE COURT: All right. Well, thank you all. Yes. My court reporter is the best.

MR. LoCASCIO: The same, Your Honor.

THE COURT: All right. And so I would also reiterate, because it's so refreshing in these cases, to have reasonable counsel, is keep it up, and you've got really good Delaware counsel who have reputations for that, so if you just maintain that. Now, I don't know. Maybe



you've had terrible discovery disputes in front of a magistrate judge that I'm not aware of.

MR. LoCASCIO: No.

MR. MORIN: No.

THE COURT: Great. It's really refreshing and I think the clients are really well served by it, you know. It's a better way to litigate.

MR. MORIN: Appreciate you saying that when we lost the motion.

THE COURT: Well, it was a good motion. Okay. Thank you, all.

(Counsel respond, "Thank you, Your Honor.")

(Hearing concluded at 5:36 p.m.)

- - -