# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMO Development, et al, )
Plaintiffs, )
v. ) Civil Action No: 20-842-CFC-JLH
Alcon Vision, et al, )
Defendants. )

United States District Court
844 King Street
Wilmington, Delaware

Friday, December 17, 2021
2:00 p.m.

BEFORE: THE HONORABLE JENNIFER L. HALL
United States Magistrate Judge

APPEARANCES:

JACK BLUMENFELD, ESQ.
MORRIS NICHOLS
and
SARANG (SY) DAMLE, ESQ.
RACHEL W. COHEN, ESQ
LATHAM & WATKINS
For the Plaintiffs

KAREN KELLER, ESQ.
SHAW KELLER
and
JEANNE M. HEFFERNAN, P.C.
NOAH FRANK, ESQ.
GREGG F. LoCASCIO, ESQ.
KIRKLAND & ELLIS
For the Defendants

Also Present:
Denise DeFranco, Johnson & Johnson





THE COURT: Good afternoon, everyone. This is Jennifer Hall. We are here for a discovery dispute teleconference. This is AMO v. Alcon; Civil Action No: 20-842-50-JLH.

Who do we have on the line for Plaintiff starting with Delaware counsel?

MR. BLUMENFELD: Good afternoon, Your Honor. It's Jack Blumenfeld from Morris Nichols for the Johnson & Johnson companies; also on are Sy Damle and Rachel Cohen from Latham & Watkins and Denise DeFranco from Johnson & Johnson. And with Your Honor's permission, Mr. Damle will be presenting for the Plaintiffs today.

THE COURT: Fantastic. Good afternoon to all of you.

Who do we have for Alcon?

MS. KELLER: Good afternoon, Your Honor. It's Karen Keller from Shaw Keller; with me from Kirkland & Ellis are Jeanne Heffernan, Noah Frank and





Gregg LoCascio.

THE COURT: Good afternoon to all of you have. So I can tell you all that I have read the letters carefully. I've looked at the attachments as well. I think I have a good understanding about -- well, I'm not sure I have a good understanding about what's disputed, but I have read the letters carefully.

So let's hear first from the movant, who, in this case, is Alcon.

MR. LoCASCIO: Thank you, Your Honor. It's Gregg LoCascio from Kirkland & Ellis. I see you've obviously read the materials, but to sort of set the relevance of this and the dispute as it stands, let me just say this, which is since the beginning of discovery in this case Alcon has been seeking from J&J factual information about what we short-handedly call it's 2014 investigation into the copyright allegations.





Because we learned, and actually before they even disclosed it to us, because it's been sort of dribs and drabs and sort of tooth and nail to get any information on this, that they had access to an Alcon's LenSx machine, as it's called, and the object code for that machine. And there's two discovery requests that go after this, Interrogatory 5 and 17. And J&J has not given us any factual information on that. At one point they said go take deps and figure it out for yourselves. In that case we said, look, there are facts here that need to be disclosed and then we can take some of these sort of downstream issues and what that leads to.

And it's in our request, it's in the rog, it's in the letter, we're asking for things like, okay, what testing, evaluation, analysis, observations, reverse engineering was done by J&J of Alcon's product in 2014.

And that's relevant and already at issue in this case because J&J's decision did not bring suit until 2020, and that's a six-year delay in doing so. Based on nothing more than the very same information they had from 2014 was before Judge Connolly's preliminary injunction hearing. It's a large part his rationale for denying injunctive relief. And J&J, to this day, continues to seek permanent injunction relief as well as other equitable remedies like disgorgement.

And Judge Connolly said Exhibit A, 344, 13 to 18, it's undisputed that as of 2014 J&J had in its possession all of the knowledge that formed the basis of its assertion in July of 2020 that Alcon or former employees of Alcon had unlawfully copied the challenged source code.

And J&J counsel didn't dispute that. Indeed, they agreed. At the hearing itself, again, 323, 4 to 6,





Mr. Morin, lead counsel for J&J said the bottom line is -- to quote, the bottom line is, yes, we had every bit of knowledge or at least the ability to know in 2014 what we knew when we filed the complaint. And then they went further, to try to mitigate this, they put it further at issue. Mr. Morin, 323, 19 to 24, quote, the reason we waited six years, it might show we could tolerate them copying some directory names. None of that suggests we would tolerate what he described as wholesale copping. Quote, we did not sit on that information, Your Honor. Yet, they refuse to rely on any of the factual analysis or investigation actually done.

THE COURT: Let me just stop you right there, counsel. So taking what you say as true, why do you need more than what you already know? So that's the operative fact is that they had some information in 2014 and they didn't do anything. I'm struggling. So





maybe you can address why it's relevant to a claim or defense in this case. I'm struggling to understand.

MR. LoCASCIO: For sure. So I'll take the relevance piece first, which is, for instance, when their engineers and software folks analyzed the code in 2014, there were documents and analysis that we can look at the log, and there clearly are those that weren't legal advice. They weren't prepared for legal advice. It was someone did a factual comparison.

And the relevance of that is a couple issues, first of all, let's say when they looked at that they said, hey, this stuff is out there and everybody knows it, it's not anything anyone considers of any value. Certainly that would be relevant to both the merits and the damages claims in this case.

If they went on further and said things like --

THE COURT: Let me ask you





this, why is it relevant to the damages claim? So there's a three-year statute of limitations, right, so aren't they trying to prove damages from 2017 to 2020?

MR. LoCASCIO: So they're arguing for both disgorgement of Alcon's profits. They're saying it's a head start advantage, such as lead time advantage to getting in earlier and the result of that would be they couldn't have stopped it. So we have a mitigation argument that would come into play on that.

Because if they had raised this -- so let's also say in the software engineer's analysis they say, yeah, this is something that would take a grad student six weeks to write, for instance, as opposed to War and Peace copyright protection.

If that's the case, then had they ever raised it to us in 2014, '15, pick a year between then and 2021,

there's a cost or value as to what it would have taken to correct that to mitigate. They have taken no such steps. The theories are, I guess, three-fold.

THE COURT: I'm sorry. I just want to make sure I understand. But you're saying they could have done something in 2014 to mitigate damages for a tort that had not yet occurred because it wasn't -- I mean, they're limited to infringement from 2017 to 2020, right?

Is there any case you have that says you have a duty to prevent a tort from occurring that that's mitigation of damages?

MR. LoCASCIO: Well, just because the damages there that they would be able to seek, and I don't actually know that that's what their view of the scope of damages are on the statute and three-year look back. But to put that as a bookmark for a second,





the point is just because you might be limited in damages, laches and all these other defenses look to when you knew the tort was going on. It's if the tort began in 2017 --

THE COURT: You just said "laches. Is laches a defense in copyright cases? Because my recollection is that it's not.

MR. LoCASCIO: It is. And the Petrella case speaks to this. The Petrella case says it is not a defense to actual damages. It is a defense for equitable relief of which there are at least two prongs they're seeking. One, an injunction. Two, disgorgement. And the language --

THE COURT: Okay. I got you. So you're talking about equitable relief and disgorgement?

MR. LoCASCIO: Correct.

THE COURT: Okay.

MR. LoCASCIO: That's laches per se. But the case, Pertrella,





supreme court case on this issue says, quote, a Plaintiff's delay can always be brought to bear at the remedial stage in determination appropriate injunctive relief and assessing the profits of the infringer. So those two prongs, the case is abundantly clear, it's not off the table. It's not a non-entity in the copyright context.

THE COURT: All right.

MR. LoCASCIO: So if I can make one or two other points on this, Your Honor. If you look at the chart, they don't argue, and J&J has not said this is irrelevant or it's improper. They say it's privileged and they've given us all that they should be required to give us.

In their own submission they have essentially the lawyers version of what they want to say and what they said at the PI hearing. They've not addressed how they haven't opened this door even further. But they say we





disclosed this, it's their brief, Page 1. J&J disclosed exactly what those investigators did. And then they say inspect object code and that they've observed, quote, hundreds of similarities.

Okay. Well, they've offered that. They put that at issue. That can't be enough that we just have to trust that. Obviously what those investigators did is a factual question that's subject to discovery.

And in their chart, like there are four rows. And maybe on rows one and two they feel fine about what they've done. They told you the number of systems. They told us who did the inspection. Look at row 3, if you have their letter in front of you, the request is all testing, evaluation, analysis, observation, or reverse engineering. And their response is, we disclosed that they inspected the object code.

Well, that's just great except it omits all of the actual substance of that analysis and what was done. And when they filed suit in this case they admitted, and it was made clear at the PI hearing, that that analysis in 2014 is all they had when they decided they have a basis to bring a claim here.

So looking at what that analysis is, was, to the points we just talked about, is relevant. And they don't allege anywhere that this is work product. They don't go there. They specifically now said it took them a while to get there, that they're not relying on it.

And if we look at the log, this is our Exhibit F, [redacted]. It took seven months for us to determine what even exists. And only in the





window between our filing this motion, despite, I don't know, a half a dozen meet and confers on this. And their response, they even produced the photographs, which no one could credibly say are attorney/client privileged.

And yet they still hold [redacted]





[redacted] That's not attorney/client privilege. It's not a request for legal advice or the provision of legal advice. The law on this is abundantly clear, that the facts you have, the facts your software engineer determines based on comparing A to B of these is never privileged. If it was in a memo of the client maybe you'd have to do some redactions around it. [redacted] who they asked, look, compare this code to that code.

THE COURT: You suggested that they have injected this 2014 investigation into the litigation. I understood their letter to be that they're not relying at all on the 2014 investigation in the litigation. It seems to me, and we'll hear from them, but they gave you some responses on this





to try to get you to go away but that their overall view is that it's privileged.

Isn't the underlying fact what the device looked like? And so you have access to that. You know what the device looked like. If they have pictures taken as part of an internal analysis that the investigation -- counsel, I don't understand why that wouldn't be privileged.

MR. LoCASCIO: Sure. [redacted] So the pictures of the product do nothing other than show that they got their hands on a device. So that certainly isn't a substitute or any comparison --

THE COURT: So why do you even want them? So that's the first question. But keep going. Go ahead. I understand what you're saying.

MR. LoCASCIO: They gave us

the photos because that's not the battle, that's sort of the sideshow. But it was a privilege claim that nobody could even stand up and credibly say. So the photos were produced. We weren't pushing for we want the photos. What we're saying is your factual analysis, assessment, comparison of the code done by one of your business people. Not in anticipation of litigation under their own assessment of where they're drawing the lines on work product, is a factual document in their possession about the issue at hand, meaning what the code that they claim is copyrighted and our code.

How similar are they? What was their assessment of it? What's the value of it. Is this stuff that's copyrightable, public domain, et cetera? And that being done by a business person. Why we wanted it is because it undermines potentially various aspects of their claims, both factual elements





of the copyright claim and the big issue on value of this code to damages.

The fact that they waited six years certainly is indicative of that latter piece, but also of the former, that this wasn't of substance; it didn't matter. [redacted]

And in some ways it's even worse now. It's like a sword/shield scenario where they want to tell a story that the information that they had was sufficient and it was egregious. And they certainly didn't sit on their rights and let damages accrue or let the market place play out while they chose





not to act. And the documents that actually reveal that, they haven't provided at all. They exist and we see them on the log.

And just at base, the standard for relevance on this, even if those issues weren't in the case, is broad. But I think squarely here for the various reasons we talked about it's relevant. And there's no credible privilege assertion. I mean, that's a core problem here. Just that they might think we've given you enough or we don't want to give you this, there has to be a basis to withhold these documents.

And an analysis by a business person, of two technical products, could never be attorney/client privilege. It might in a certain circumstance satisfy work product scenario but they're not asserting that and they can't.

So I feel like while I understand that the process -- and I





want to make sure you understand our position -- this one is they're the ones withholding materials that are requested and relevant. It's a rog response plus documents. And by them not giving us anything, and only by pulling teeth getting the barest of facts, doesn't meet the standard for them. And they can't meet any burden to show this is somehow immune from discovery on privilege grounds.

THE COURT: So they said there isn't anything else that isn't privileged. Are you saying you don't believe them that there isn't anything else? Or are you saying these communications that they say have an attorney on them and were made for the purpose of getting legal advice are not privileged?

MR. LoCASCIO: So I'm not saying I don't believe that they've said there's nothing else. I think the idea they said this is a dry well, we've

given them everything, is belied by the fact that we keep finding information, and the log itself reveals there's others.

But the question of -- Your Honor's question was, okay, but if there's lawyers on it am I saying it's not privileged? One, I'm saying if it's not providing or giving -- it's not requesting or providing legal advice, it's not privilege. And just because you put in a log, a privilege description doesn't make it so.

But the predicate of your question that there's lawyer on it also isn't true. [redacted] the facts





themselves still aren't privilege. But they're not claiming work product.

Because they're in a spot, I gather, and I think the reason they're not is because during this whole period, it seems as if we got this answer filed from their submission, they never put a preservation order in effect.

And I do have questions about whether document by the natural process of time or else-wise don't exist anymore, that's for another day. [redacted]





[redacted] That's never privileged.

THE COURT: All right. Let me ask you this, you have suggested -- well, they've admitted that they were on notice of a bunch of facts. They said it in open court; they said it in their letter here. They said they didn't have the source code. You're not suggesting that they actually did have the source code back then and they're trying to hide it, are you?

MR. LoCASCIO: I am not. But the difference between source and object code is this, if their position was you couldn't make an assessment full stop, so we had no way of knowing anything because we didn't have the source code, okay, that's not true. And they did this whole analysis and they went to all these lengths for a year-and-a-half looking at it without the source code.





And when they sent the letter in July of 2020, and when they filed these claims in the case in 2020, they didn't have source code then either, yet they were comfortable saying they had basis to sue us, and indeed say we find dozens of examples of egregious copying. Okay. Well, those examples, if you found them in 2014, either you didn't think they were important or they're not really there in your own mind or you thought that there was some other frailty to their copyrightability because you did an analysis and you sat on it for six years and did nothing.

At a minimum that would impact how and what relief you ought to be entitled to at an equitable level.

THE COURT: Right. And you will be able to make that argument to Judge Connolly just as you just made it to me. I think I understand your position.

Let's switch and hear from

the other side and then we'll give you a chance to have the last word.

MR. DAMLE: Thank you, Your Honor. This is Sy Damle. So let's start with the question of whether we're even relying on any of these materials from 2014, and the findings from this inspection. The answer is no. That inspection was just of object code, which is not really human readable.

So it showed, and we disclosed this to them, and they relied on these disclosures to defeat our preliminary injunction motion, we disclosed to them that that inspection of the object code showed hundreds of similarities in file function and folder names, folder structure, error messages, other on screen instructions.

So all of that material we disclosed to them. Those were the results. Those were the observations that they ask for from our 2014 investigation. So all of that





information, Mr. LoCascio suggested that we hadn't provided any, to quote him, factual information, simply not true. The letter at that Exhibit 3 that they quoted, they block quoted in their opposition to our motion for a preliminary injunction provided exactly those facts.

So we're not relying on any of that. Because now since after we filed suit we got access, each side got access to each others' source code, which is human readable. And that is the basis of our infringement claim now. Because we can see exactly what was copied. You saw 26,000 lines of identical code, not just the hundreds of individual words that we saw in the object code. So that's the basis of our claim now.

As I said, we had provided exactly what they asked for in the interrogatories. They asked for analysis and observation. And we gave





them exactly that. We gave them the fact that there were hundreds of similarities, that there was a parallel file folder structure, that there were similar onscreen instructions and error messages. Those were the findings of the 2014 inspection. They understood that when filing their PI brief because they referred to those findings as being findings that came out of the 2014 inspection. So I have to admit some bewilderment at Mr. LoCascio's representation that we didn't provide any factual information.

Third, he mentioned that as a grounds for relevance, laches. Alcon has not pled laches as a defense in this case. And they had the opportunity to amend their answer in June or July of this year, after they had relied on our delay to defeat our preliminary injunction motion, and even then did not plead a laches defense.

THE COURT: But they've





generally pled that your ability to obtain equitable relief should be limited due to the delay in filing suit. Isn't that enough to sort of get into the case what they're telling me on the phone today, which is that to the extent you're going to seek that extreme equitable relief, that the Court should take into consideration the fact that you delayed in suing?

MR. DAMLE: They have the ability to make that argument. And they have that ability to make that argument with all of the information that they already have at hand, as you suggested with questions, Your Honor.

THE COURT: Okay. You can --

MR. DAMLE: I think that's all we have to say about that. We provided them with everything that they've asked for, even though there's questions about its relevance, but we provided it. So there's nothing more

that we can do.

THE COURT: Okay. Let me ask you this, I just want to ask you about some of the language in your letter. For example, I'm looking at the third page and it says, "Second, as discussed, there is no additional relevant evidence related to the 2014 inspection." So what does that mean, "there is no additional relevant evidence? It's kind of a hedge. I just want to make sure you're not aware of other information or documents related to that inspection that haven't been logged.

MR. DAMLE: No, I'm not aware of any other information, Your Honor.

THE COURT: All right. We'll turn it back over for the last word.

MR. LoCASCIO: Thank you, Your Honor. I want to address a few points that were just made. I'll take





the one first, which I think from your question, doesn't move the needle on the issue. But just to be abundantly clear on this question of what we pled, at the end of the same PI hearing transcript, Exhibit A, for a submission, Judge Connolly makes it perfectly clear that with respect to those affirmative defenses they were all pled at the outset before we had any of this information, before we even had the bare bones rog responses from them, he dismissed without prejudice and said point blank, 355:13 I'm going to give you leave to amend; 355:23 I'll just grant it, when we asked him about coming back after discovery. And we have been asking them and working with J&J I think for six or seven months to try to get a satisfactory answer to Rog 5 and Rog 17.

And so the fact that we haven't gone to court to amend until we get the answer from them certainly shouldn't play to their advantage.





Second, Your Honor made a point that said at the end when I finished a moment ago, I could make that same argument. I can make the lawyers' argument that they must have known, could have known, should have known it wasn't worth what they claim. But as you all know, that's only going to get me, I don't even think "so far" is the right word. It's not going to get me very far because I'm going to need to point to evidence to that effect. And the evidence of what they knew and what their analysis showed is, I'm sure amongst many other documents, at a minimum [redacted].

And so just because I might be able to try to be persuasive on the topic at a PI hearing where there was no evidence in, it was essentially it's a PI hearing, it's a lawyers' argument, the judge has to make a decision. Judge





Connolly says, look, all I know is some of this stuff was clearly known in 2014. And that's not okay with me.

Ultimately, now, the merits of that, the relevance of it to mitigation, et cetera, is going to have to come out of what the investigation was. And that's the last point I want to make. Because we heard counsel on the other side said, we provided -- I wrote it down, we provided them our observations from 2014. Again, he said, we gave them, quote, the findings the inspection. That's just not what the record or any of the exhibits bear out. The interrogatory response doesn't say anything. It just says these got (unintelligible) inspection, full stop.

They point in their letter to an exhibit, which is in Exhibit 3, which is a letter from their CEO during the mediation process that lays out what they think the story is. As you can imagine, it's written by lawyers, it

certainly spun from their perspective. That's not the findings -- it didn't even reference that that was a 2014 investigation. They sort of the kept that behind the curtain until we found it out mid PI briefing.

The point of the matter is they just said we've given them the findings of our investigation and our observation. No, they have not. They told us how the lawyers there in a letter want to describe it. It's nowhere in the interrogatory response, which they're obligated to do. The documents that bear it out, the factual investigation itself is the proof in the pudding for that assertion they make and that statement they say we have the ability to make and test.

And so the only basis for them not giving them to us is attorney/client privilege. And they don't really take any steps because they can't, to justify, it's withholding on





that ground. The rog answer is woefully deficient on what happened in that investigation. And the documents that factually are needed to test the assumption and allow us to plead our defenses is being withheld improperly on a privilege claim that doesn't exist.

THE COURT: All right. Thank you, counsel. Stand by for just a moment and I think I can be in a position to give you a ruling in just a moment or two.

MR. LoCASCIO: Thank you, Your Honor.

(Off the record.)

THE COURT: Okay, counsel. I'm ready to rule on this dispute. Alcon's motion to compel will be denied. As an initial matter, having reviewed the record, heard the arguments today, it appears to me that there is no additional non-privileged information that has not already been disclosed. I've reviewed J&J's responses to





Interrogatories No. 5 and 17, and I agree with J&J that they are responsive and that they don't have to be supplemented further.

The only thing I would request the parties to meet and confer about is J&J's letter that suggests that it has disclosed who folks told about the responses -- or about the results of the investigation. And instead of pointing to the interrogatory responses, pointed t to the privilege log. So discuss that amongst yourself as to whether the interrogatories need to be updated instead of pointing to a privilege log for a response.

Again, as we discussed during the oral argument, I don't think there are any sword and shield concerns here. J&j has represented that it's not relying on anything from 2014 to prove infringement. As we also discussed, there's a three-year statute of limitation on copyright claims since,





2014 is outside the limitations period anyway.

There was some discussion about J&J hiding underlying facts and citing to Upjohn. That's not really a situation we have here. So it's not as if there was some historical events that occurred and lawyers interviewed folks about it, and that the party is trying to hide the underlying facts relevant to the event.

Here we have what J&J has represented to be an internal expert, slash, consultant investigation about a competing product. That's not really what Upjohn concerns. And I really don't think there are underlying facts that are being hidden here. The underlying facts are the content of the software and the quality of Alcon's products in 2014. And it's Alcon's product, they know what the facts are.

I'm also skeptical with Alcon's position that the additional

information they want, the additional information; that is more information about why J&J didn't sue them back in 2014. I'm skeptical that that's relevant to a claim or defense in the case. If it is relevant, it's relevant to the Court's ultimate decision about whether or not to grant an equitable remedy.

But the operative facts are that Alcon had information back in 2014, that Alcon as we said now suggested copying and they chose not to sue. That fact is undisputed -- excuse me, that J&J had information back in 2014. So that fact is undisputed.

Alcon can and it has already made that argument to Judge Connolly. And J&J has listed people knowledgeable about that in their rog response.

There was a suggestion in the letter that there may have been some spoliation. On this record I am not persuaded that there was spoliation or





that the circumstances here suggest any spoliation.

So I think that addresses all of the disputes are before me today.

Anything further from counsel for Alcon?

MR. LoCASCIO: Your Honor, it's Gregg LoCascio for Alcon. With respect to Rogs 5 and 17, we understand your ruling on that. We'll confer with the other side about the supplementation vis-à-vis, things that are currently sitting only in the log or other places.

And insofar as them identifying individuals on this score who did the investigation, you know, ultimately I expect there's going to be discovery of those folks. And to the extent these issues may come back to you on whether documents that are on the log are properly privileged or whether those witnesses cannot talk about the investigation and as comparison they did the facts there of, you know, will be





for another day.

But we certainly don't -- I don't think you've decided and we don't agree and we certainly haven't asked for in camera review or to walk through this, but if all the materials they've identified are the scope and existence of all the documents, that may be one thing. But certainly a different question as to whether they're all adequately and properly subject to privilege in our view.

THE COURT: I don't know what to say in response to that, except for that I'm not going to say anything further, besides what I've already said. Nor am I going to make a determination of whether whatever principle I've decided today is applicable to some future dispute that hasn't arisen.

Anything further from J&J?

MR. DAMLE: Just to clarify one point about the statute of limitations. There was material that





was not available to us in 2014, such as the source code; we also added claims about FDA documentation.

So I just want to be clear that, for the record, that we're not conceding that we're only entitled to damages going back three years from when we filed suit. Because there was other information that became available to us only after we filed the suit. So I just want to make that clear for the record.

THE COURT: Fair enough. And understood. I don't think that my -- well, here's what I'll say, I don't think my ruling depends on a finding that the statute of limitations only goes back to 2017.

At the end of the day you represented that you're not relying on anything from 2014 to prove infringement. So that is what it is. Anything else?

MR. LoCASCIO: Just -- and I don't want to belabor this. I

appreciate the amount of time you've given us today, Your Honor. But if now on the J&J side they're going to say, no, no, they're going back for damages, the fact that they're not relying on the information from 2014 isn't (unintelligible).

So if they ultimately are seeking damages behind that, then what was going on in that window? Not just what they choose to rely on, but what factually was known, is absolutely relevant.

And so maybe we'll end up back on this depending on how they decide to play their damages. But Your Honor I think was pretty clear, and I get that it's not the entirety of the basis for your analysis, but certainly it's a piece and a lot of the discussion was around what matters in 2014 and why it would matter.

THE COURT: Okay. We're going to end this for today. You all





can work this out in a meet and confer. We'll take it up again if you've got open issues.





All right, everyone. Have a good one.

ALL RESPOND: Thank you, Your Honor.

(Teleconference concluded at 2:42 p.m.)





State of Delaware )
)
New Castle County )

CERTIFICATE OF REPORTER

I, Stacy L. Vickers, Registered Professional Reporter and Notary Public, do hereby certify that the foregoing record is a true and accurate transcript of my stenographic notes taken on December 17, 2021, in the above-captioned matter.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 20th day of December, 2021, at Wilmington.

*/s/ Stacy L. Vickers*
Stacy L. Vickers, RPR