1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF DELAWARE

3    AMO DEVELOPMENT, LLC,       )
     AMO MANUFACTURING USA,      )
4    LLC, and AMO SALES AND      )
     SERVICE, INC.,              )
5                                )
              Plaintiffs,        )
6                                )   C.A. No. 20-842-CFC
        v.                       )
7                                )
     ALCON VISION, LLC, ALCON    )
8    LABORATORIES, INC., and     )
     ALCON RESEARCH, LLC,        )
9                                )
              Defendants.        )
10

11

12

13                   Friday, January 13, 2023
                           1:00 p.m.
14                       Oral Argument

15

16                       844 King Street
                     Wilmington, Delaware
17

18    BEFORE: THE HONORABLE COLM F. CONNOLLY
      United States District Court Judge
19

20

21    APPEARANCES:

22

23            MORRIS NICHOLS ARSHT & TUNNELL
              BY:  JACK B. BLUMENFELD, ESQ.
24
              -and-

25

```
 1    APPEARANCES CONTINUED:

 2

 3                 LATHAM & WATKINS
                   BY:  MICHAEL A. MORIN, ESQ.
 4                 BY:  RACHEL RENEE BLITZER, ESQ.
                   BY:  SARANG V. DAMLE, ESQ.
 5                         Counsel for the Plaintiff

 6

 7

 8                 SHAW KELLER
                   BY:  JOHN W. SHAW, ESQ.
 9

10                            -and-

11                 KIRKLAND & ELLIS
                   BY:  JEANNE M. HEFFERNAN, ESQ.
12                 BY:  GREGG F. LOCASCIO, ESQ.
                   BY:  NOAH S. FRANK, ESQ.
13                 BY:  RYAN MELD, ESQ.

14                         Counsel for the Defendants

15

16

17

18

19

20

21

22                    _ _ _ _ _ _ _ _ _

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3          (Proceedings commenced in the courtroom beginning at

 4      1:00 p.m.)

 5                  THE COURT:  Good afternoon.  Please be seated.

 6                  Mr. Blumenfeld.

 7                  MR. BLUMENFELD:  Thank you, Your Honor.

 8                  Jack Blumenfeld from Morris Nichols for the

 9      plaintiffs.  And with me at counsel table, all from Latham

10      & Watkins, are Mike Morin, Sy Damle, and Rachel Blitzer.

11                  THE COURT:  Great.  Thank you.

12                  MR. BLUMENFELD:  Thank you.

13                  THE COURT:  Mr. Shaw.

14                  MR. SHAW:  Good afternoon, Your Honor.

15      John Shaw for defendants.  Joining me at counsel table

16      from Kirkland & Ellis, Gregg LoCascio, Jeanne Heffernan;

17      and second row, Ryan Melde and Noah Frank.  And then from

18      Alcon, in the gallery, Jeff Prokop.

19                  THE COURT:  Okay.  Thank you.

20                  All right.  So let's deal with the Stamm

21      motion.  All right?

22                  MS. HEFFERNAN:  Good afternoon, Your Honor.

23      For the record, Jeanne Heffernan on behalf of Alcon.

24                  The question here is whether Ms. Stamm's

25      established the required causal nexus to recover indirect
```

1    profits for IOLs, intraocular senses, which themselves

2    indisputably do not infringe any of the asserted

3    copyrights in the case.  They don't contain any of the

4    copyrighted materials.

5         Ms. Stamm -- just to be clear, Ms. Stamm seeks

6    indirect profits on other products as well, beyond just

7    IOLs.  That is not part of our motion.  We will take that

8    up at another time.  We don't -- I just want to be clear

9    for the record.  We don't concede a nexus as to those

10   other products.

11        But focusing on the IOLs, what contains the

12   infringing code here, the allegedly infringing code, is

13   the LenSx laser.  Intraocular lenses contain no source

14   code.  Alcon IOLs are not required --

15        **THE COURT:**  Let me stop you there.  Here's the

16   thing:  So I actually -- I'll just tell you what gave rise

17   to this.  I was ready to write an opinion going your way.

18   I think they're stretching the case law, but then I get to

19   this Page 9 of their brief, and it throws me for a loop.

20        It says that Stamm's opinion only included

21   those IOL sales to customers who had purchased a LenSx,

22   and only after the LenSx purchase had occurred.

23        And I don't think -- and they save it for the

24   end.  It's like the last page, right.  And I've got -- and

25   then I thought, wait, this is different than I thought.

 1    And if it's truly that narrow, then I'm thinking, well,

 2    what else is she supposed to do?

 3            So where I am is, I don't really get the facts

 4    because neither of you kind of say, hey, here's a report,

 5    here's exactly what she says.

 6            And so I -- that's why I said, you know what?

 7    I'm not going to spend any more time on this, I'm going to

 8    bring you all in, and let me figure out.

 9            So do you agree that she is only including IOL

10    sales, one, to customers who had purchased a LenSx; and

11    two, only after the LenSx purchase had occurred?

12            Is that right?

13            **MS. HEFFERNAN:**  That is correct, Your Honor.

14            **THE COURT:**  Okay.  Now, my second question,

15    they don't answer and you don't answer this.  So do these

16    LenSx -- I don't know how these operations work, these

17    doctor operations.

18            So in other words, if you're selling to a

19    doctor's practice and all that doctor's practice does

20    is -- what do you call it?  FLAM --

21            **MS. HEFFERNAN:**  FLACS.

22            **THE COURT:**  FLACS, right.  FLACS or FLACS, is

23    that how you pronounce it?

24            **MS. HEFFERNAN:**  Yes.

25            **THE COURT:**  -- FLACS surgery, well, then that

1    seems pretty reasonable, what she's doing.

2            On the other hand, if an individual practice is

3    doing all sorts of other things, besides FLACS surgery,

4    well, then I think that might be a problem, but it may not

5    because it may not be possible for them to come up with

6    anything more granular, that they're kind of stuck with

7    the way you do your books.

8            So do you get where I'm coming from now?

9            **MS. HEFFERNAN:**  I think I do.

10           **THE COURT:**  All right.  So address those

11   issues, please.

12           **MS. HEFFERNAN:**  Sure.  So in these practice

13   groups, one, the groups that have a FLACS machine, which

14   could be any manufacturer's Femtosecond-Laser-Assisted

15   cataract surgery machine, or LenSx accounts -- if we want

16   to focus specifically on LenSx accounts for the moment --

17   a LenSx can be placed into an account that is already

18   doing maybe another manufacturer's FLACS surgery.  You can

19   have two different FLACS machines.

20           **THE COURT:**  Okay.  So I could be, basically, an

21   ophthalmologist --

22           **MS. HEFFERNAN:**  Yes --

23           **THE COURT:**  -- and I've got a bunch of

24   different machines in my practice --

25           **MS. HEFFERNAN:**  Right.

7

 1              THE COURT:  -- one room is LenSx, one room

 2     something else.

 3              MS. HEFFERNAN:  Could have a Catalys in another

 4     room.  Exactly.

 5              THE COURT:  Right.  Okay.

 6              MS. HEFFERNAN:  Or the vast majority of the

 7     procedures at that specific surgery site could be done

 8     manually even in the presence of a FLACS machine, whether

 9     that's a LenSx or some other device.  And in fact

10     97 percent of surgeries worldwide are done manually.

11              And even the doctors, who you'll hear from at

12     trial who do FLACS surgeries, also do manual surgeries.

13     And in some cases, have multiple FLACS devices at their

14     accounts.

15              THE COURT:  All right.  So all that weighs in

16     favor of you with that.  And I want to hear from them,

17     obviously.  But, you know, then I'd still be off to, okay,

18     well, I think your motion has legs.

19              But then what I'm going to guess they're going

20     to come up with is, and I don't know, but -- because it's

21     not in the papers, is, well, how do you do your books,

22     right.  And it may be -- like, I think they're stretching

23     it.

24              MS. HEFFERNAN:  Right.

25              THE COURT:  You know, the case law is -- what

1      the case law says is, you can't use, basically, the gross

2      revenue for the company.  That's -- you know, we're not

3      going to do that.  Right?

4              **MS. HEFFERNAN:**  Or even gross revenues for

5      entire product line.

6              **THE COURT:**  Well, see, that's where we need to

7      get in.  It could be.  Like, I think if it's General

8      Motors and it's the particular car, it may be because

9      depends where the parts -- what else are they used for,

10     right?  It could be.

11             But I think Congress put this in the statute

12     because it foresaw the difficulty with parsing these

13     revenue numbers.  And so there is somewhat, if you will,

14     of a burden on the defendant.  I mean, if you structure

15     your books so that there is no way to parse this out,

16     well, then that may be what this statute is all about.

17             So how do you book the revenue to a doctor's

18     practice?

19             **MS. HEFFERNAN:**  Before I get there, could I

20     just continue to finish here your first?

21             **THE COURT:**  Yes.

22             **MS. HEFFERNAN:**  Because there's some more at

23     play in the surgery site.

24             **THE COURT:**  Okay.

25             **MS. HEFFERNAN:**  So in addition to a FLACS

1    machine, whether you do FLACS or by manual, you've got

2    other machines already in place at those surgery centers

3    that are part of the cataract surgery procedure.  You have

4    phacoemulsification machines.  You may have other products

5    like a digital marking machine to help place an advanced

6    technology IOL correctly into the capsule.

7            There are lots of other pieces of equipment

8    that all make up part of the cataract surgery.

9            IOL is what gets implanted at the end.  It is

10   the only piece of equipment that the patient leaves with

11   and has in his or her eye forever.

12           And the decision-making process for which IOL

13   to implant, you'll hear from both sides' experts say, has

14   nothing to do with the manufacturer of the FLACS machine.

15   It has to do with what the patient requires.  What kind of

16   needs does that patient have for seeing at the end of the

17   cataract surgery.

18           **THE COURT:**  Right.

19           **MS. HEFFERNAN:**  So those IOLs, not tied one to

20   one with a manufacturer of a FLACS machine --

21           **THE COURT:**  Right.  I've got that.

22           **MS. HEFFERNAN:**  -- or any other machine.

23           **THE COURT:**  Right.

24           **MS. HEFFERNAN:**  And, in fact, the sales

25   procedure, kind of getting to your second question, is --

1    for IOLs, is to, all of the manufacturers of IOLs, place

2    their IOLs on consignment at surgery centers and

3    hospitals.  The hospitals don't actually buy the lenses

4    from the outset at all.

5              **THE COURT:**  It's only when they use them.

6              **MS. HEFFERNAN:**  It's only when they're used.

7    And when they're used, they're used based on the doctor's

8    decision for that particular patient and that patient's

9    needs, not based on the FLACS machine or --

10             **THE COURT:**  All right.  Now, let me just ask

11   you, if the experts address this:  Do you have exclusive

12   supply arrangements, such that if you're Dr., you know,

13   Smith, you've got your practice, you're only buying IOLs

14   from one supplier?

15             **MS. HEFFERNAN:**  That's not how it happens.

16             **THE COURT:**  No.

17             **MS. HEFFERNAN:**  There's no evidence of that in

18   the record at all.  In fact, the evidence is just the

19   opposite.

20             For example, for Alcon -- and I'm sure they'll

21   talk about J&J and their practices.  But for Alcon, the

22   salesperson who goes in to sell a FLACS, the LenSx,

23   doesn't have responsibility for IOLs or any other piece of

24   equipment.  And, in fact, the surgical side that has the

25   FLACS devices, the LenSx devices in them, totally separate

1    business at Alcon from the IOL business.

2         **THE COURT:**  All right.  Let me put the breaks a

3    little there, okay?  Because, you see, this is what I

4    meant, I want oral argument.  There's something to their

5    side.

6         You've got PowerPoints.  You definitely think

7    that LenSx sales drive IOL sales.

8         Now, they go too far, you know.

9         **MS. HEFFERNAN:**  Right.

10        **THE COURT:**  I get that.  And my only question

11   is:  Are they going too far, though, because your books

12   don't allow for parsing, in which case then, I think we're

13   going to have to look at this statute.  Because this

14   statute contemplates, right, that burden shift at some

15   point.

16        Agreed?

17        **MS. HEFFERNAN:**  I agree.  I agree, but the

18   burden shift is not at the causal nexus step.

19        **THE COURT:**  All right.  Well, let's get to the

20   facts first.  So let's go with the facts.

21        **MS. HEFFERNAN:**  Let me go back to the anchoring

22   documents.

23        **THE COURT:**  Yeah.

24        **MS. HEFFERNAN:**  Okay.  There's no question,

25   those documents are there and that language is used.  What

1    those documents show is some correlation.  Causation?  No.

2    They do not establish causation.  They do show

3    correlation.

4              **THE COURT:**  Okay.

5              **MS. HEFFERNAN:**  Which is why, Your Honor, we

6    did not move on the $772-million figure Ms. Stamm

7    calculates based on those documents.

8              **THE COURT:**  Right.  But then I want to know:

9    How do you come up with the 40 percent, or whatever the

10   percentage was?  What was it?  It's been a couple weeks.

11   Yes, 40 percent of U.S. --

12             **MS. HEFFERNAN:**  Are you going to the -- oh, the

13   deductions that Ms. Davis takes, the 38 percent?

14             **THE COURT:**  Is that what she's getting that

15   from?  Is she basically getting 772 from the PowerPoint?

16             **MS. HEFFERNAN:**  No, no, no.  No, not -- no.

17             **THE COURT:**  All right.

18             **MS. HEFFERNAN:**  So Ms. Stamm calculates

19   $511 million of what she calls "pull-through sales," so --

20   allegedly with a causal nexus.  We disagree; say it's

21   correlation, not causation.

22             She arrives at the 511 by using those documents

23   you just referred to, Your Honor.

24             **THE COURT:**  Okay.

25             **MS. HEFFERNAN:**  In her reply report, she does a

1    totally different set of calculations not based on those

2    documents; instead, she bases them on the difference, the

3    delta in IOL penetration at surgery centers or accounts

4    that have an Alcon phaco machine and a LenSx machine on

5    the one hand, and accounts that have an Alcon phaco

6    machine and a J&J Catalys on the other.

7            She does a comparison between those two

8    accounts in terms of the penetration of IOLs that are sold

9    into each of those accounts and does a calculation based

10   on that to say, there is pull-through of $772 million at

11   accounts where there is a LenSx placed with an Alcon

12   phaco, versus accounts where there's a J&J Catalys placed

13   with an Alcon phaco.

14           Again, we say that's correlation, not

15   causation.  But she performs that calculation.

16           For sake of this motion, we don't challenge

17   that.  We do challenge the merits of that, but that's not

18   what we have before Your Honor.

19           The only thing we have before Your Honor is her

20   3.1-billion-dollar calculation, and that's because it's

21   legally flawed.  That's the calculation where Ms. Stamm

22   says, "I can show you pull-through for the entire pot of

23   IOL revenues of 3.1 billion dollars" --

24           **THE COURT:**  Right.  But that 3.1 -- this is

25   what I didn't get until I got to Page 9 of their brief.

1    That 3.1 is two customers who had purchased a LenSx, and

2    it includes revenue from those customers only after they

3    purchased the LenSx.

4            Is that right?

5            **MS. HEFFERNAN:**  Yes.  But, Your Honor, may I

6    add to that?

7            **THE COURT:**  Hold on.

8            **MS. HEFFERNAN:**  Okay.

9            **THE COURT:**  So then, tell me about now -- and

10   don't answer anything else.  I only want to know --

11           **MS. HEFFERNAN:**  Okay.

12           **THE COURT:**  -- what do your revenue books look

13   like that you give to them?

14           Like, in other words --

15           **MS. HEFFERNAN:**  Right.

16           **THE COURT:**  -- and if you could put one on the

17   screen, that would be great.

18           Is there a way that they could break that down,

19   or is it, no, you just have IOLs -- I get some IOL sales.

20   I'm going to tell you right now, they should be allowed to

21   put in front of the jury that there's a connection between

22   some IOL sales and LenSx sales.  I think that's fair.  All

23   right.

24           Now, should they be allowed to put the entire

25   revenue of the business?  Of course not.  I think that's

 1    what the case law is really clear about, right?

 2            And then the only issue is:  Should they be

 3    allowed to put the entire IOL sales in front of the jury?

 4            And that could be misleading, and I think it

 5    could be wrongly admitted under the law.  But where are

 6    you going to draw the line?

 7            So tell me.  Show me your books or tell me.

 8            **MS. HEFFERNAN:**  So in terms of -- they are

 9    separate books between the LenSx and the IOLs.  And both

10    at J&J and at Alcon, neither company tracks IOL deductions

11    on an IOL basis.  Like, they don't do it on a product

12    basis.  So the P&Ls at both J&J and Alcon are not done at

13    the product level basis.  They're done at the business

14    level basis.

15            And so that's why, for example, when we analyze

16    our deductions, our expert Julie Davis, which is the

17    subject of their *Daubert* motion, has to use a document

18    that created those P&Ls specifically for a particular

19    purpose.

20            And we'll get into that.  I think Mr. Damle is

21    arguing that motion later.

22            **THE COURT:**  Oral argument now --

23            **MS. HEFFERNAN:**  Okay.

24            **THE COURT:**  We've got to get this one done.

25            **MS. HEFFERNAN:**  Sure.  But --

1    THE COURT:  So I want to see how if affects

2    that one.

3    MS. HEFFERNAN:  But I think what's important

4    here in terms of sales of the IOLs, is that Ms. Stamm

5    admits that not every IOL sold into a LenSx account is

6    even used with a LenSx.

7    THE COURT:  Why is that compelling?  Why does

8    that matter?

9    MS. HEFFERNAN:  Because there's no connection

10   at all that that --

11   THE COURT:  But why --

12   MS. HEFFERNAN:  -- between the LenSx and the

13   IOL.

14   THE COURT:  But, see, this is where I think --

15   let's go back to the statute, right.

16   504(b) says, quote, "In establishing the

17   infringer's profits, the copyright owner is required to

18   present proof only of the infringer's gross revenue, and

19   the infringer is required to prove his or her deductible

20   expenses in the elements of profit attributable to factors

21   other than the copyrighted work."

22   Now, for profits.  You know, the statute

23   doesn't define what gross revenue is.  The sentence that

24   immediately precedes this sentence in 504(b), says, quote,

25   "The copyright owner is entitled to recover the actual

1    damage suffered by him or her as a result of the

2    infringement."

3              **MS. HEFFERNAN:**  Right.

4              **THE COURT:**  Right?  So I think if you're

5    selling, I mean -- and what is it?  Convoyed sales in the

6    patent context.  You can get -- recover profits for

7    convoyed sales, right?

8              **MS. HEFFERNAN:**  We don't disagree with that.

9              **THE COURT:**  Right.  All right.

10              **MS. HEFFERNAN:**  If the proof is there.

11              **THE COURT:**  Yeah, yeah.  All right.  So then,

12    you don't dispute that.

13              So now let's focus on this second sentence.

14    "In establishing the infringer's profits, the copyright

15    owner is required to present proof only of the infringer's

16    gross revenue, and then the infringer is required to prove

17    deductible expenses and elements of the profit

18    attributable to factors other than copyright work."

19              **MS. HEFFERNAN:**  That's right.

20              **THE COURT:**  So...

21              **MS. HEFFERNAN:**  So I would -- I think the

22    Courts have read that statute by reading the sentence you

23    read before, the profits, 504(b), which is, the revenues

24    have to be, I think, "attributable to, reasonably related

25    to."

1          **THE COURT:**  Reasonably related to.  I agree

2     with that.

3          **MS. HEFFERNAN:**  Reasonably related to --

4          **THE COURT:**  Right.  But IOLs -- let's put it

5     this way:  IOLs used for FLACS surgery with a LenSx are

6     very reasonably attributable, right?

7          **MS. HEFFERNAN:**  No.  No, they are not.

8          **THE COURT:**  Really?

9          **MS. HEFFERNAN:**  Because the same IOL,

10    97 percent of the time, is used in a manual surgery.

11    There's no causal connection between --

12         **THE COURT:**  I posited a causal connection.  I

13    said, "IOL used in FLACS surgery with a LenSx are

14    reasonably attributable."

15         You don't even agree with that?

16         **MS. HEFFERNAN:**  Not the way that "reasonably

17    attributable" has been understood by the case law.

18         (Cross-talking.)

19         **THE COURT:**  So you would have no convoyed

20    sales.  You would say IOLs are -- they're out 100 percent,

21    you can never have an IOL.

22         **MS. HEFFERNAN:**  Yes.  Yes.  Unless there's some

23    evidence that we have not seen in this case that

24    customers, doctors, are making purchasing decisions.  And

25    in this case, because everything is on consignment, the

1   decision to actually implant a particular IOL, because of

2   the code in the LenSx device.

3         **THE COURT:**  Your own documents say that LenSx

4   drives and leverages IOL sales.  How can you stand here

5   and say, no, we don't count any IOLs?

6         **MS. HEFFERNAN:**  I can say that because those

7   documents, at best, show a correlation.  It's sort of

8   like --

9         **THE COURT:**  Drive?  Drive is not a correlation.

10        **MS. HEFFERNAN:**  Well, sure, but those documents

11   also are marketing documents that were created with 504(b)

12   in mind.

13        **THE COURT:**  No, they were created by people --

14   you're right.  They weren't thinking about a lawsuit.

15   They're thinking about just reality.

16        **MS. HEFFERNAN:**  They were thinking about ways

17   to get more investment in their business and arguing that

18   there is this correlation, so we should get more

19   investment into your business.  But you have to --

20        **THE COURT:**  Wow.  So you're going to take the

21   position that IOLs, period, are out.  Okay.

22        **MS. HEFFERNAN:**  Unless they can demonstrate a

23   causal nexus, which is their burden.  And once they

24   demonstrate a causal nexus, only then does the burden

25   shift to the defendant to prove deductions and also do an

1      apportionment, which is the second part of the statute

2      that Your Honor read.

3                **THE COURT:**  Can you cite a case for me that

4      says that the reasonably attributable test is causal

5      based?

6                **MS. HEFFERNAN:**  Sure.  I think that I can cite

7      *Leonard v. Stemtech*.  Let me go to that.

8                *Leonard v. Stemtech* is 834 F.3d 376 out of the

9      Third Circuit in 2016.

10               **THE COURT:**  Right.  And it says, quote, "Courts

11     interpret 'gross revenue' to mean 'the gross revenue that

12     is reasonably related to the infringement.'"  They're

13     quoting Graham.

14               Do they say anything about causality?

15               **MS. HEFFERNAN:**  They do.  If you go further, it

16     says, "Under 504(b), we use a two-step framework for

17     recovery of indirect profits," which is what we're talking

18     about here, citing Graham again.  "First, the plaintiffs

19     must demonstrate a 'causal nexus' between the infringement

20     and the infringer's gross revenue."

21               **THE COURT:**  That's the infringement.  I get

22     that.  But it's the second part.  I mean -- and then we've

23     got to figure out -- I mean, clearly, they've got to

24     establish that they made money from the sales from their

25     revenue, which would include the LenSx sales.

21

1         **MS. HEFFERNAN:**  Right.

2         **THE COURT:**  You're saying every single aspect

3 of it, there has to be a causal nexus.

4         **MS. HEFFERNAN:**  For the indirect infringement,

5 absolutely, for the IOLs --

6         **THE COURT:**  Okay.  And then how would you --

7         **MS. HEFFERNAN:**  -- because, otherwise, it would

8 be easier to get -- it would be easier to get damages for

9 IOLs than it would be for the LenSx itself, I mean, at

10 some point.

11         **THE COURT:**  Well, at some point.  That's where

12 I want to draw the line.  But it's interesting, you want

13 to draw the line at zero.

14         **MS. HEFFERNAN:**  In this -- under these

15 circumstances and the facts and the evidence in the case,

16 especially with their own experts saying, "That's not how

17 I make my purchasing decision."

18         We actually have, in this case, customers,

19 consumers who talk about their purchasing decisions.

20 Their own experts.

21         **THE COURT:**  So that seems to be the

22 quintessential factual issue.  You've got your own

23 internal documents from your marketing people that are

24 saying, "IOL sales are driven by LenSx."

25         Then why don't we just let the jury decide

1    that?

2          **MS. HEFFERNAN:**  Okay, Your Honor.  That's why

3    we did not move on the 511 or the 772.  But the

4    $3.1 billion is an entirely different kettle of fish.

5    And, in fact, those documents and her -- Ms. Stamm's

6    reliance on those documents to make her 511-million-dollar

7    calculation belies the notion that there is any causal

8    nexus to the $3.1 billion.

9          She can only show, at best -- and we're giving

10   her this, for purposes of this motion -- a correlation

11   which she says is a causal nexus to $511 million, or

12   alternatively, $772 million.

13         The fact that she can perform that analysis for

14   that chunk of IOL revenues undercuts her alternative step,

15   which is to grab the whole kettle of fish.

16         **THE COURT:**  So I was with you.  Like I said, I

17   wrote it up without a clerk.  I wrote it myself.  I was

18   like, this is -- I can do this.  And then I get to this

19   one sentence, though.  And this is where I kind of lose

20   you.  And maybe you just have to -- I don't know if you

21   brought a PowerPoint, but make a better argument for me

22   because they are limiting the universe.  And that's where

23   I'm just wondering, well, should we just let the jury

24   decide then.

25         Because what they're saying is, hey, we --

1   Alcon, they're telling us, LenSx drives IOL sales, so

2   therefore, let's only count the IOL sales for Alcon

3   customers who bought a LenSx and we'll limit it to the

4   IOLs they bought after the LenSx.

5           Now, I still think it includes too much, right?

6   Because it includes the hand surgery, it includes the

7   surgery done with other machines, not LenSx.

8           But then, do you give them any basis or any

9   means by which they can pair that down?

10          **MS. HEFFERNAN:**  They did, Your Honor.

11          **THE COURT:**  Well --

12          **MS. HEFFERNAN:**  They paired down the

13  $3.1 billion to, alternatively, 511 or 772.

14          **THE COURT:**  Right.

15          **MS. HEFFERNAN:**  And by doing that, they have

16  some evidentiary basis.  Jury can sort that out, unless

17  we, you know, get it JMOL.

18          **THE COURT:**  Right.  I guess the question,

19  though, is:  You're okay with them doing the 772 --

20          **MS. HEFFERNAN:**  I'm not okay with it, but, I

21  mean, we didn't move against that.  It's not part of our

22  motion, and we footnoted that to make that clear.

23          **THE COURT:**  It is clear.

24          But my question, though, is:  Well, is there

25  something between 772 and 3.1 billion that they should be

 1  allowed to bring in?

 2          **MS. HEFFERNAN:**  Absolutely not.  They've got no

 3  evidence for it, and if they had, we would have seen it.

 4          **THE COURT:**  Okay.  How do they get the 772 --

 5  would your -- is your position going to be the 772 is the

 6  gross revenue that's referenced in 504(b)?

 7          **MS. HEFFERNAN:**  We are going to challenge that

 8  at trial with their own witnesses who will say there isn't

 9  a causal nexus in their purchasing decisions.  So they

10  will -- yes, they will come into trial, if Your Honor

11  permits them to, and make that argument that the 772 is

12  the gross revenue.

13          **THE COURT:**  Well, if I -- I thought you're not

14  moving to preclude them from making a 7 --

15          **MS. HEFFERNAN:**  We are not moving to preclude

16  them from making that.

17          **THE COURT:**  Okay.  Well, since you're not, I'm

18  not going to preclude them either.

19          **MS. HEFFERNAN:**  Okay.  Fair enough.

20          **THE COURT:**  All right.  So my question is

21  then -- and then what you're going to do, apparently, is,

22  you're going to just say, there is no 772 because there's

23  no causality at all.

24          **MS. HEFFERNAN:**  That's right.

25          **THE COURT:**  Are you going to try to show

1     deductible expenses or elements of profit attributable to

2     factors other than the copyrighted work?

3              **MS. HEFFERNAN:**  Absolutely.

4              **THE COURT:**  Okay.

5              **MS. HEFFERNAN:**  And we have that in Ms. Davis'

6     report.

7              **THE COURT:**  Just give me a second.

8              Okay.  Anything else?

9              **MS. HEFFERNAN:**  I think I'll stop there, with

10    the opportunity to stand up after my colleague does --

11             **THE COURT:**  Okay.

12             **MS. HEFFERNAN:**  -- sits down.

13             **THE COURT:**  Okay.

14             **MS. HEFFERNAN:**  Thank you.

15             **MR. DAMLE:**  Good morning, Your Honor.  Sy Damle

16    for the plaintiffs.

17             **THE COURT:**  All right.

18             **MR. DAMLE:**  I'd like to start with just a

19    couple of factual points.

20             One is, I think we're on common ground of

21    $3.1 billion in IOL revenues, is limited to IOL sales to

22    LenSx accounts after the LenSx was placed.  And I

23    apologize that we didn't make that clear earlier.

24             **THE COURT:**  No, no, no.  In fact, you probably

25    didn't know, but what -- and I probably misstated.

```
 1              What's not clear -- and it's only now that I
 2    want to hear what you have to say -- is, so what's a LenSx
 3    account?
 4              And -- so do you agree that a LenSx account
 5    could be a practice that has one LenSx machine that only
 6    does a minority -- or that is only used in a minority of
 7    the surgical procedures?
 8              MR. DAMLE:  That is a possibility, Your Honor.
 9              THE COURT:  That's a problem for you.  Because,
10    see, that's the thing, is -- and that's -- when I got to
11    this page, I stepped back and I said, "Whoa, wait.  I may
12    have been misinterpreting this."
13              MR. DAMLE:  Your Honor, I think, just to answer
14    the second -- sort of, the factual question that you had,
15    which is:  We don't have the level of granularity in order
16    to be able to disentangle that.
17              THE COURT:  Well, how did you come up with 772?
18              MR. DAMLE:  Okay.  So the 772 was really a
19    response to an argument to a point that their expert had
20    made.  Their expert tried to disprove any causal
21    relationship between a sale of a LenSx and IOL sales.
22              And so she did this analysis that compared IOL
23    penetration at -- LenSx accounts with IOL penetration at
24    Catalys accounts and came up with a number.  And she
25    dismissed that number as -- you know, only four percentage
```

 1     points.

 2              Ms. Stamm did the math -- and this is really an

 3     apportionment analysis, not a -- not an effort to

 4     determine gross revenue.  It was what is the causal -- how

 5     much of the revenue is actually caused by the placement of

 6     the LenSx, right.  That's an apportionment analysis.

 7              What she found, after doing that, looking at

 8     that and doing the math, she said that adds up to 772.

 9     That's a very different inquiry than the gross revenue

10     inquiry that is really our burden.

11              The 772 really goes to their burden.

12     Disentangling how much of the effect of the placement is

13     caused by the LenSx and how much is caused by other

14     factors.  That's their burden.

15              **THE COURT:**  Yeah.  My sense is that you read --

16     you take too much liberty with the case on that.  Not with

17     indirect gross revenue figures...

18              **MR. DAMLE:**  Well, if I could discuss --

19              **THE COURT:**  You know, I just don't think you

20     get to start with, oh, they had $3.1 billion worth of --

21     for instance -- let me step back.

22              What's their total IOL sales; do you know?

23              **MR. DAMLE:**  $13 billion for -- across their

24     entire company.  Yeah, 13 billion.

25              **THE COURT:**  What's J&J's IOL sales?

1          **MR. DAMLE:**  It's less.  It's definitely less.

2          **THE COURT:**  Do you have any idea?  Is it

3     billions?

4          **MR. MORIN:**  I would say, Your Honor -- I'm very

5     careful to be precise in court, so let me say it's a

6     guess -- a lower market share than them, but yes,

7     billions.

8          **THE COURT:**  Okay.  All right.  So we think it's

9     $13 billion, and then you narrow it down to 3.1 billion --

10         **MR. DAMLE:**  Correct.

11         **THE COURT:**  -- basically, those are the LenSx

12    accounts.

13         **MR. DAMLE:**  Those are the LenSx accounts.

14         **THE COURT:**  Right.

15         **MR. DAMLE:**  And then the burden shifts to them

16    to say, well, only X percentage of them were actually used

17    in a LenSx procedure.  We don't have that data.  That's

18    really their burden.

19         And if I could just talk about the Volkswagen

20    case, because I think that's probably the most instructive

21    case.  That was in the Eighth Circuit, but adopted -- the

22    reasoning was adopted by the Third Circuit.

23         So in that case, the plaintiff put forward

24    gross revenues for all Audi TT sales in the country during

25    the period of time the infringing commercial ran.  That

1    was $153 million, that we only ultimately got 570,000 of

2    that, but he was able to start with $153 million.

3           The defendant made almost exactly the argument

4    that Alcon is making here, that:  Look, not all sales are

5    made -- are caused by somebody watching a commercial.

6    Lots of other reasons.  Brand loyalty, reputation.  All of

7    that.  Same things they point to.

8           The Court said -- rejected that argument and

9    said they'd satisfied the burden using circumstantial

10   evidence, that there was a reasonable relationship between

11   the infringement, the commercial, and the category of

12   revenue, sales of Audi TTs in the country.

13          And it said that even as it acknowledged that

14   there were likely people who had never seen the

15   commercial.  They said part of the people -- part of that

16   $153 million of gross revenue included people that bought

17   the car without even seeing the commercial, and probably

18   included people that were not influenced by the commercial

19   even if they did see it.  But it didn't matter.  The

20   plaintiff's burden was satisfied by showing that kind of

21   circumstantial evidence.

22          And as I think Your Honor appreciates, we have

23   their own documents, 17 different documents that talk

24   about --

25          **THE COURT:**  But the commercial was for the car.

1    It wasn't for parts of the car.  And it wasn't for, you

2    know, luggage carriers that you can buy and put on the

3    car, right, which would be much more like an IOL.

4             **MR. DAMLE:**  Well, look, I think the important

5    of the documents is that Alcon regards the LenSx

6    respectively as a commercial.

7             **THE COURT:**  Right.  But, see, what I don't get

8    is, then why didn't your expert start at 40 percent?

9    Like, in other words, the only information your expert has

10   at the starting point, as I can infer from the briefs, is

11   the driving language coming out of the marketing

12   department.

13            And it, as far as -- of course, I'm not really

14   sure, but if I look at Page 3 of the brief, it's got those

15   PowerPoint slide.  And it says:  "LenSx represents about

16   $90 million U.S. dollars in profit per year.  LenSx

17   accounts represent 40 percent of Alcon's PC IOL."

18            Is that the same thing as an IOL, PC IOL?

19            **MS. HEFFERNAN:**  It is a type of IOL, yes.

20            **THE COURT:**  Okay.  And how much of the IOL,

21   $3.1 billion, is PC IOL?

22            **MR. DAMLE:**  I think -- we think it's a -- I'm

23   not 100 percent sure.

24            **THE COURT:**  Okay.

25            **MR. DAMLE:**  I think it's a majority.

1          **MS. HEFFERNAN:** Because the advanced ^.

2          **MR. DAMLE:** Right.  The PC IOLs are the

3    monofocal basic IOLs, the AT IOL.

4          **THE COURT:** Right.  What I don't get is --

5    again, because you only give me limited information.  I

6    didn't read the reports, and I don't think that's my

7    burden right now.

8          I'm thinking, okay, you should get 40 percent,

9    like the starting point.  I mean, unless you've got

10   another document which says there's some other

11   correlation, you get 40 percent, especially given what has

12   been confirmed for me today, which is that these are not

13   inclusive supplier situations, and more importantly these

14   are not situations where once a doctor starts using the

15   LenSx, that's all they use.  They don't do any other work

16   besides the LenSx involving IOLs.

17         **MR. DAMLE:** So I would point you to, there is a

18   lot of different evidence with lots of different

19   numbers --

20         **THE COURT:** Okay.

21         **MR. DAMLE:** -- showing this effect on IOLs.

22   Now, what portion -- again, our burden, under the

23   Volkswagen case, is to show that there is a reasonable

24   relationship, not to identify with precision which IOLs

25   were sold because of the infringement.

1          **THE COURT:**  I just don't find Volkswagen that

2    compelling because it's not the same situation.  The

3    Volkswagen -- in the Volkswagen case, I mean, the Audi is

4    the LenSx, right?

5          **MR. DAMLE:**  No.  In the Volkswagen situation,

6    the commercial is the LenSx.  The commercial is what

7    drives Audi sales, right.  The commercial is what's

8    infringing and the sales of the follow-on product, the

9    convoyed sale, follows on from that.

10         That's almost precisely the situation we have

11   here.

12         **THE COURT:**  I guess, maybe I should -- to me --

13   okay.  Then the commercial is the source code that's used

14   to operate the LenSx.

15         **MR. DAMLE:**  The -- in the commercial, there

16   was -- the commercial wasn't entirely infringing.  A part

17   of the commercial was infringing, so.

18         **THE COURT:**  Yeah.  I mean, it's not a really

19   good analogy.  I mean, the copyright in the Volkswagen

20   case is the commercial?

21         **MR. DAMLE:**  Is a piece of the commercial.  It's

22   ten words of the commercial.

23         **THE COURT:**  Fair enough.  Copyright here is --

24         **MR. DAMLE:**  Source code.

25         **THE COURT:**  -- some number of words in the

1    total computer code that operates the LenSx?

2              **MR. DAMLE:**  Correct.

3              **THE COURT:**  All right.  And let's just posit

4    that, that source code does indeed operate the LenSx.

5              **MR. DAMLE:**  Yes.  It is necessary to run it,

6    yes.

7              **THE COURT:**  Necessary to run it.  See, again,

8    that won't fit right with the commercial, because it's not

9    necessarily for a commercial to run the Audi.  But there's

10   a correlation.

11             Like, I think, for me, what I do find

12   acceptable as an analogy is that the LenSx sales, what is

13   sold directly as the direct infringement, is coming from

14   the -- from the source code.  It just doesn't fit very

15   well, the more I think it through.

16             I think that it's more attenuated here.  Like I

17   said, if you want -- the equivalent, it seems to me,

18   perhaps, better in the context of the Volkswagen case,

19   would be extras that you buy sometimes when you buy the

20   Audi, but not always.

21             **MR. DAMLE:**  Well, maybe I can give you a

22   different example, which is the Sunset Lamp case, which is

23   discussed in the Audi case --

24             **THE COURT:**  Okay.

25             **MR. DAMLE:**  -- is a case where it was a

1    door-opener product, right.  The company sold a

2    door-opener product that was infringing.  And they wanted

3    to recover lost sales from that door-opener product, but

4    also other products that are associated with that product.

5    Not necessarily tied one to one, but are associated with

6    the product.

7          And the Court said you are able -- that was a

8    lost profits context.  The Audi case talks about it in the

9    disgorgement context, basically, to the same logic -- yes,

10   because these two products tend to be sold together,

11   right.  A washer and dryer would be another example of

12   that, right.

13         These two products tend to be sold together.

14   You're able to get your lost profits, not just from the

15   infringed product, but from the product that tends to be

16   sold with it, right.  And then the gross revenue is the

17   full amount, would be the full amount of sales for that

18   convoyed product.  And then the burden shifts to them.

19         Now, they're able to -- they put forward, if

20   they have -- if Ms. Davis has done so.  We don't think

21   they've done so, right.  We don't think that Ms. Davis has

22   done an apportionment.  But it is their burden to do that.

23         And why the $3.1 billion matters.  Ms. Stamm's

24   opinion is that, at least -- if you look at her response

25   to Ms. Davis' analysis, this is to show, that doesn't show

1    no causation.  It shows that at least $772 million of

2    revenue is caused by the infringement.  And that would

3    be --

4              THE COURT:  But you've got -- this is where --

5    look, where the fight is, is the definition of gross

6    revenue.

7              MR. DAMLE:  Right.

8              THE COURT:  That's Number 1.

9              Number 2, do you agree gross revenue is

10   established by showing a causal nexus?

11             MR. DAMLE:  It's established by showing a

12   reasonable relationship, right, which is done not through

13   statistical causal proof, which is what they're claim is,

14   and it's not shown by showing that each and every sale was

15   caused by the infringement.  That's contrary to

16   Volkswagen.  It's contrary to Third Circuit *Tally* case.

17             It's -- the kind of evidence that you have is

18   often just circumstantial.  It's the 17 documents.

19             THE COURT:  Does it have to be, though,

20   evidence of a causal nexus?

21             MR. DAMLE:  It has to be evidence of -- the

22   case uses the word "causal nexus," yes.

23             THE COURT:  Right.  I just wanted to check.  It

24   also uses "reasonably attributable."

25             MR. DAMLE:  Correct.

1          THE COURT:  That's what I was focused on.

2          MR. DAMLE:  Right.

3          THE COURT:  But I'm going to go back and look

4    at it.  It sounds like, in discussing reasonable

5    attribuality -- whatever the correct noun would be -- it's

6    got to be a causal nexus.

7          MR. DAMLE:  Yeah.  And so I point you to the

8    Ninth Circuit's articulation of the test in the *Polar Bear*

9    case, which is a case that they cite, which is, that the

10   requirement is to provide some evidence that the

11   infringement at least partially caused the profits that

12   the infringer generated.

13          And I think there's no dispute here that IOL

14   revenues were at least partially caused by the placement

15   of a LenSx.

16          THE COURT:  Well, let me ask you this:  Could

17   you start with just the gross revenue for the company,

18   period?

19          MR. DAMLE:  No.

20          THE COURT:  Why not?

21          MR. DAMLE:  Because that would include things

22   like contact -- I happen to being wearing Alcon contact

23   lenses.  That would include contact lenses.  It would

24   include unrelated lines of business:  Solution -- that's

25   not -- that, I think, would be inappropriate.  That's like

1    the Eighth Circuit --

2              **THE COURT:**  Well, wait.  I mean, let's just

3    assume for argument's sake the doctor's office also buy

4    contact lenses from Alcon.  So why don't we count them?

5              **MR. DAMLE:**  Well, I mean, if we had the

6    evidence showing that causal relationship --

7              **THE COURT:**  So you do have to show some

8    evidence?

9              **MR. DAMLE:**  We have to show some evidence that

10   the infringement at least partially caused the category of

11   profits that we're trying to seek.

12             **THE COURT:**  Okay.  So what's your evidence that

13   $3.1 billion worth of sales is partially caused by LenSx

14   sales?

15             **MR. DAMLE:**  It's all of the documents we've

16   been discussing.

17             **THE COURT:**  See, those documents show, it seems

18   to me, 40 percent of the 30.1 billion -- of the

19   3.1 billion might be captured by that.

20             **MR. DAMLE:**  It's at least partially.

21             **THE COURT:**  So then, give me another figure.

22   Why is it more than 40?

23             **MR. DAMLE:**  So if you look at -- in her

24   report -- well, first of all, we have their own analysis,

25   right, which we've used to get to the 772.  That's a

1    partial -- at least partial.

2              THE COURT:  I think if you walked in and you

3    said, "Look, I'm coming up with 772," I don't think you

4    would have a fight on your hands.  I mean, you would in

5    front of the jury, but -- and they've already said they

6    wouldn't have brought a *Daubert* motion.

7              So you even agree, 772.  How do you get above

8    772?  What's the causal evidence?

9              MR. DAMLE:  Again, this is all about the

10   burden, right.  So can show --

11             THE COURT:  No, no, no, no.  Here's -- let's

12   just assume right now you've got the burden.  See, you've

13   admitted at some level you have a burden.  Because

14   you've -- even you've admitted, you couldn't waltz in here

15   and use gross revenue, period.

16             MR. DAMLE:  Correct.  Correct.

17             THE COURT:  Right.  Okay.  So that means you've

18   got to show something.

19             MR. DAMLE:  Right.

20             THE COURT:  All right.  So, and frankly, if you

21   came in here and you started at 40 percent of PC IOL

22   business revenue, I think you'd have a really good

23   argument.  You know, you could say it would be a factual

24   question, the experts can duke it out, and the jury will

25   decide.  I get that.

1          **MR. DAMLE:**  Right.

2          **THE COURT:**  And then whatever particular

3    information you came up with to get the 772 figure, the

4    same thing.

5          So we've got to get, though -- you've got to

6    get, from -- why you can posit more than 772, all right?

7          So what do you have?

8          **MR. DAMLE:**  Again, I think this goes back to

9    the burdens.

10          **THE COURT:**  Okay.  So you're not going to

11    answer the question.  Because you'll lose if you're not

12    going to answer the question.

13          **MR. DAMLE:**  So if we look at Ms. Stamm's

14    report, it points to documents showing -- I don't know

15    that.  I have a number bigger than 40 percent in here.

16          Well, let me -- if I may.

17          **THE COURT:**  Sure.  Take a moment.

18          **MR. DAMLE:**  If I could just talk about one of

19    the other cases, the *Polar Bear* case.

20          **THE COURT:**  Sure.

21          **MR. DAMLE:**  In the *Polar Bear* case, the

22    plaintiff was seeking -- was starting -- their burden was

23    to show gross revenues of sales of wristwatches, right.

24    And they were seeking to provide evidence of the overall

25    gross revenues made by the defendant at a trade show,

1    right.

2              The trade show -- there was a trade show booth,

3    the video was playing at the trade show booth.

4              The plaintiff's expert testified that in his

5    experience, 10 to 25 percent of the trade show sales are

6    generated because of the excitement at the trade show

7    booth, right.  That was the evidence.

8              But the plaintiff was not limited to presenting

9    gross revenue of 25 percent of the overall trade show

10   sales; they were able to put in the entire category, the

11   entire gross revenue from trade show sales.

12             Now, similar sort of situation here.  Now, if

13   they want to take that 40 percent and say, well, that

14   shows that it's only 40 percent, that's really their

15   burden.  They can use that evidence to say that that's --

16   that's their burden.

17             Again, what the Court said -- in the Ninth

18   Circuit said, was that you are able to put in gross

19   revenue for the entire category of revenue for that

20   product.  That seems on all fours of what's happening

21   here.

22             **THE COURT:**  Can you explain to me -- because,

23   again, I've not read the report, right -- how does your

24   expert get to 772?

25             **MR. DAMLE:**  Again, this is a response --

 1           THE COURT:  I know, but just get me.  If you

 2    were explaining in front of the jury, where do you start

 3    to get the 772?

 4           MR. DAMLE:  Do you want to...

 5           MR. MORIN:  May I -- Your Honor, may I?

 6           THE COURT:  Sure.

 7           MR. MORIN:  I think Mr. Damle is doing a

 8    fabulous job, but I know that portion of the report a

 9    little bit better, if that's helpful.

10           THE COURT:  All right.  That's fine.  Speak to

11    the specific question.

12           MR. MORIN:  Sure.  So in Ms. Stamm's opening

13    report, she did what we viewed -- and I understand the

14    Court may question that.

15           THE COURT:  She says 3.1.

16           MR. MORIN:  As the Volkswagen approach,

17    basically.

18           THE COURT:  Right.  Okay.  Here's what I want

19    to know is:  Can she get to the 772 without starting at

20    3.1?

21           MR. MORIN:  She does it, but it's still

22    effectively a different way of saying what portion of the

23    3.1 would be --

24           THE COURT:  Right.  I just want to know:  Does

25    she get to it?

1          In other words, what I'm -- just trying to be

2     practical about this, is --

3          **MR. MORIN:**  Yes.

4          **THE COURT:**  -- that she's got some papers and

5     she comes up and says, well, I started at 772.

6          Let's just say, argument's sake only -- I've

7     not made up my mind.  Let's say, look, there's a rational

8     basis, she could say 772 is a starting point.

9          My question is -- and I'm going to ask them the

10    same thing, is:  Is it possible to even get to the 772

11    without starting at 3.1?

12         **MR. MORIN:**  You can -- I don't mean to be

13    confusing, Your Honor, and I apologize in advance.  You

14    can do math without taking three -- I think it's kind of

15    interesting.

16         Do you have just two minutes for me to explain

17    how she got there?  Because that's --

18         **THE COURT:**  That's exactly -- go ahead.

19         **MR. MORIN:**  Okay.  So here's what's

20    interesting.  So our opening report -- not to beat a dead

21    horse -- Stamm says, here's the category.  And she viewed

22    it as doing it like Volkswagen.  And we instructed her.

23    We thought that's how -- what Volkswagen required.

24         **THE COURT:**  Right.

25         **MR. MORIN:**  Now we said the burden's on them.

1          The other side comes up -- and I don't know

2     want to be overly simplistic.  Their expert says, "I'm

3     looking at accounts with the J&J product and the Alcon

4     product."  It's a nice control.

5          I say, "How much Alcon IOLs do we sell?"  And

6     she puts together a chart.  And she says, "There's only a

7     4 percent difference, which isn't much."  That's what she

8     says.

9          Now, Your Honor, it went from 10 percent to

10    14 percent.  And she says that's a 4 percent difference.

11         Our point, when we went back and did the math

12    is, if you took sales tax at 5 percent and went to

13    10 percent, that's not a 5 percent difference, it's a

14    doubling, right.

15         So we made the point that that adds up, when

16    you do all the math, to $772 million.  So what we said is,

17    what she said didn't show much of anything.  And what she

18    said is negligible, is actually almost a billion dollars.

19    It's $772 million.

20         Our point on the burden -- not to beat a dead

21    horse -- was, we think we've discharged our burden at

22    $3.1 billion.  And they haven't come back and done the

23    apportionment.  Our expert just used the numbers that she

24    said showed lack of causation to show what percentage of

25    the overall sales we found attributable to the IOLs.

1          I would posture one thing, Your Honor, and may

2     I just propose it because it may get to the end.  We

3     could, because the 772 -- I'll answer your -- and

4     Mr. Damle was too, I think -- I'll answer your question

5     very directly.

6          We don't have a number between 772 and 3.1.

7     And our expert will not say every single lens sale that

8     was made to a LenSx account is because of that LenSx.  We

9     know that's not true.  Some people do some manual things.

10         We have viewed it as us meeting our burden, and

11    them not meeting their burden.  So our expert would come

12    in and say it's at least 772.  And the jury would be

13    legally justified at giving something between the two

14    numbers because they haven't discharged their burden.

15         If it would solve the problem and offer

16    Your Honor the right solution, we could agree that our

17    expert will say nothing more than, it's at least 772, and

18    not tell the jury it's -- $3 billion is the correct

19    number.

20         But she should at least be able to present

21    that, because like the Audi case and every other case --

22              **THE COURT:**  Present what?

23              **MR. MORIN:**  Say what the number is, not as the

24    damages figure, but say, here is the circle of IOL sales.

25              **THE COURT:**  Which is 3.1.

 1              **THE WITNESS:**  Which is 3.1.  And in the pie

 2    chart say -- to make it very clear to the jury, she's not

 3    reaching for all of them -- it's at least the 772.

 4              And our friends on the other side say, well,

 5    you're just trying to get big numbers in front of the

 6    jury.  But if not, we're not explaining that we're

 7    actually apportioning or we're taking a subset of it.

 8              So if it would solve Your Honor's issue, I

 9    think what we could agree is the following:  She will not

10    advocate the damages are $3.1 billion, and we won't play

11    the burden game.  She will say, it's at least 772 -- using

12    the other side's numbers -- but she has to be able to

13    explain the pie chart, not as a "I could seek all of

14    this," but explaining what's going on, that it's only a

15    quarter of the sales to those IOLs, which is a factually

16    true statement, so they can understand that we're not

17    overreaching, if you will, and doing the burden game.

18              I think that would solve the problem.

19              **THE COURT:**  Then, I mean, 772 is almost --

20    well, no.  It's actually a lot less than 40 percent.

21              **MR. MORIN:**  The 40 percent -- so there are

22    numbers that talk about a 40-percent difference.  I

23    suppose we could have gone in and tried to -- it's their

24    burden, we believe.  But we could have gone in and said,

25    use that 40 percent.

1          What we decided to use was, not the documents

2     that talked about a generalization of those accounts, but

3     the specific.  We have customer-by-customer data, which is

4     what I'm talking about, with -- accounts with LenSx versus

5     accounts with Catalys, with J&J, and we use those actual

6     numbers to come up with our numbers, which is a lot less

7     than 40 percent.  It's 25 percent or 27 percent.

8          But the underlying point to this, I am offering

9     a compromise.  You seem not to be buying our argument,

10    which we believe in, but we respectfully --

11         **THE COURT:**  Well, I don't know.  I mean, I --

12    look, here's -- what I'm struggling with is this.  I think

13    that -- it's what you encounter all the time in this these

14    cases, right.  Everybody's kind of overshooting.

15         And so I think that because gross revenue is

16    undefined, it can be hard to parse when you actually apply

17    it.  And so -- and I think, you know -- who was the

18    gentleman who spoke?

19         **MR. MORIN:**  Oh, Mr. Damle.

20         **THE COURT:**  Yeah, Damle.  He did what he had to

21    do, which he had to admit -- like, I would have never

22    believed anything else he said in argument if he said, oh,

23    no, no, we can start with the gross revenue of the

24    company, right, or even the gross revenue of everything

25    sold to the practices that have a LenSx account, right.

1    Like contact lenses, right.

2              But, you know, there's -- and then I think, the

3    other side would have to -- they would have no credibility

4    if they say, well, let's not count the LenSx sales, right.

5    And the answer is, well -- but the hard part is, well,

6    what's in between.

7              **MR. MORIN:**  Right.

8              **THE COURT:**  And we know we have to use IOLs

9    with LenSx.  Now, they don't have to be Alcon's IOLs, but

10   some IOLs have to be used with LenSx.  And I don't know if

11   there's any other piece of equipment out there that has to

12   be used with the surgery, but definitely IOLs.

13             I can see the other products that Alcon might

14   be selling that would be associated with, maybe eyedrops

15   that somebody uses after they get the surgery.  I'm just

16   making it up.  I don't know.  Right.

17             It's where do you find this gross revenue?

18   Where do you draw the line?  And it's not that clear.

19   It's a hard question, right.

20             And that initially -- but you, it seems to me,

21   have to prove -- you have to put something forward.  You

22   couldn't just posit all contact lenses, right.  You'd have

23   to -- unless you can show a connection.  So the only

24   connection you've shown is that IOLs are used in the

25   surgery.  That's it.

 1              **MR. MORIN:**  No.  Well, I think in terms of --

 2     not to beat a dead horse, but we have all the documents,

 3     you pointed to, that it drives it.  I mean, we have

 4     evidence there's a connection.

 5              **THE COURT:**  Oh, oh, sure.  I apologize.  You

 6     definitely have those, but --

 7              **MR. MORIN:**  We have evidence there's --

 8              **THE COURT:**  -- they're all about IOLs.

 9              **MR. MORIN:**  Right.  That's right.

10          And so where I would leave you -- I think it's

11     been a robust discussion.  I'll answer any of your

12     questions.  I mean, I think the first -- it is an

13     interesting academic question.

14              I actually think the statute is interesting,

15     and how VW answered it and how the Third Circuit and the

16     other cases have answered it, are interesting.  And you

17     could see academic debate on it.  Here's why.

18              We seem to have a disagreement on what that

19     nexus has to be to.  Does it have to be that you show the

20     subset of IOL sales, that actually were attributable, were

21     the extra sales as a result of LenSx in Step 1, where we

22     identify the gross revenues, or is it enough to do the

23     category.

24              And respectfully, Your Honor, I know you see

25     the Audi case is different in the sense that -- I mean,

1    it's a very complicated -- you know, putting all these

2    together -- but in the sense that this is the convoyed

3    thing, and the advertisement was about the TT rather than

4    about an accessory to the TT.

5            But one thing I think that dispositively tells

6    us is, whatever the causal nexus needs to be, it doesn't

7    have to be onsie-twosie, and it doesn't have to carve up

8    that category.  They say, you bring in the whole category

9    and then it shifts to the other side.

10           So the causal nexus does not have to be,

11   whether it's 100 percent or 80 percent or 60 percent of

12   whatever you're dealing with.  The courts make that very

13   clear.

14           The 772, if you will, gets to what you would do

15   to parse it up in Level 2.  But the point is, they never

16   did that on the burden shifting.  We came back did that

17   with the data that they gave us afterwards.

18           Whatever the case, we think the proper approach

19   is -- what we were planning to do, is to say, it's at

20   least 772.  And they haven't met their burden, so it could

21   be up to $3.1 billion.

22           If Your Honor is less comfortable with that in

23   viewing all the case law, I am offering the compromise

24   that we will say, "Here is the overall category."  We have

25   to be able to quantify it to explain the context of what

1    we've done.

2              And that when we come and they say we're being

3    unreasonable, we could say, "It's only a quarter of these

4    sales that we're asking for damages on, and our witness

5    just say it's at least 772."

6              But the point is, she would not then put out

7    the number and say, "Jury, I believe it's $3.1 billion."

8              **THE COURT:**  Okay.  Thank you.

9              **MS. HEFFERNAN:**  Okay.  So I'm going to do my

10   best to kind of pick my way through the questions you

11   asked my colleagues.

12             I do have Ms. Stamm's schedule from her

13   report -- I can hand it up to Your Honor -- where she

14   calculates the $772 million.

15             She does not start with $3.1 billion; instead,

16   she starts with, as I mentioned earlier, this difference

17   in penetration of IOLs into accounts that have an Alcon

18   phaco and Alcon LenSx, versus accounts that have an Alcon

19   phaco and Catalys, J&J Catalys.

20             May I hand it up?  Just so can you see there's

21   no $3.1 billion.

22             **THE COURT:**  Right.  But let's just start,

23   though -- let's start with the proposal on the table,

24   which is, they don't mention 3.1, and they say starting

25   point, you know -- it's 772, up to -- I guess they would

1    mention 3.1 because they want to put what the cap would

2    be.

3              **MS. HEFFERNAN:**  So that wouldn't be acceptable

4    to us.

5              **THE COURT:**  Yeah.  You know, here's the thing:

6    If she had started with 40 percent of 3.1 --

7              **MS. HEFFERNAN:**  May I correct Your Honor on

8    that?

9              **THE COURT:**  Yeah.

10             **MS. HEFFERNAN:**  It's not 40 percent on the 3.1.

11    The document that Your Honor's referring to talks about

12    40 percent of PC IOLs --

13             **THE COURT:**  Right.

14             **MS. HEFFERNAN:**  -- presbyopia-correcting IOLs.

15             **THE COURT:**  Right.  Which is funny.  I actually

16    Googled it to figure out what the heck it is, and I guess,

17    you know, it's not record evidence, but I assume it's a

18    subset of IOLs.

19             **MS. HEFFERNAN:**  It is a subset of IOLs.

20             **THE COURT:**  Right.

21             **MS. HEFFERNAN:**  But that would be only

22    40 percent of those PC IOLs that are sold into a LenSx

23    account, which is not $3.1 billion.

24             **THE COURT:**  Right.

25             **MS. HEFFERNAN:**  And then they -- but they don't

1    just seek infringing indirect profits on PC IOLs.  They

2    seek them on all advanced technology IOLs and all

3    monofocal IOLs.

4              So it's not 40 percent of 3.1 billion.

5    40 percent in that document is 40 percent of PC IOLs that

6    are sold into a LenSx account.

7              **THE COURT:**  Okay.

8              **MS. HEFFERNAN:**  So you can't -- one cannot

9    apply 40 percent to 3.1 billion.

10             **THE COURT:**  All right.  There's also, though,

11   in the bottom left of the same PowerPoint slide,

12   there's -- it says, "22 percent of LenSx accounts,

13   percentage of Alcon IOL."  It's not limited to PC IOLs.

14             So 22 percent, which is not that far off from

15   772 million.  Right.  772 million is going to be, I don't

16   know, a little bit under 25 percent, right?

17             **MS. HEFFERNAN:**  I think that's fair.  But I'm

18   not sure what the question is.

19             **THE COURT:**  Let's just suppose that's what they

20   started with.  Let's suppose -- let's suppose they had

21   their expert take the approach that LenSx -- Alcon's own

22   internal documents acknowledge 22 percent correlation, or

23   actually -- and in fairness for them, I think that would

24   be, in my mind, sufficient to put in front of a jury as

25   causation -- but 22 percent of all Alcon IOL sales go to

1    LenSx accounts.

2         **MS. HEFFERNAN:**  So what their expert did was

3    look at the document Your Honor's looking at, did not use

4    that number, used a different number from that document,

5    to get to her $511 million.

6         **THE COURT:**  Okay.

7         **MS. HEFFERNAN:**  We did not move on that number.

8         **THE COURT:**  Right.

9         **MS. HEFFERNAN:**  Yeah.

10        **THE COURT:**  Hold on.  I'm just asking though,

11   what if she had said, "My starting point is 22 percent of

12   the $3.1 billion"?

13        **MS. HEFFERNAN:**  I haven't done the analysis for

14   that, and whether we would, at that point, have brought a

15   different *Daubert* motion before the Court.  I haven't done

16   the analysis, and our expert hasn't done it, and neither

17   has theirs.  So I know that's dissatisfying, but I'm not

18   sure I can answer that question.

19        But may I add, though, Your Honor, you asked a

20   question about -- you know, this is, in some sense, a line

21   drawing exercise; where do we draw the line?

22        **THE COURT:**  Right.

23        **MS. HEFFERNAN:**  Well, we draw the line -- they

24   have drawn the line, beyond LenSx, to also include the

25   soft-fit patient interface which does have a one-to-one

1  correlation with LenSx devices.  You cannot use a

2  patient --

3              **THE COURT:**  Hold on.

4              You didn't move to exclude anything about soft

5  fits.

6              **MS. HEFFERNAN:**  Correct.  And what I'm doing

7  is, I'm letting Your Honor know what's in play.  You

8  asked.

9              **THE COURT:**  Oh.

10             **MS. HEFFERNAN:**  This is a line-drawing

11 exercise, and I'm letting the Court know, a little bit,

12 where those lines have been drawn.

13             So they are seeking profits on placements of

14 LenSx devices.  They are seeking indirect profits on every

15 patient interface used with a LenSx whenever it's run.

16 That is not the subject of our *Daubert* motion.

17             They are also seeking indirect profits on all

18 of the service revenue from servicing LenSx devices.  That

19 is not the subject of our motion.

20             Finally, they are also seeking indirect profits

21 on sales of Verion digital marking machines which help to

22 implant IOLs after a LenSx is used.  We are not seeking to

23 exclude that.

24             So as far as line-drawing exercises go, there

25 is a big line that's been drawn around all of that

1     equipment.  That is not the subject of our *Daubert*.  The

2     only subject of our *Daubert* is the IOLs.

3              And more specifically, this jump from 511, or

4     alternatively, 772, which Ms. Stamm has some evidence

5     for -- we disagree with it, but she has some evidence for

6     it -- jumping from that to the 3.1 billion that she has

7     absolutely no evidence of a causal nexus for.

8              And the case law is clear, that you need to

9     have a causal nexus.  You look at *Leonard v. Stemtech*,

10    which is a Third Circuit case.  And --

11             **THE COURT:**  I'm okay with the causal nexus.

12    They don't dispute it, so...

13             **MS. HEFFERNAN:**  Okay.  And then also the PP --

14    the *Polar Bear*, sorry -- the *Polar Bear* case, which I

15    think is a Ninth Circuit case --

16             **THE COURT:**  It is.

17             **MS. HEFFERNAN:**  -- in that case, the Court said

18    it was okay for them to go after indirect profits based on

19    sales that were made at the trade show, where it was

20    undisputed that customers at the trade show saw the

21    commercial and it participated in their purchasing

22    decision.

23             But then they, "they" the plaintiff, went after

24    more than that, and said, Okay.  Well, we have had a lot

25    of success with this advertising campaign.  We think it

1    has an effect, actually, on retail sales outside of the

2    trade show context.  Let's go after retail sales.

3              And *Polar Bear* Court said, "There must be a

4    demonstration that the infringing acts had an effect on

5    profits before the parties can wrangle about

6    apportionment."

7              So you've got to do causal nexus before you get

8    to apportionment.

9              "To recover indirect profits under its theory,

10   brand premium theory, *Polar Bear* shoulders the burden of

11   demonstrating that the infringement is causally linked to

12   the revenues from the sales of all expedition watches."

13             So they need to show a connection to all IOLs

14   if they want to try to get indirect profits on them.  Not

15   just a category or an idea, but they have to show a causal

16   nexus to all.

17             And, in fact, I think it was -- I think it was

18   the *Polar Bear* case that went on to say, "The whole point

19   of the causation element of the statute serves as a

20   logical parameter to the range of gross profits.  This

21   rule of reason obviates a great deal" -- sorry -- "a good

22   deal of mischief in claiming profits beyond what might be

23   attributable to the infringement."

24             And that is the *Polar Bear* case at 711.

25             And that's exactly what we have here.  From

1    772 million, up to 3.1 billion, that's the mischief.  They

2    have shown a nexus of some kind, a correlation to 511 and

3    772, but absolutely nothing beyond that.

4          **THE COURT:**  Do you know, was 504(b) in

5    existence before source code was deemed to be

6    copyrightable?

7          **MS. HEFFERNAN:**  I do not, standing here, know

8    the answer to that question.

9          **THE COURT:**  I mean, I'm going to guess it was,

10   but do you know?

11         **MS. HEFFERNAN:**  I would assume it was.  But I

12   can't answer that question that I know it was.

13         **MR. MORIN:**  Sy's not --

14         **MR. DAMLE:**  Huh-huh.  Yeah.

15         **MS. HEFFERNAN:**  Oh, Sy, I forgot you're in the

16   room.

17         **MR. DAMLE:**  Yes.  The answer is yes.  It was

18   copyrighted before.

19         **THE COURT:**  Long before.  I'm going to guess

20   it's been a -- probably the common law, or -- but it's

21   certainly, it's been --

22         **MR. DAMLE:**  Well, computer programs were

23   recognized as copyrightable before 1976, which is when

24   this provision was adopted.

25         **THE COURT:**  Oh, so wait.  You're saying this

1    provision did not predate source code --

2              **MR. DAMLE:**  No.  This provision postdated that.

3              **THE COURT:**  Postdated.  I didn't hear you

4    correctly.

5              **MR. DAMLE:**  Sorry.  The provision was adopted

6    after the recognition of computer programs as being

7    copyrightable.

8              **THE COURT:**  In the statute?  Okay.

9              **MR. DAMLE:**  It was common -- it was under the

10   1909 Act, which didn't use the word "computer program."

11   But it was understood that computer programs in case law,

12   was understood that computer programs were protectable

13   under copyright law prior to 1976.  This provision was

14   adopted by its terms in 1976.

15             **THE COURT:**  All right.  Anything else?

16             **MS. HEFFERNAN:**  Only if Your Honor still has

17   questions.

18             **THE COURT:**  Well, I have lots of questions.  I

19   think a -- it's not clearcut.  And that's why I was trying

20   to come up with something practical.

21             **MS. HEFFERNAN:**  Thank you, Your Honor.

22             **THE COURT:**  But I'll just think more about it.

23   It's still not clear to me what the right answer is.  I

24   don't have a very strong conviction about gross revenue,

25   how it's defined.

1              So I'll think more about it.  All right?

2      Thanks.

3              **MS. HEFFERNAN:**  Thank you.

4              **THE COURT:**  I don't know if it's worth doing

5      the second motion.  I mean, I've got a sentencing at 2:30,

6      or rather, a plea hearing.  I guess we could -- and I

7      thought that the -- basically, how I decided the first

8      motion would influence the second.

9              Am I wrong on that?

10             **MR. MORIN:**  Your Honor, I don't think that

11     whatever you decide in the first one would affect the

12     second.  IOLs are in play.

13             **THE COURT:**  All right.  Well, then walk me

14     through them.  Whoever's going to argue, let's go.

15             **MR. MORIN:**  My colleague, Ms. Blitzer, I think

16     it's the first time before this Court.

17             **THE COURT:**  All right.  Thank you.

18             **MS. BLITZER:**  Good afternoon, Your Honor.

19     Rachael Blitzer for plaintiff.

20             I have brought some slides today to help -- to

21     aid with my discussion.  And I'll try to keep this brief.

22             The reason for J&J's *Daubert*, Number 3, is

23     Ms. Davis' attempt to opine on hundreds of millions of

24     dollars in IOL expenses through a single sentence in a

25     footnote.  And that single sentence adopts a single

1          forecast in a company's presentation.  And she uses this

2          presentation and that one line to try to deduct off of the

3          top of Alcon's IOL revenue, 62 percent of all expenses

4          across the board for a period of about 12 years.

5                    We've listed, in our papers, a number of

6          reasons why this is inappropriate and why this should be

7          excluded under *Daubert*.  I'll quickly talk through a

8          couple of them.

9                    The first is, this is contrary to copyright

10         law.  And the second is, that this is unreliable and

11         untestable and that can't be cured here by

12         cross-examination.

13                   So talking quickly about the law.  The law

14         requires, here, that a defendant identify its costs that

15         are deductible when a plaintiff is seeking profits.

16                   You read Section 504(b) earlier.

17                   And the cases make very clear that only those

18         expenses that are proven with some specificity to relate

19         to the infringement are deductible.  And a defendant can't

20         meet this burden by providing general statements of broad

21         categories of expense.  They really have to identify each

22         item that they intend to deduct.

23                   It's a very exacting standard, and it's one

24         that Ms. Davis completely fails to meet.

25                   She needs to identify all of the different

1    expenses that she seeks to deduct on an individual level.

2    So the costs to make the IOLs, the cost to market them, to

3    ship them, and a host of others.  But, instead, her entire

4    analysis is contained here in the footnote that you see on

5    the screen, where she performs no actual analysis, but

6    just adopts a profit margin number from an Alcon capital

7    allocation.

8            Now, for comparison sake, let me compare that

9    to the analysis that Ms. Davis did in her work to deduct

10   costs for LenSx, also at issue in the case.

11           When doing that, she spoke about it in her

12   report over the course of four different pages, and she

13   included five different schedules listing out all of the

14   different expenses that she thought were appropriate to

15   deduct.  They're all there line by line.  This includes

16   citations to over a dozen different Alcon financial

17   documents, like spreadsheets and conversations with Alcon

18   personnel.

19           This is the analysis done for LenSx, as

20   compared to the single footnote that I showed you earlier.

21   And I don't even think I'm quite at the end of it, but I

22   will keep moving ahead.

23           In addition to not meeting the standards for

24   proving deductions under the Copyright Act, the cross-exam

25   is also insufficient to address the reliability problems

1    with this analysis.  That's because Alcon and Ms. Davis

2    have not provided any of the documents that underlie the

3    38-percent figure.  That data has not been provided.

4           Now, Alcon is a publicly traded company.  They

5    make -- they have a multibillion dollars IOL business.

6           I don't know why this single document is the

7    one that they've provided to their expert, but surely they

8    have troves and troves of financial information

9    documenting the expenses that go into their IOL business.

10          So here we have the 38-percent figure that

11   Ms. Davis relies on.  And I don't know if that 38-percent

12   figure, if it's based on something or if it's based on

13   nothing.  But either way, Alcon has a big problem on their

14   hands.  Because if that 38-percent figure is based on

15   something, if it's based on real, hard data, then there

16   where is that data?  Why has that data not been produced

17   in this case?  What does that data show?  What expenses

18   are included in that data?

19          We have no idea.  Even Ms. Davis has no idea.

20   She asked Alcon for that information and they didn't give

21   it to her.

22          Now, if that 38-percent number, on the other

23   hand, is not based on data, well, of course, that's

24   inherently a huge problem in itself.  That it is

25   completely unreliable.  But either way, Alcon cannot meet

1    its burden simply with this number.  And because we don't

2    have the information that backs up that number, we can't

3    meaningfully cross Ms. Davis on it.

4            So if Ms. Davis were to come into court and

5    opine ipse dixit that 62 percent of the Alcon's IOL

6    revenue is deductible, we have no way to cross that.  We

7    have no way to prove that she's wrong, because we have no

8    seen the documents underlying it.  And even she has not

9    seen the documents underlying it.

10           Now, this is exactly that *Daubert* was intended

11   to prevent.

12           In the interest of time, I'll wrap it up.  But

13   I will just note that, in addition to not being sufficient

14   under the copyright law, this document is unreliable on

15   its face.  It's identified as preliminary.  There is

16   language earlier in the report indicating that this report

17   is not to be used for financial reporting.  And moreover,

18   it's a forecast.  This doesn't even purport to be an

19   actual profit margin.

20           Now, Alcon has made the case that there's

21   another document out there that they can use to

22   substantiate this number.  That's something that we

23   learned for the first time in Ms. Davis' deposition.  That

24   was not included in her report.  I showed you the entirety

25   of her position on my first slide.

 1              But regardless, I want to make very clear, that

 2      that other document that's supposedly referenced, that

 3      document does not substantiate a 38-percent profit margin.

 4      That document shows much higher profit margins, which

 5      means much smaller deductions.

 6              All that document is used for is to say, okay,

 7      well, for the costs considered in that document, those

 8      cost remain steady over time.  So therefore, we can say

 9      that the much bigger costs, addressed in this 38-percent

10      document, remain steady over time.  But that doesn't make

11      any sense.  There are many more costs, obviously, included

12      in this 38-percent figure.  That spreadsheet cannot speak

13      to whether these remain constant.

14              And I want to leave you with one last thought

15      on our inability to properly cross-examine here.

16              I walked you earlier through Ms. Davis'

17      deduction of specific expenses, which is required under

18      the law.  And going through the expenses, she deducts

19      many -- and then there are also expenses on Alcon's books

20      that she says, "These are inappropriate.  These are not

21      attributable to LenSx.  I'm not going to include them in

22      my analysis."

23              Now, because we were able to identify all of

24      the expenses that she did opt to include, we had our own

25      expert opine on them as well.  And she pointed out that

1    some of those were inappropriate deductions, and that,

2    therefore, they should not have been included in Stamm's

3    deductions.

4            We then had an opportunity to depose -- I'm

5    sorry, in Davis' deposition -- we, then, had an

6    opportunity to depose Ms. Davis on that question and say,

7    "Is it true that these were inappropriate deductions?"

8            And she said, "Yes.  You're right.  These were

9    inappropriate deductions.  I will remove them from my

10    calculations when I update them before trial."

11            But we don't have the opportunity to do that

12    with this 38-percent figure.  It just stands out there on

13    its own with no support, no analysis, and Ms. Davis

14    reports to use it to deduct hundreds of millions of

15    dollars.

16            **THE COURT:**  What's the theory then?  Why

17    doesn't it comport -- it's a Rule 702 motion, right?

18            **MS. BLITZER:**  Yes.

19            **THE COURT:**  All right.  So what is it that

20    violates 702?

21            **MR. DAMLE:**  Well, completely unreliable.

22            **THE COURT:**  Is there anything else?

23            **MS. BLITZER:**  No.  You know, in their papers

24    Alcon has argued that it need only meet the fit

25    requirement, that it need only be something that's helpful

1    to the jury.  That's not the only element under 702 in

2    *Daubert*.  There's also the requirement of qualification,

3    and most importantly, the requirement of reliability.

4              And this is not only unreliable, but it's not

5    amenable to cross-examination.  We can't fix this on cross

6    because we haven't the seen the documents and Ms. Davis

7    hasn't seen the document.

8              **THE COURT:**  Okay.  So it's reliability -- lack

9    of reliability?

10             **MS. BLITZER:**  Yes.

11             **THE COURT:**  All right.  Thanks very much.

12             **MS. BLITZER:**  And contrary to law.

13             **THE COURT:**  I don't think the rule says

14   anything about contrary to law, does it?  I think that's

15   reliability.

16             **MS. BLITZER:**  Well, under 702, definitely

17   reliability.

18             **THE COURT:**  Okay.  Thank you.

19             **MS. HEFFERNAN:**  The case law says nothing about

20   the type of documents an expert can use to prove

21   deductions.  And there's the *Counsulnet* case that we

22   cite --

23             **THE COURT:**  You know, I've got to -- look, I

24   will be -- honestly, I didn't read the papers.

25             **MS. HEFFERNAN:**  Okay.

 1          **THE COURT:**  Just so you'll know because of the

 2    rush we're in, I studied at length the first *Daubert*

 3    motion, saw that the -- I asked for oral argument.

 4          If you look at my oral order, what it says is,

 5    you should also be prepared.  And the reason why I said

 6    that was because the other motion had to do with IOLs, and

 7    so I assumed some causal connection.  That's -- to be

 8    upfront, that's what I did.

 9          **MS. HEFFERNAN:**  There's some correlation, but

10    no causal --

11          **THE COURT:**  You needed -- you needed to be

12    prepared, and you all were and did very nice arguments.

13    And that was a very nice argument, especially given it's

14    your first.

15          So, just to be candid, so but it's worthwhile.

16    It helps me.  And I've got another seven minutes before I

17    go into another proceeding.

18          So, you know, I mean, I can say it was pretty

19    good argument, and it's going to certainly make me go back

20    and read this motion carefully.  I mean, I've got some

21    concerns.

22          These are predictive data?

23          **MS. HEFFERNAN:**  Well, it's -- this is -- yes,

24    this predicts the deductions for IOLs in 2021, but based

25    on evidence from 2018, 2019 that formed the basis of this

1    document.

2            **THE COURT:**  Okay.  Were there documents that

3    were produced that address those prior years?

4            **MS. HEFFERNAN:**  So those documents -- they did

5    not ask for those documents.  Can I just let the Court

6    know how this kind of bubbled up during the course of

7    discovery?

8            **THE COURT:**  Sure.

9            **MS. HEFFERNAN:**  So on February 14, 2022, just

10   two weeks before the close of extended fact discovery, was

11   the first time J&J told Alcon it was going to go after

12   disgorging IOLs.  It's the first time we learned of it.

13   So we scrambled and got documents for -- as best we could,

14   for Ms. Davis in terms of IOLs and deductible expenses.

15           As I mentioned during our first argument,

16   neither company tracks expenses on a product level.  So

17   not on an IOL level.  So we went to Alcon Finance and

18   said, "Do you have anything to show expenses for IOLs?"

19           And they said, "We did a one-off deep dive with

20   McKinsey & Company," which is a consulting company, "and

21   they prepared this presentation," which is at -- let's

22   see.  I think it's Exhibit 40.  I'll get it up.

23           But in any event, the presentation was prepared

24   in conjunction with McKinsey & Company --

25           **THE COURT:**  Is that part of the presentation?

1          **MS. HEFFERNAN:**  It is.  It is part of it.

2          **THE COURT:**  Okay.  "This," so the record

3    reflects, is the slide that's on the screen which appears

4    to the J&J Exhibit 22-A at Page 8.

5          **MS. HEFFERNAN:**  That's right.

6          And in the Alcon responsive brief, we actually

7    have the entire presentation.  And that is at -- I'm

8    sorry, Exhibit 48 to Alcon's responsive brief.

9          And the cover page shows that it is a capital

10   allocation presentation.  And then below that it says "ECA

11   Discussion Document."  That's the executive committee of

12   Alcon.  It's made of the top six or seven folks of Alcon:

13   The chief executive officer, the chief financial officer,

14   et cetera.

15         This document was prepared for that committee

16   to decide -- after the spin of Novartis, Alcon was spun

17   off from Novartis in 2019 -- based on Alcon's prior

18   financial performance, how are we going to allocate our

19   capital going forward to get the highest return on

20   invested capital?

21         And so they looked at -- "they," meaning

22   McKinsey and the financial folks at Alcon -- looked at

23   past performance.  Here's what we invested in the past.

24   How did it do?  What was our return?  Do we want to

25   continue investigating internally?  Do we want to start

1    acquiring external companies the pharma business because

2    there's a higher return on invested capital there?

3                That's what this entire presentation, in

4    Exhibit 40 to Alcon's answering brief, discusses.  And it

5    is one of most reliable presentations because Alcon's top

6    executives are making business -- forward-looking business

7    decisions based on past historical financial performance

8    on how to investigate their capital.

9                Ms. Davis had a conversation with

10   Andrew McDonald -- she testified to it at her

11   deposition -- about this document and what went into

12   making up this document and believed, based on her expert

13   experience, totally reliable to use this.

14               **THE COURT:**  And who's Andrew McDonald again?

15               **MS. HEFFERNAN:**  He is part of the finance team

16   at Alcon.

17               **THE COURT:**  All right.  Anything else?

18               **MS. HEFFERNAN:**  Just briefly.

19               So I heard a pretty good cross-exam of

20   Ms. Davis in the argument just now.  But the questioning

21   of Ms. Davis on this document at her deposition was maybe

22   two and a half pages of questions.

23               So they had their opportunity to get additional

24   information about this document and its reliability from

25   Ms. Davis at her deposition and decided not to.

1          Now, if the -- anybody wants -- you know,

2    we'll -- we can bring a witness who can testify more about

3    it at trial, but Ms. Davis had these conversations and

4    absolutely trusts in the reliability of this presentation.

5    She used a second document that was referred to during the

6    argument to corroborate the evidence in this document.

7          That second document is one that is produced --

8    prepared every single year of Alcon's existence from --

9    prior to 2010, and it's going to go for a long time

10   because it's required to be prepared by the Swiss and U.S.

11   tax authorities.

12         Alcon has Swiss connections.  There's Swiss

13   tax.  They want their tax dollars; the U.S. wants its tax

14   dollars.  And so there is an allegation of revenue that is

15   performed each and every year, because that is subject to

16   an audit by the Swiss and U.S. tax authorities.

17         Ms. Davis had a conversation with

18   David Chamberlain, who is in the tax department at Alcon,

19   about that corroborating document and felt that document

20   was sufficiently reliable for her to corroborate this

21   number -- this number, the 38 percent that we see on the

22   slide here -- because it includes also some more

23   deductible expenses beyond what was in the Chamberlain

24   document; namely, R&D.

25         And so Ms. Davis felt that this 38-percent

 1    number was more inclusive of all of Alcon's deductible

 2    expenses for IOLs and that's why she used it.

 3            THE COURT:  All right.  So this is the only

 4    document she relied on, the Exhibit 22-A here, right?

 5            MS. HEFFERNAN:  Well --

 6            THE COURT:  Except for, she then corroborated,

 7    I guess, you're saying, with this Chamberlain document.

 8            MS. HEFFERNAN:  I would just make a slight

 9    correction to that --

10            THE COURT:  Yeah.

11            MS. HEFFERNAN:  -- and say it's the document at

12    Exhibit 48 to Alcon's answering brief, because that's the

13    full document.  This is just an excerpt.

14            THE COURT:  Fair enough.  Okay.

15            MS. HEFFERNAN:  But, yes.  So she relies on

16    this document --

17            THE COURT:  This document we're going to call

18    the McKinsey presentation?

19            MS. HEFFERNAN:  Yes.

20            THE COURT:  Okay.  And then the other document

21    is --

22            MS. HEFFERNAN:  Let's call it the --

23            THE COURT:  The Chamberlain document.

24            MS. HEFFERNAN:  The Chamberlain document.

25            THE COURT:  Okay.  Were the Chamberlain

1    document and the McKinsey presentation produced in

2    discovery?

3                 **MS. HEFFERNAN:**  Yes.

4                 **THE COURT:**  Okay.  Were they produced prior to

5    her giving this opinion?

6                 **MS. HEFFERNAN:**  They were -- yes, they were

7    produced prior to her giving the opinion.  The document

8    that we're -- the McKinsey document was produced prior to

9    the close of fact discovery.

10                And the Chamberlain document was produced just

11   prior to Ms. Davis serving her rebuttal report in which

12   she addressed Ms. Stamm's IOL disgorgement analysis,

13   because that was the first time Alcon knew they were going

14   to be going after IOLs.

15                **THE COURT:**  That's the Chamberlain document?

16                **MS. HEFFERNAN:**  That's correct.

17                **THE COURT:**  So McKinsey was produced before the

18   end of fact discovery?

19                **MS. HEFFERNAN:**  Yes.

20                **THE COURT:**  Chamberlain document was produced

21   somewhere between the responsive expert brief from Stamm

22   and reply brief by Davis.

23                **MS. HEFFERNAN:**  Between Stamm's opening brief

24   and Davis' rebuttal brief.

25                **THE COURT:**  Okay.  All right.

 1              **MS. BLITZER:**  Your Honor, if I can just

 2     correct --

 3              **MS. HEFFERNAN:**  Or rebuttal report, I should

 4     say.

 5              **MS. BLITZER:**  Yeah, that document was provided

 6     at the exact same time as the rebuttal report.

 7              **MS. HEFFERNAN:**  Yeah, it was -- I think it was

 8     the day of, the day before of, but it was produced with

 9     her rebuttal report.  I wasn't trying to take liberties

10     there.  I think I said that it produce...

11              **THE COURT:**  You said "before," which is a

12     little different than "with."

13              **MS. HEFFERNAN:**  Well, I don't know if it was

14     hours before or what, but it was produced, I'll say, in

15     conjunction with her rebuttal report.

16              **THE COURT:**  Well, that sounds more accurate.

17     Okay.

18              **MS. HEFFERNAN:**  And then, also, the

19     conversations that she had with Mr. McDonald and

20     Mr. Chamberlain.

21              **THE COURT:**  Right.  Okay.

22              So the first you ever hear of the 38 percent is

23     in the rebuttal report?

24              **MS. BLITZER:**  No.  The first that we ever hear

25     of the spreadsheet that -- at Ms. Davis' deposition that

1    she tries to identify as corroborating -- or really, I

2    think the "corroborating" language comes from the briefs,

3    not from Ms. Davis.

4            The first time we hear of that is in connection

5    with this rebuttal report.  And it wasn't provided.

6            **THE COURT:**  I guess -- I'm confused then.  I

7    thought I asked the question.

8            The first you ever heard about it is with the

9    rebuttal report.  You're saying that it's --

10           **MS. BLITZER:**  No.  Not the 38-percent figure,

11   the -- this Excel spreadsheet that they're trying to

12   identify as confirming the 38-percent number.  I'm a

13   little confused now, too.

14           **THE COURT:**  All right.  So let's step back.

15           You're telling me that Davis applies a

16   38-percent deduction based on the McKinsey report.

17           **MS. BLITZER:**  Yes, a 62 percent deduction.

18           **THE COURT:**  Sixty-two.  The opposite, right.

19   Okay.

20           So my question is:  When did you first hear

21   about that?

22           **MS. BLITZER:**  This document was --

23           **THE COURT:**  Not the document.  When did you

24   first hear that Davis is opining "I'm going to reduce by

25   62 percent"?

1              **MS. BLITZER:**  In her rebuttal report.

2              **THE COURT:**  Okay.  I will have to look at the

3      transcript.

4              So that's the first you hear about it.  All

5      right.  So then, you question her, right, in a deposition?

6              **MS. BLITZER:**  Yes.

7              **THE COURT:**  All right.  And so -- and she's

8      only relying on two documents, both of which were produced

9      to you no later than her rebuttal report.

10             **MS. BLITZER:**  Yes.

11             **THE COURT:**  All right.

12             **MS. BLITZER:**  That's right.

13             **THE COURT:**  Okay.  And so the issue is whether

14     relying on a McKinsey presentation to -- is it disputed,

15     that the presentation was given to the CEO and the top

16     executives of Alcon?

17             **MS. BLITZER:**  That's not in the record.  I

18     don't know who it was given to.  I learned today --

19             **THE COURT:**  You could have asked that at the

20     deposition.  Was it asked at deposition?

21             **MS. BLITZER:**  We could have asked who it was

22     given to, that's right.

23             **THE COURT:**  Right.

24             **MS. BLITZER:**  And that question was not asked

25     at the deposition.  But also, we haven't seen -- this data

1   was provided to McKinsey, right.  This is a 2020 -- this

2   litigation was already going on in July of 2020 when this

3   was created.

4           **THE COURT:**  Did you ask for -- did you make a

5   discovery request for that material?

6           **MS. BLITZER:**  Oh, we've had discovery requests

7   and discovery meet and confers on IOL financial

8   information going all the way back to August of 2021.  We

9   didn't say, is there a McKinsey presentation --

10          **THE COURT:**  So I asked you though -- see, this

11  is the thing.  This is why you've got to be careful.

12          I asked you, I said:  What's the basis of the

13  motion?

14          And you said 702.

15          And then I asked you:  What in 702?

16          You said reliability.

17          So you didn't say it's a Rule 26 motion.  You

18  didn't say there's any other justification to preclude

19  this evidence from coming in.  So it's going solely to

20  reliability.

21          **MS. BLITZER:**  It is going solely to

22  reliability, but it's also -- I also explained that it's

23  contrary to law.  And this is their burden.

24          This is -- as you read earlier in the statute,

25  this is very clearly Alcon's burden to prove their

1    deduction.  These are real, hard numbers.  They've paid

2    these costs over the last decade.  And the only evidence

3    that they can provide for it is this McKinsey spreadsheet.

4            If you would let me just point to one more

5    thing --

6            **THE COURT:**  No.  I'm not going to because --

7    well, I'll read the briefs.  I'll take a look at what you

8    said.  So I'll focus on that, actually, when I do the

9    briefs, which is, is there something that the law requires

10   to be more specific than this?  In which case, maybe you

11   have a good argument.

12           But if there's not cases that say -- that

13   require that these deductions contemplated by 504(b).  You

14   have to be very, very specific.  And given that the

15   statute doesn't define "gross revenue," I have to say,

16   going into it, I'll be surprised.

17           But I'll look at it with an open mind, and I'll

18   decide both motions on the eve of trial, but as soon as I

19   can.

20           All right.  Now, we've got a pretrial

21   conference coming up.  When's that?

22           **MS. HEFFERNAN:**  Next week.

23           **THE COURT:**  Next week.  And we'll see what I

24   can do, if I can get a decision in by then.  It's at 3:00?

25           **MS. HEFFERNAN:**  It's 3:00 to 5:00 -- oh, well,

1    3:00 to -- whenever the Court will like to end it.

2         THE COURT:  I can't imagine we'll finish before

3    5:00.  And then I just saw some other papers.  I forgot

4    you guys have another set of lawsuits going on in front of

5    me.

6         MR. LOCASCIO:  There are.  There's the patent

7    issues that were long-term stayed in this case.

8         THE COURT:  Right.

9         MR. LOCASCIO:  And then there's the separate

10   case with two patents, which I believe is still on a

11   motion -- a 101 motion from the other side that's just

12   been on ice since then.

13        THE COURT:  And I'm going to just leave those

14   to, let's get this trial done and then we will decide

15   those.

16        MR. LOCASCIO:  How we proceed then.

17        THE COURT:  All right.  That's what we will do.

18   So you guys can also focus on trial prep.

19        MR. LOCASCIO:  Thank you, Your Honor.

20        THE COURT:  All right.

21        MR. MORIN:  Thank you, Your Honor.

22        THE COURT:  Anything else?

23        MR. LOCASCIO:  No.  We'll see you next

24   Wednesday.

25        MR. MORIN:  See you next Wednesday.

1          **THE COURT:**  Next Wednesday.  All right.  As

2     always, I enjoyed the lawyering.  Thank you very much.

3              (The proceedings concluded at 2:30 p.m.)

4

5

6              CERTIFICATE OF COURT REPORTER

7

8         I hereby certify that the foregoing is a true and

9     accurate transcript from my stenographic notes in the

10    proceeding.

11

                                   /s/ Bonnie R. Archer
12                                 Bonnie R. Archer
                                   Official Court Reporter
13                                  U.S. District Court

14

15

16

17

18

19

20

21

22

23

24

25

MR. BLUMENFELD: [2]  3/7
3/12
MR. DAMLE: [55]  25/15
25/18 26/8 26/13 26/17 27/18
27/23 28/1 28/10 28/13 28/15
30/4 30/22 30/25 31/2 31/17
31/21 32/5 32/15 32/21 32/24
33/2 33/5 33/21 33/25 35/7
35/11 35/21 35/25 36/2 36/7
36/19 36/21 37/5 37/9 37/15
37/20 37/23 38/9 38/16 38/19
39/1 39/8 39/13 39/18 39/21
40/25 41/4 57/14 57/17 57/22
58/2 58/5 58/9 65/21
MR. LOCASCIO: [5]  79/6
79/9 79/16 79/19 79/23
MR. MORIN: [22]  28/4 41/5
41/7 41/12 41/16 41/21 42/3
42/12 42/19 42/25 44/23
45/21 46/19 47/7 48/1 48/7
48/9 57/13 59/10 59/15 79/21
79/25
MR. SHAW: [1]  3/14
MS. BLITZER: [21]  59/18
65/18 65/23 66/10 66/12
66/16 74/1 74/5 74/24 75/10
75/17 75/22 76/1 76/6 76/10
76/12 76/17 76/21 76/24 77/6
77/21
MS. HEFFERNAN: [130]
THE COURT: [226]
THE WITNESS: [1]  45/1

## $

$13 [2]  27/23 28/9
$13 billion [2]  27/23 28/9
$153 [3]  29/1 29/2 29/16
$153 million [3]  29/1 29/2
29/16
$3 [1]  44/18
$3 billion [1]  44/18
$3.1 [16]  22/4 22/8 23/13
25/21 27/20 30/21 34/23
37/13 43/22 45/10 49/21 50/7
50/15 50/21 51/23 53/12
$3.1 billion [16]  22/4 22/8
23/13 25/21 27/20 30/21
34/23 37/13 43/22 45/10
49/21 50/7 50/15 50/21 51/23
53/12
$511 [3]  12/19 22/11 53/5
$511 million [3]  12/19 22/11
53/5
$772 [7]  12/6 13/10 22/12
35/1 43/16 43/19 50/14
$772 million [6]  13/10 22/12
35/1 43/16 43/19 50/14
$772-million [1]  12/6
$90 [1]  30/16
$90 million [1]  30/16

## '

'causal [1]  20/19
'gross [1]  20/11
'the [1]  20/11

## -

-and [2]  1/24 2/10

## /

/s [1]  80/11

## 1

10 [1]  40/5
10 percent [2]  43/9 43/13
100 percent [3]  18/20 30/23
49/11
101 motion [1]  79/11
12 years [1]  60/4
13 [1]  1/13
13 billion [1]  27/24
14 [1]  68/9
14 percent [1]  43/10
17 [2]  29/23 35/18
1909 [1]  58/10
1976 [3]  57/23 58/13 58/14
1:00 [2]  1/13 3/4

## 2

20-842-CFC [1]  1/6
2010 [1]  71/9
2016 [1]  20/9
2018 [1]  67/25
2019 [2]  67/25 69/17
2020 [2]  77/1 77/2
2021 [2]  67/24 77/8
2022 [1]  68/9
2023 [1]  1/13
22 percent [5]  52/12 52/14
52/22 52/25 53/11
25 percent [4]  40/5 40/9 46/7
52/16
26 [1]  77/17
27 percent [1]  46/7
2:30 [2]  59/5 80/3

## 3

3.1 [13]  13/24 14/1 41/15
41/20 41/23 42/11 44/6 44/25
45/1 50/24 51/1 51/6 51/10
3.1 billion [8]  13/23 23/25
28/9 37/19 52/4 52/9 55/6
57/1
3.1-billion-dollar [1]  13/20
30.1 billion [1]  37/18
376 [1]  20/8
38 percent [2]  12/13 71/21
74/22
38-percent [13]  62/3 62/10
62/11 62/14 62/22 64/3 64/9
64/12 65/12 71/25 75/10
75/12 75/16
3:00 [3]  78/24 78/25 79/1

## 4

4 percent [2]  43/7 43/10
40 [3]  37/22 68/22 70/4
40 percent [23]  12/9 12/11
30/8 30/17 31/8 31/11 37/18
38/21 39/15 40/13 40/14
45/20 45/21 45/25 46/7 51/6
51/10 51/12 51/22 52/4 52/5
52/5 52/9
40-percent [1]  45/22
48 [2]  69/8 72/12

## 5

5 percent [2]  43/12 43/13
504 [9]  16/16 16/24 17/23

19/11 20/16 24/6 57/4 60/16
78/13
531 [5]  12/22 22/3 23/13 55/3
57/2
511-million-dollar [1]  22/6
570,000 [1]  29/1
5:00 [2]  78/25 79/3

## 6

60 percent [1]  49/11
62 percent [4]  60/3 63/5 75/17
75/25

## 7

702 [6]  65/17 65/20 66/1
66/16 77/14 77/15
711 [1]  56/24
772 [37]  12/15 22/3 23/13
23/19 23/25 24/4 24/11 24/22
24/22 26/17 26/18 27/8 27/11
37/25 38/3 38/7 38/8 39/6
40/24 41/3 41/19 42/5 42/8
42/10 44/3 44/6 44/12 44/17
45/3 45/11 45/19 49/14 49/20
50/5 50/25 55/4 57/3
772 figure [1]  39/3
772 million [3]  52/15 52/15
57/1

## 8

80 percent [1]  49/11
834 [1]  20/8
844 [1]  1/16

## 9

97 percent [2]  7/10 18/10

## A

able [11]  26/16 29/2 34/7
34/14 34/19 40/10 40/18
44/20 45/12 49/25 64/23
about [42]  8/16 10/21 14/9
15/1 19/14 19/15 19/16 20/14
20/18 21/19 28/19 29/24
30/15 34/8 38/9 39/18 42/2
45/22 46/2 46/4 48/8 49/3
49/4 51/11 53/20 54/4 56/5
58/22 58/24 59/1 60/4 60/13
61/11 66/14 66/19 70/11
70/24 71/2 71/19 75/8 75/21
76/4
above [1]  38/7
absolutely [6]  21/5 24/2 25/3
55/7 57/3 71/4
academic [2]  48/13 48/17
acceptable [2]  33/12 51/3
accessory [1]  54/4
account [8]  6/17 16/5 26/3
26/4 44/8 46/25 51/23 52/6
accounts [23]  6/15 6/16 7/14
13/3 13/5 13/8 13/9 13/11
13/12 25/22 26/23 26/24
28/12 28/13 30/17 43/3 46/2
46/4 46/5 50/17 50/18 52/12
53/1
accurate [2]  74/16 80/9
acknowledge [1]  52/22
acknowledged [1]  29/13
acquiring [1]  70/1
across [1]  27/23 60/4

Act [2]  58/19 61/24
acts [1]  58/4
actual [4]  16/25 46/5 61/5
63/19
actually [17]  4/16 10/3 19/1
21/18 27/5 28/16 43/18 45/7
45/20 46/16 48/14 48/20
51/15 52/23 56/1 69/6 78/8
add [2]  14/6 53/19
addition [3]  8/25 61/23 63/13
additional [1]  70/23
address [4]  6/10 10/11 61/25
68/3
addressed [2]  64/9 73/12
adds [2]  27/8 43/15
admit [1]  46/21
admits [1]  16/5
admitted [3]  15/5 38/13 38/14
adopted [5]  28/21 28/22 57/24
58/5 58/14
adopts [2]  59/25 61/6
advance [1]  42/13
advanced [3]  9/5 31/1 52/2
advertisement [1]  49/3
advertising [1]  55/25
advocate [1]  45/10
affect [1]  59/11
affects [1]  61/4
after [16]  4/22 5/11 14/2 23/4
25/10 25/22 27/7 47/15 54/22
55/18 55/23 56/2 58/6 68/11
69/16 73/14
afternoon [4]  3/5 3/14 3/22
59/18
afterwards [1]  49/17
again [16]  13/14 20/18 31/5
31/22 33/7 38/9 39/8 40/17
40/23 40/25 70/14
against [1]  23/21
agree [10]  5/9 11/17 11/17
18/1 18/15 26/4 35/9 38/7
44/16 45/9
Agreed [1]  11/16
ahead [2]  42/18 61/22
aid [1]  59/21
ALCON [51]  1/7 1/7 1/8 3/18
3/23 4/14 10/20 10/21 11/1
13/4 13/5 13/11 13/13 15/10
15/12 23/1 23/2 29/4 30/5
36/22 37/4 43/3 43/5 47/13
50/17 50/18 50/18 52/13
52/25 61/6 61/16 61/17 62/1
62/4 62/13 62/20 62/25 63/20
65/24 68/11 68/17 69/6 69/12
69/12 69/16 69/22 70/16
71/12 71/18 73/13 76/16
Alcon's [14]  30/17 47/9 52/21
60/3 63/5 64/19 69/8 69/17
70/4 70/5 71/8 72/1 72/12
77/25
all [82]
allegation [1]  71/14
allegedly [2]  4/12 12/20
allocate [1]  69/18
allocation [1]  61/7 69/10
allow [1]  11/12
allowed [4]  14/20 14/24 15/3
24/1
almost [4]  29/3 32/10 43/18
45/19

# A

already [4] 6/17 9/2 38/5 77/2
also [22] 7/12 19/11 19/25
34/4 35/24 37/3 52/10 53/24
54/17 54/20 55/13 61/10
61/25 64/19 66/2 67/5 71/22
74/18 76/25 77/22 77/22
79/18
alternative [1] 22/14
alternatively [3] 22/12 23/13
55/4
always [2] 33/20 80/2
am [4] 5/3 46/8 49/23 59/9
amenable [1] 66/5
AMO [3] 1/3 1/3 1/4
amount [2] 34/17 34/17
analogy [2] 32/19 33/12
analysis [16] 22/13 26/22 27/3
27/6 34/25 37/24 53/13 53/16
61/4 61/5 61/9 61/19 62/1
64/22 65/13 73/12
analyze [1] 15/15
anchoring [1] 11/21
Andrew [2] 70/10 70/14
Andrew McDonald [2] 70/10
70/14
another [10] 4/8 6/18 7/3
31/10 34/11 37/21 63/21
67/16 67/17 79/4
answer [15] 5/15 5/15 14/10
26/13 39/11 52/12 44/3 44/4
47/5 48/11 53/18 57/8 57/12
57/17 58/23
answered [2] 48/15 48/16
answering [2] 70/4 72/12
any [19] 4/2 4/3 5/7 6/14 9/22
10/23 19/5 22/7 23/8 23/8
26/20 28/2 31/15 47/11 48/11
62/2 64/11 68/23 77/18
anybody [1] 71/1
anything [13] 6/6 14/10 20/14
25/8 43/17 46/22 54/4 58/15
65/22 66/14 68/18 70/17
79/22
apologize [3] 25/23 42/13
48/5
apparently [1] 24/21
APPEARANCES [2] 1/21 2/1
appears [1] 69/3
applies [1] 75/15
apply [2] 46/16 52/9
apportioning [1] 45/7
apportionment [7] 20/1 27/3
27/6 34/22 43/23 56/6 56/8
appreciates [1] 29/22
approach [3] 41/16 49/18
52/21
appropriate [1] 61/14
Archer [2] 80/11 80/12
are [63] 3/10 4/14 7/10 8/9
9/3 9/7 11/11 11/25 12/12
13/8 15/5 15/8 15/12 18/5
18/7 18/13 18/20 18/24 19/11
19/21 21/23 21/24 22/22 24/7
24/15 24/25 28/11 28/13 29/4
29/5 31/2 31/12 31/14 34/4
34/5 34/7 40/5 40/18 45/10
45/21 47/24 48/16 51/22 52/6
54/13 54/14 54/17 54/20

# 54/22 59/12 60/15 60/18
60/19 62/18 64/11 64/18
64/20 64/20 67/22 69/18 70/10
78/1 79/6
argue [1] 59/14
argued [1] 65/24
arguing [2] 15/21 19/17
argument [18] 1/14 11/4
15/22 22/21 24/11 26/19 29/3
29/8 38/23 46/9 46/22 67/3
67/13 67/19 68/15 70/20 71/6
78/11
argument's [2] 37/3 42/6
arguments [1] 67/12
around [1] 54/25
arrangements [1] 10/12
arrives [1] 12/22
ARSHT [1] 1/22
articulation [1] 36/8
as [38] 4/6 4/9 17/1 26/25
29/13 29/22 30/6 30/10 30/13
30/13 30/18 33/12 33/13
41/16 42/22 44/10 44/23
45/13 48/21 50/16 52/24
54/24 54/24 56/19 57/23 58/6
61/19 63/15 64/25 68/13
68/15 74/6 75/1 75/12 77/24
78/18 78/18 80/1
ask [5] 10/10 36/16 42/9 68/5
77/4
asked [13] 50/11 53/19 54/8
62/20 67/3 75/7 76/19 76/20
76/21 76/24 77/10 77/12
77/15
asking [2] 54/3 54/10
aspect [1] 21/2
asserted [1] 4/2
Assisted [1] 6/14
associated [3] 34/4 34/5
47/14
assume [4] 37/3 38/12 51/17
57/11
assumed [1] 67/7
attempt [1] 59/23
attenuated [1] 33/16
attribuality [1] 36/5
attributable [13] 16/20 17/18
17/24 18/6 18/14 18/17 20/4
25/1 35/24 43/25 48/20 56/23
64/21
Audi [10] 28/24 29/12 32/3
32/7 33/9 33/20 33/23 34/8
44/21 48/25
Audi TT [1] 28/24
audit [1] 71/16
August [1] 77/8
authorities [2] 71/11 71/16

# B

back [12] 11/21 16/15 26/11
27/21 36/3 39/8 43/11 43/22
49/16 67/19 75/14 77/8
backs [1] 63/2
based [17] 10/7 10/9 12/7
13/1 13/9 20/5 55/18 62/12
62/12 62/14 62/15 62/23
67/24 69/17 70/7 70/12 75/16
bases [1] 13/2
basic [1] 31/3
basically [7] 6/20 8/1 12/15

# 28/11 34/9 41/17 59/3
basis [9] 15/1 15/12 15/13
86/4 23/8 23/16 42/8 67/25
77/12
be [92]
Bear [9] 36/8 39/19 39/21
55/14 55/14 56/3 56/10 56/18
56/24
beat [3] 42/20 43/20 48/2
because [57] 5/4 6/5 7/20 8/8
8/12 8/22 11/3 11/11 11/13
13/20 16/9 18/9 18/25 19/1
19/6 21/7 22/22 22/25 23/6
24/22 26/9 28/20 31/1 31/5
31/25 32/2 33/8 34/10 36/21
38/13 39/11 40/6 40/22 42/17
44/2 44/3 44/8 44/14 44/21
46/15 51/1 62/1 62/14 63/1
63/7 64/23 66/6 67/1 67/6
70/1 70/5 71/10 71/15 71/22
72/12 73/13 78/6
been [14] 12/10 18/17 26/12
31/12 37/16 48/11 54/12
54/25 57/20 57/21 62/3 62/16
65/2 79/12
before [21] 1/18 8/19 13/18
13/19 17/23 53/15 56/5 56/7
57/5 57/18 57/19 57/23 59/16
65/10 67/16 68/10 73/17 74/8
74/11 74/14 79/2
beginning [1] 3/3
behalf [1] 3/23
being [4] 36/22 50/2 58/6
63/13
belies [1] 22/7
believe [4] 45/24 46/10 50/7
79/10
believed [2] 46/22 70/12
below [1] 69/10
besides [2] 6/3 31/16
best [4] 19/7 22/9 50/16 68/13
better [3] 22/21 33/18 41/9
between [14] 13/7 14/21 15/9
16/12 18/11 20/19 23/25
26/21 29/10 44/6 44/13 47/6
73/21 73/23
beyond [5] 4/6 53/24 56/22
57/3 71/23
big [3] 45/5 54/25 62/13
bigger [2] 39/15 64/9
billion [31] 13/20 13/23 22/4
22/8 23/13 23/25 25/21 27/20
27/23 27/24 28/9 28/9 30/21
34/23 37/13 37/18 37/19
43/18 43/22 44/18 45/10
49/21 50/7 50/15 50/21 51/23
52/4 52/9 53/12 55/6 57/1
billions [2] 28/3 28/7
bit [3] 41/9 52/16 54/11
BLITZER [4] 2/4 3/10 59/15
59/19
BLUMENFELD [3] 1/23 3/6
3/8
board [1] 8/12
Bonnie [2] 80/11 80/12
book [1] 8/17
books [8] 6/7 7/21 8/15 11/11
14/12 15/7 15/9 64/19
booth [3] 40/2 40/3 40/7
both [3] 48/7 15/12 76/8

# 78/18
bought [3] 23/3 23/4 29/16
brand [2] 29/6 56/10
break [1] 14/18
breaks [1] 11/2
brief [12] 4/19 13/25 30/14
59/21 69/6 69/8 70/4 72/12
73/21 73/22 73/23 73/24
briefly [1] 70/18
briefs [4] 30/10 75/2 78/7 78/9
bring [5] 5/8 24/1 49/8 71/2
broad [1] 60/20
brought [4] 22/21 38/6 53/14
59/20
bubbled [1] 68/6
bunch [1] 6/23
burden [37] 8/14 11/14 11/18
19/23 19/24 27/10 27/11
27/14 28/15 28/18 29/9 29/20
31/7 31/22 34/18 34/22 38/10
38/12 38/13 39/22 40/15
40/16 43/20 43/21 44/10
44/11 44/14 45/11 45/17
45/24 49/16 49/20 56/10
60/20 63/1 77/23 77/25
burden's [1] 42/25
burdens [1] 39/9
business [13] 11/1 11/1 14/25
15/13 19/17 19/19 36/24
38/22 62/5 62/9 70/1 70/6
70/6
buy [5] 10/3 30/2 33/19 33/19
37/3
buying [2] 10/13 46/9

# C

C.A [1] 1/6
calculates [3] 12/7 12/18
50/14
calculation [5] 13/9 13/15
13/20 13/21 22/7
calculations [2] 13/1 65/10
call [3] 5/20 72/17 72/22
calls [1] 12/19
came [4] 26/24 38/21 39/3
49/16
campaign [1] 55/25
can [48] 6/17 6/18 13/22 17/6
18/21 19/4 19/6 19/22 20/3
20/6 22/9 22/13 22/18 23/9
23/16 30/2 30/10 33/21 38/10
38/24 39/6 40/15 40/22 41/9
42/12 42/14 45/16 46/16
46/23 47/13 47/23 50/13
50/20 53/18 56/5 63/21 64/8
66/20 67/18 68/5 71/2 71/2
74/1 78/3 78/19 78/24 78/24
79/18
can't [8] 8/1 52/8 57/12 60/11
60/19 63/2 66/5 79/2
candid [1] 67/15
cannot [4] 52/8 54/1 62/25
64/12
cap [1] 51/1
capital [6] 61/6 69/9 69/19
69/20 70/2 70/8
capsule [1] 9/6
captured [1] 37/19
car [8] 8/8 29/17 29/25 30/1

**C**

car... [1]  30/3
careful [2]  28/5 77/11
carefully [1]  67/20
carriers [1]  30/2
carve [1]  49/7
case [51]  4/3 4/18 7/25 8/1
11/12 15/1 18/17 18/23 18/25
20/3 21/15 21/18 27/16 28/20
28/21 28/23 31/23 32/3 32/20
33/18 33/22 33/23 33/25 34/8
35/16 35/22 36/9 36/9 39/19
39/21 44/21 44/21 48/25
49/18 49/23 55/8 55/10 55/14
55/15 55/17 56/18 56/24
58/11 61/10 62/17 63/20
66/19 66/21 78/10 79/7 79/10
66/17 67/10 78/12
cases [6]  7/13 39/19 46/14
48/16 60/17 78/12
Catalys [7]  7/3 13/6 13/12
26/24 46/5 50/19 50/19
cataract [4]  6/15 9/3 9/8 9/17
categories [1]  60/21
category [10]  29/11 37/10
40/10 40/19 42/21 48/23 49/8
49/8 49/24 56/15
causal [30]  3/25 11/18 12/20
18/11 18/12 19/23 19/24 20/4
21/3 22/7 22/11 24/9 26/20
27/4 35/10 35/13 35/20 35/22
36/6 37/6 38/8 49/6 49/10
55/7 55/9 55/11 56/7 56/15
67/7 67/10
causality [2]  20/14 24/23
causally [1]  56/11
causation [8]  12/1 12/2 12/21
13/15 35/1 43/24 52/25 56/19
caused [10]  27/5 27/13 27/13
29/5 35/2 35/15 36/11 36/14
37/10 37/13
centers [3]  9/2 10/2 13/3
CEO [1]  76/15
certainly [2]  57/21 67/19
CERTIFICATE [1]  80/6
certify [1]  80/8
cetera [1]  69/14
CFC [1]  1/6
challenge [3]  13/16 13/17
24/7
Chamberlain [10]  71/18 71/23
72/7 72/23 72/24 72/25 73/10
73/15 73/20 74/20
chart [3]  43/6 45/2 45/13
check [1]  35/23
chief [2]  69/13 69/13
chunk [1]  22/14
circle [1]  44/24
Circuit [9]  20/9 28/21 28/22
35/16 37/1 40/18 48/15 55/10
55/15
Circuit's [1]  36/8
circumstances [1]  21/15
circumstantial [3]  29/9 29/21
35/18
citations [1]  61/16
cite [4]  20/3 20/6 36/9 66/22
citing [1]  20/18
claim [1]  35/13
claiming [1]  56/22

clear [14]  4/5 4/8 15/1 23/22
23/23 25/23 58/7 45/2 47/13
49/13 55/8 58/23 60/17 74/10
clearcut [1]  59/19
clearly [2]  20/23 77/25
clerk [1]  22/17
close [2]  68/10 73/9
code [11]  4/12 4/12 4/14 19/2
32/13 32/24 33/1 33/4 33/14
57/5 58/1
colleague [1]  25/10 59/15
colleagues [1]  50/11
COLM [1]  1/18
come [11]  6/5 7/20 12/9 24/10
26/17 43/22 44/11 46/6 50/2
58/20 63/4
comes [3]  42/5 43/1 75/2
comfortable [1]  49/22
coming [6]  6/8 30/11 33/13
38/3 77/19 78/21
commenced [1]  3/3
commercial [21]  28/25 29/5
29/11 29/15 29/17 29/18
29/25 30/6 32/6 32/6 32/7
32/13 32/15 32/16 32/17
32/20 32/21 32/22 33/8 33/9
55/21
committee [2]  69/11 69/15
common [3]  25/20 57/20 58/9
companies [1]  70/1
company [11]  8/2 15/10 27/24
34/1 36/17 46/24 62/4 68/16
68/20 68/20 68/24
company's [1]  60/1
compare [1]  61/8
compared [2]  26/22 61/20
comparison [2]  13/7 61/8
compelling [2]  16/7 32/2
completely [3]  60/24 62/25
65/21
complicated [1]  49/1
comport [1]  65/17
compromise [2]  46/9 49/23
computer [6]  33/1 57/22 58/6
58/10 58/11 58/12
concede [1]  4/9
concerns [1]  67/21
concluded [1]  80/3
conference [1]  78/21
confers [1]  77/7
confirmed [1]  31/12
confirming [1]  75/12
confused [2]  75/6 75/13
confusing [1]  42/13
Congress [1]  8/11
conjunction [2]  68/24 74/15
connection [10]  14/21 16/9
18/11 18/12 47/23 47/24 48/4
56/13 67/7 75/4
connections [1]  71/12
CONNOLLY [1]  1/18
considered [1]  64/7
consignment [2]  10/2 18/25
constant [1]  64/13
consulting [1]  68/20
consumers [1]  21/19
contact [6]  36/22 36/22 36/23
37/4 47/1 47/22
contain [2]  4/3 4/13
contained [1]  61/4

contains [1]  4/11
contemplated [1]  78/13
contemplates [1]  11/14
context [1]  17/6 33/18 34/8
34/9 49/25 56/12
continue [2]  8/20 69/25
CONTINUED [1]  2/1
contrary [6]  35/15 35/16 60/9
66/12 66/14 77/23
control [1]  43/4
conversation [2]  70/9 71/17
conversations [3]  61/17 71/3
74/19
conviction [1]  58/24
convoyed [6]  17/5 17/7 18/19
32/9 34/18 49/2
copyright [10]  16/17 16/25
17/14 17/18 32/19 32/23
58/13 60/9 61/24 63/14
copyrightable [3]  57/6 57/23
58/7
copyrighted [4]  4/4 16/21 25/2
57/18
copyrights [1]  4/3
correct [12]  5/13 28/10 33/2
35/25 36/5 38/16 38/16 44/18
51/7 54/6 73/16 74/2
correcting [1]  51/14
correction [1]  72/9
correctly [2]  9/6 58/4
correlation [14]  12/1 12/3
12/21 13/14 19/7 19/9 19/18
22/10 31/11 33/10 52/22 54/1
57/2 67/9
corroborate [2]  71/6 71/20
corroborated [1]  72/6
corroborating [3]  71/19 75/1
75/2
cost [2]  61/2 64/8
costs [7]  60/14 61/2 61/10
64/7 64/9 64/11 78/2
could [31]  6/14 6/20 7/3 7/7
8/7 8/10 8/19 14/16 14/18
15/4 15/5 26/5 27/18 28/19
36/16 38/23 39/18 42/8 44/3
44/16 45/9 45/13 45/23 45/24
48/17 49/20 50/3 59/6 68/13
76/19 76/21
couldn't [2]  38/14 47/22
counsel [4]  2/5 2/14 3/9 3/15
Counsulnet [1]  66/21
count [4]  19/5 23/2 37/4 47/4
country [2]  28/24 29/12
couple [3]  12/10 25/19 60/8
course [5]  14/25 30/13 61/12
62/23 68/6
court [18]  1/1 1/18 28/5 29/8
34/7 40/17 41/14 53/15 54/11
55/17 56/3 59/16 63/4 68/5
79/1 80/6 80/12 80/13
courtroom [1]  3/3
courts [3]  17/22 20/10 49/12
cover [1]  69/9
created [4]  15/18 19/11 19/13
77/3
credibility [1]  47/3
cross [9]  18/18 60/12 61/24
63/3 63/6 64/15 66/5 66/5
70/19
cross-exam [1]  61/24 70/19

cross-examination [2]  60/12
66/3
cross-examine [1]  18/18
Cross-talking [1]  18/18
cured [1]  60/11
customer [2]  46/3 46/3
customers [8]  4/21 5/10 14/1
14/2 18/24 21/18 23/3 55/20

**D**

damage [1]  17/1
damages [4]  21/8 44/24 45/10
50/4
DAMLE [8]  2/4 3/10 15/20
25/15 41/7 44/4 46/19 46/20
data [12]  28/17 46/3 49/17
62/3 62/15 62/16 62/16 62/17
62/18 62/23 67/22 76/25
Daubert [11]  15/17 38/6 53/15
54/16 55/1 55/2 59/22 60/7
63/10 66/2 67/2
David [1]  71/18
David Chamberlain [1]  71/18
Davis [27]  12/13 15/16 34/20
34/21 60/24 61/9 62/1 62/11
62/19 63/3 63/4 66/5 65/13
66/6 68/14 70/9 70/20 70/21
70/25 71/3 71/7 71/14 73/11
73/22 75/3 75/3 75/15 75/24
Davis' [8]  25/5 34/25 59/23
63/23 64/16 65/5 73/24 74/25
day [3]  74/8 74/8
dead [3]  42/20 43/20 48/2
deal [3]  3/20 56/21 56/22
dealing [1]  49/12
debate [1]  48/17
decade [1]  78/2
decide [7]  21/25 22/24 38/25
59/11 69/16 78/18 79/14
decided [3]  46/1 59/7 70/25
decision [6]  9/12 10/8 19/1
21/17 55/22 78/24
decision-making [1]  9/12
decisions [4]  18/24 21/19 24/9
70/7
deduct [6]  60/2 60/22 61/1
61/9 61/15 65/14
deductible [9]  16/19 17/17
25/1 60/15 60/19 63/6 68/14
71/23 72/1
deduction [4]  64/17 75/16
75/17 78/1
deductions [13]  12/13 15/10
15/16 19/25 61/24 64/5 65/1
65/3 65/7 65/9 66/21 67/24
78/13
deducts [1]  64/18
deemed [1]  57/5
deep [1]  68/19
defendant [6]  8/14 19/25 29/3
39/25 60/14 60/19
defendants [3]  1/9 2/14 3/15
define [2]  16/23 78/15
defined [1]  58/25
definitely [5]  11/6 28/1 47/12
48/6 66/16
definition [1]  35/5
DELAWARE [2]  1/2 1/16
delta [1]  13/3
demonstrate [3]  19/22 19/24

**D**

demonstrate... [1] 20/19
demonstrating [1] 56/11
demonstration [1] 56/4
department [2] 30/12 71/18
depends [1] 8/9
depose [2] 65/4 65/6
deposition [10] 63/23 65/5 70/11 70/21 70/25 74/25 76/5 76/20 76/20 76/25
determine [1] 27/4
DEVELOPMENT [1] 1/3
device [2] 7/9 19/2
devices [6] 7/13 10/25 10/25 54/1 54/14 54/18
did [27] 12/6 22/3 23/10 26/17 26/22 27/2 29/19 41/13 43/11 46/20 49/16 49/16 53/2 53/3 53/7 58/1 61/9 64/24 67/8 67/12 68/4 68/19 69/24 75/20 75/23 77/4 77/4
didn't [16] 13/25 23/21 25/23 25/25 29/19 30/8 31/6 43/17 54/4 58/3 58/10 62/20 66/24 77/9 77/17 77/18
difference [6] 13/2 43/7 43/10 43/13 45/22 50/16
different [20] 4/25 6/19 6/24 13/1 22/4 27/9 29/23 31/18 31/18 33/22 41/22 48/25 53/4 53/15 60/25 61/12 61/13 61/14 61/16 74/12
difficulty [1] 8/12
digital [2] 9/5 54/21
direct [1] 33/13
directly [2] 33/13 44/5
disagree [3] 12/20 17/8 55/5
disagreement [1] 48/18
discharged [2] 43/21 44/14
discovery [8] 68/7 68/10 73/2 73/9 73/18 77/5 77/6 77/7
discuss [1] 27/18
discussed [1] 33/23
discusses [1] 70/4
discussing [2] 36/4 37/16
discussion [3] 48/11 59/21 69/11
disentangle [1] 26/16
Disentangling [1] 27/12
disgorgement [2] 34/9 73/12
disgorging [1] 68/12
dismissed [1] 26/25
dispositively [1] 49/5
disprove [1] 26/20
dispute [3] 17/12 36/13 55/12
disputed [1] 76/14
dissatisfying [1] 53/17
DISTRICT [4] 1/1 1/2 1/18 80/13
dive [1] 68/19
dixit [1] 63/5
do [70] 4/2 5/2 5/9 5/15 5/20 6/7 6/8 6/9 7/12 7/12 7/21 7/21 8/3 8/17 9/1 9/14 9/15 10/11 12/2 12/2 12/9 13/17 14/12 15/11 19/25 20/14 20/15 22/18 23/8 24/4 24/21 26/4 27/22 28/2 31/15 33/11 34/22 35/9 37/7 38/7 39/7

drawing [3] 53/21 54/10 54/24
drawn [3] 53/24 54/12 54/25
drive [3] 11/7 19/9 19/9
driven [1] 21/24
drives [4] 19/4 23/1 32/7 48/3
driving [1] 30/11
dryer [1] 34/11
duke [1] 38/24
during [4] 28/24 68/6 68/15 71/5

**E**

each [4] 13/9 35/14 60/21 71/15
earlier [7] 25/23 50/16 60/16 61/20 63/16 64/16 77/24
easier [2] 21/8 21/8
ECA [1] 69/10
effect [4] 27/12 31/21 56/1 56/4
effectively [1] 41/22
effort [1] 27/3
Eighth [2] 28/21 37/1
Eighth Circuit [1] 37/1
either [3] 24/18 62/13 62/25
element [2] 56/19 66/1
elements [3] 16/20 17/17 25/1
ELLIS [2] 2/11 3/16
else [10] 5/2 7/2 8/9 14/10 25/8 46/22 58/15 65/22 70/17 79/22
encounter [1] 46/13
end [7] 4/24 9/9 9/16 44/2 61/21 73/18 79/1
enjoyed [1] 80/2
enough [4] 24/19 32/23 48/22 72/14
entire [11] 8/5 13/22 14/24 15/3 27/24 40/10 40/11 40/19 61/3 69/7 70/3
entirely [2] 22/4 32/16
entirety [1] 63/24
entitled [1] 16/25
equipment [5] 9/7 9/10 10/24 47/11 55/1
equivalent [1] 33/17
especially [3] 21/16 31/11 67/13
ESQ [9] 1/23 2/3 2/4 2/4 2/8 2/11 2/12 2/12 2/13
establish [2] 12/2 20/24
established [3] 3/25 35/10 35/11
establishing [2] 16/16 17/14
eve [1] 69/14
eve [1] 78/18
even [16] 7/8 7/11 8/4 16/6 18/15 29/13 29/17 29/19 38/7 38/14 42/10 46/24 61/21 62/19 63/8 63/18
event [1] 68/23
ever [3] 74/22 74/24 75/8
every [6] 16/5 21/2 35/14 44/7 44/21 54/14 71/4 71/15
Everybody's [1] 46/14
everything [2] 18/25 46/24
evidence [30] 10/17 10/18 18/23 21/15 24/3 29/10 29/21 31/18 35/17 35/20 35/21 37/6 37/8 37/19 37/9 37/12

38/8 39/21 40/7 40/15 48/4 48/7 51/1 55/4 55/5 55/7 67/25 71/6 77/19 78/2
evidentiary [1] 23/16
exact [1] 74/6
exacting [1] 60/23
exactly [6] 5/5 7/4 29/3 42/18 56/25 63/10
exam [2] 61/24 70/19
examination [2] 60/12 66/5
examine [1] 64/15
example [4] 10/20 15/15 33/22 34/11
Excel [1] 75/11
Except [1] 72/6
excerpt [1] 72/13
excitement [1] 40/6
exclude [2] 54/4 54/23
excluded [1] 60/7
exclusive [1] 10/11
executive [2] 69/11 69/13
executives [2] 70/6 76/16
exercise [2] 53/21 54/11
exercises [1] 54/24
Exhibit [6] 68/22 69/4 69/8 70/4 72/4 72/12
Exhibit 22-A [1] 69/4 74/4
Exhibit 40 [2] 68/22 70/4
Exhibit 48 [2] 69/8 72/12
existence [2] 57/5 71/8
expedition [1] 56/12
expense [1] 60/21
expenses [19] 16/20 17/7 25/1 59/24 60/3 60/18 61/1 61/14 62/9 62/17 64/17 64/18 64/19 64/24 68/14 68/16 68/18 71/23 72/2
experience [2] 40/5 70/13
expert [20] 15/16 26/19 26/20 30/8 30/9 40/4 40/24 43/2 43/23 44/7 44/11 44/17 52/21 53/2 53/16 62/7 64/25 66/20 70/12 73/21
experts [5] 9/13 10/11 21/16 21/20 38/24
explain [4] 40/22 42/16 45/13 49/25
explained [1] 77/22
explaining [3] 41/2 45/6 45/14
extended [1] 68/10
external [1] 70/1
extra [1] 48/21
extras [1] 33/19
eye [1] 9/11
eyedrops [1] 47/14

**F**

F.3d [1] 20/8
fabulous [1] 41/8
face [1] 63/15
fact [11] 7/9 9/24 10/18 10/24 22/5 22/13 25/24 56/17 68/10 73/9 73/18
factors [4] 16/20 17/18 25/2 27/14
facts [4] 5/3 11/20 11/20 21/15
factual [4] 21/22 25/19 26/14 38/23
factually [1] 45/15

**D**

—41/2 41/4 42/14 42/16 43/5 43/16 44/9 46/24 47/19 47/19 48/22 49/14 49/19 50/7 50/12 53/21 56/7 57/4 57/7 57/10 65/11 67/6 68/18 69/24 69/24 69/25 78/8 78/24 79/17
doctor [2] 5/17 31/14
doctor's [5] 5/19 5/19 8/17 10/7 37/3
doctors [2] 7/11 18/24
document [47] 15/17 31/10 51/11 52/5 53/3 53/4 62/6 63/14 63/21 64/2 64/3 64/4 64/6 64/7 64/10 66/7 68/1 69/11 69/15 70/11 70/12 70/21 70/24 71/5 71/6 71/7 71/19 71/19 71/24 72/4 72/7 72/11 72/13 72/16 72/17 72/20 72/23 72/24 73/1 73/7 73/8 73/10 73/15 73/20 74/5 75/22 75/23
documenting [1] 62/9
documents [34] 11/22 11/25 12/1 12/7 12/22 13/2 19/3 19/7 19/10 19/11 21/23 22/5 22/6 29/23 29/23 30/5 35/18 37/15 37/17 39/14 46/1 48/2 52/22 61/17 62/2 63/8 63/9 66/6 66/20 68/2 68/4 68/5 68/13 76/8
does [21] 5/19 9/16 12/25 13/7 13/9 16/7 19/24 25/10 26/6 33/4 35/19 40/23 41/21 41/24 48/19 49/10 50/15 53/25 62/17 64/3 66/14 64/10 65/17 78/15
doesn't [10] 10/23 16/23 33/14 34/25 49/6 49/7 63/18 64/10 65/17 78/15
doing [13] 6/1 6/3 6/18 23/15 23/19 27/7 27/8 41/7 42/22 45/17 54/6 59/4 61/11
dollar [2] 13/20 22/6
dollars [8] 13/23 30/16 43/18 59/24 62/5 65/15 71/13 71/14
don't [55] 4/3 4/8 4/9 4/23 5/3 5/15 5/15 5/16 7/20 10/3 11/12 13/16 14/10 15/17 17/18 17/12 18/15 19/5 21/25 22/20 26/15 27/19 28/17 30/7 31/4 31/6 31/15 32/1 34/20 34/21 37/4 38/3 39/14 42/12 43/1 44/6 46/11 47/9 47/10 47/16 50/24 51/25 52/15 55/12 58/24 59/4 59/10 61/21 62/6 62/11 63/1 65/11 63/13 74/13 76/18
done [17] 7/7 7/10 15/12 15/13 15/24 23/7 34/20 34/21 34/22 35/12 43/22 50/1 53/13 53/15 53/16 61/19 79/14
door [3] 34/1 34/2 34/3
door-opener [3] 34/1 34/2 34/3
doubling [1] 43/14
down [5] 14/18 23/9 23/12 25/12 28/9
dozen [1] 61/16
Dr [1] 10/12
draw [6] 15/6 21/12 21/13 47/18 53/21 53/23

**F**

fails [1] 60/24
fair [5] 14/22 24/19 32/23
52/17 72/14
fairness [1] 52/23
far [5] 11/8 11/11 30/13 52/14
54/24
favor [1] 7/16
February [1] 68/9
February 14 [1] 68/9
felt [2] 71/19 71/25
Femtosecond [1] 6/14
Femtosecond-Laser-Assisted
[1] 6/14
fight [2] 35/5 38/4
figure [14] 5/8 12/6 20/23
37/21 39/3 44/24 51/16 62/3
62/10 62/12 62/14 64/12
65/12 75/10
figures [1] 27/17
Finally [1] 54/20
finance [2] 68/17 70/15
financial [8] 61/16 62/8 63/17
69/13 69/18 69/22 70/7 77/7
find [3] 32/1 33/11 47/17
fine [1] 41/10
finish [2] 8/20 79/2
first [24] 8/20 11/20 20/18
37/24 48/12 59/7 59/15 59/16
60/9 63/23 63/25 67/2 67/14
68/11 68/12 68/15 73/13
74/22 74/24 75/4 75/8 75/20
75/24 76/4
fish [2] 22/4 22/15
fit [4] 33/8 33/14 53/25 65/24
fits [1] 54/5
five [1] 61/13
fix [1] 66/5
FLACS [21] 5/21 5/22 5/22
5/22 5/25 6/3 6/13 6/18 6/19
7/8 7/12 7/13 8/25 9/1 9/14
9/20 10/9 10/22 10/25 18/5
18/13
FLAM [1] 5/20
flawed [1] 13/21
focus [4] 6/16 17/13 78/8
79/18
focused [1] 36/1
focusing [1] 4/11
folks [2] 69/12 69/22
follow [1] 32/8
follow-on [1] 32/8
following [1] 45/9
follows [1] 32/9
footnote [3] 59/25 61/4 61/20
footnoted [1] 23/22
forecast [2] 60/1 63/18
foregoing [1] 80/8
foresaw [1] 8/12
forever [1] 9/11
forgot [2] 57/15 79/3
formed [1] 67/2
forward [5] 28/23 34/19 47/21
69/19 70/6
forward-looking [1] 70/6
found [2] 27/7 43/25
four [2] 26/25 61/12
fours [1] 40/20
framework [1] 20/16

FRANK [2] 2/12 3/17
frankly [1] 38/20
Friday [1] 1/13
friends [1] 45/4
front [7] 14/21 15/3 38/5 41/2
45/5 52/24 79/4
full [3] 34/17 34/17 72/13
funny [1] 51/15
further [1] 20/15

**G**

gallery [1] 3/18
game [2] 45/11 45/17
gave [2] 4/16 49/17
general [2] 8/7 60/20
generalization [1] 46/2
generated [2] 36/12 40/6
gentleman [1] 46/18
get [49] 4/18 5/3 6/8 8/7 8/19
11/10 11/19 13/25 14/19
15/20 15/24 17/6 19/17 19/18
20/21 21/8 21/8 22/18 23/17
24/4 27/20 30/7 31/4 31/8
31/11 34/14 37/25 38/7 38/25
39/3 39/5 39/6 40/24 41/1
41/3 41/19 41/25 42/10 44/2
45/5 47/15 53/5 56/7 56/14
68/22 69/19 70/23 78/24
79/14
gets [2] 9/9 49/14
getting [3] 9/25 12/14 12/15
give [7] 14/13 23/8 25/7 31/5
33/21 37/21 62/20
given [6] 31/11 67/13 76/15
76/18 76/22 78/14
giving [4] 22/9 44/13 73/5
73/7
go [18] 11/8 11/20 11/21
16/15 20/7 20/15 36/3 42/18
52/25 54/24 55/18 56/2 59/14
62/9 67/17 67/19 68/11 71/9
goes [3] 10/22 27/11 39/8
going [47] 4/17 5/7 5/7 7/19
7/19 8/3 11/11 11/13 12/12
14/20 15/6 19/20 24/5 24/7
24/18 24/21 24/22 24/25 36/3
39/10 39/12 42/9 45/14 50/9
52/15 57/9 57/19 59/14 64/18
64/21 67/19 68/11 69/18
69/19 71/9 72/17 73/13 73/14
75/24 77/2 77/8 77/19 77/21
78/6 78/16 79/4 79/13
gone [2] 45/23 45/24
good [11] 3/5 3/14 3/22 25/15
32/19 38/22 56/21 59/18
67/19 70/19 78/11
Googled [1] 51/16
got [32] 4/24 6/23 9/1 9/21
10/13 11/6 13/25 15/24 20/23
20/23 21/22 24/2 26/10 29/1
30/14 31/9 35/4 36/6 38/12
38/18 39/5 39/5 42/4 42/17
56/7 59/5 66/23 67/16 67/20
68/13 77/11 78/20
grab [1] 22/15
Graham [2] 20/13 20/18
granular [1] 6/6
granularity [1] 26/15
great [3] 3/11 14/17 56/21
GREGG [2] 2/12 3/16

Gregg LoCascio [1] 3/16
gross [32] 8/18 18/18 18/23
7/16 20/11 20/20 24/6 24/12
27/4 27/9 27/17 28/24 29/16
34/16 35/5 35/9 36/17 38/15
39/23 39/25 40/9 40/11 40/18
46/15 46/23 46/24 47/17
48/22 56/20 58/24 78/15
ground [1] 25/20
groups [2] 6/13 6/13
guess [11] 7/19 23/18 28/6
32/12 50/25 51/16 57/9 57/19
59/6 72/7 75/6
guys [2] 79/4 79/18

**H**

had [28] 4/21 4/22 5/10 5/11
14/1 24/3 26/14 26/19 27/20
29/14 37/5 46/20 46/21 51/6
52/20 53/11 55/24 56/4 64/24
65/4 65/5 67/6 70/9 70/23
71/3 71/17 74/19 77/6
half [1] 70/22
hand [6] 6/2 13/5 23/6 50/13
50/20 62/23
hands [2] 38/4 62/14
happen [1] 36/22
happening [1] 40/20
happens [1] 10/15
hard [5] 46/16 47/5 47/19
62/15 78/1
has [31] 7/18 9/11 9/13 9/15
10/24 15/17 18/17 21/3 26/5
30/9 31/11 34/20 34/21 35/21
45/12 47/11 48/19 53/17 55/4
55/5 55/6 56/1 58/16 62/3
62/13 62/16 62/19 63/8 63/20
65/24 71/12
hasn't [2] 53/16 66/7
have [108]
haven't [7] 43/22 44/14 49/20
53/13 53/15 66/6 76/25
he [7] 29/2 46/20 46/20 46/21
46/22 46/22 70/15
hear [5] 7/11 7/16 9/13 26/2
58/3 74/22 74/24 75/4 75/20
75/24 76/4
heard [2] 70/19 75/8
hearing [1] 59/6
heck [1] 51/16
HEFFERNAN [3] 2/11 3/16
3/23
help [3] 9/5 54/21 59/20
helpful [2] 41/9 65/25
helps [1] 67/16
her [33] 9/11 12/25 13/19
16/19 17/1 22/5 22/6 22/10
22/14 34/24 37/23 42/22
50/12 53/5 61/3 61/9 61/11
62/21 63/24 63/25 70/10
70/12 70/21 70/25 71/20 73/5
73/7 73/11 74/9 74/15 76/1
76/5 76/9
here [27] 3/24 4/12 8/20 16/4
19/4 20/18 29/4 32/11 32/23
33/16 36/13 38/14 38/21
39/15 40/12 40/21 44/24
49/24 56/25 57/7 60/11 60/14
61/4 62/10 64/15 71/22 72/4
here's [11] 4/15 5/4 5/5 38/11

41/18 43/19 43/21 46/17
hereby [1] 80/8
hey [2] 5/4 22/25
higher [2] 64/4 70/2
highest [1] 69/19
him [1] 17/1
his [3] 9/11 16/19 40/4
historical [1] 70/7
Hold [3] 14/7 53/10 54/3
honestly [1] 66/24
Honor [36] 3/7 3/14 3/22 5/13
12/5 12/23 13/18 13/19 14/5
20/2 22/2 23/10 24/10 25/15
26/8 26/13 28/4 29/22 41/5
42/13 43/9 44/1 44/16 48/24
49/22 50/13 51/7 53/19 54/7
58/16 58/21 59/10 59/18 74/1
79/19 79/21
Honor's [3] 45/8 51/11 53/3
HONORABLE [1] 1/18
horse [3] 42/21 43/21 48/2
hospitals [2] 10/3 10/3
host [1] 61/3
hours [1] 74/14
how [30] 5/16 5/23 7/21 8/17
10/15 12/9 16/1 19/4 21/6
21/16 24/4 26/17 27/4 27/12
27/13 30/20 38/7 40/23 42/17
42/23 43/5 48/15 48/15 58/25
59/7 68/6 69/18 69/24 70/8
79/16
huge [1] 62/24
huh [2] 57/14 57/14
Huh-huh [1] 57/14
hundreds [2] 59/23 65/14

**I**

I'd [2] 7/17 25/18
I'll [18] 4/16 25/9 44/3 44/4
48/11 58/22 59/1 59/21 60/7
63/12 68/22 74/14 78/7 78/7
78/8 78/16 78/17 78/17
I'm [41] 5/1 5/7 5/7 6/8 7/19
10/20 14/20 22/23 23/20
24/17 28/4 30/13 30/22 31/8
36/3 38/3 42/1 42/9 43/2 46/4
46/12 47/15 50/9 52/17 53/10
53/17 54/6 54/7 54/11 55/11
57/9 57/19 61/21 64/21 65/4
69/7 75/6 75/12 75/24 78/6
79/13
I've [9] 4/24 6/23 9/21 40/23
42/6 59/6 66/23 67/16 67/20
ice [1] 79/12
idea [4] 28/2 56/15 62/19
62/19
identified [1] 63/15
identify [8] 31/24 48/22 60/14
60/21 60/25 64/23 75/1 75/12
imagine [1] 79/2
immediately [1] 16/24
implant [3] 9/13 19/1 54/22
implanted [1] 9/9
important [2] 16/3 30/4
importantly [2] 31/13 66/3
inability [1] 64/15
inappropriate [6] 36/25 60/6
64/20 65/1 65/7 65/9
INC [2] 1/4 1/8

**I**

include [7]  20/25 36/21 36/23 36/24 53/24 64/21 64/24
included [8]  4/20 29/16 29/18 61/13 62/18 63/24 64/11 65/2
includes [6]  14/2 23/5 23/6 23/6 61/15 71/22
including [1]  5/9
inclusive [2]  31/13 72/1
indeed [1]  33/4
indicating [1]  63/16
indirect [3]  3/25 4/6 20/17 21/4 27/17 52/1 54/14 54/17 54/20 55/18 56/9 56/14
indisputably [1]  4/2
individual [2]  6/2 61/1
infer [1]  30/10
influence [1]  59/8
influenced [1]  29/18
information [8]  30/9 31/5 39/3 62/8 62/20 63/2 70/24 77/8
infringe [1]  4/2
infringed [1]  34/15
infringement [14]  17/2 20/19 20/21 21/4 29/11 31/25 33/13 35/2 35/15 36/11 37/10 56/11 56/23 60/19
infringement.' [1]  20/12
infringer [3]  16/19 17/16 36/12
infringer's [5]  16/17 16/18 17/14 17/15 20/20
infringing [4]  4/12 4/12 28/25 32/8 32/16 32/17 34/2 52/1 56/4
inherently [1]  62/24
initially [1]  47/20
inquiry [2]  27/9 27/10
instance [1]  27/21
instead [3]  13/2 50/15 61/3
instructed [1]  42/22
instructive [1]  28/20
insufficient [1]  61/25
intend [1]  60/22
intended [1]  63/10
interest [1]  63/12
interesting [6]  21/12 42/15 42/20 48/13 48/14 48/16
interface [2]  53/25 54/15
internal [2]  21/23 52/22
internally [1]  69/25
interpret [1]  20/11
intraocular [2]  4/1 4/13
invested [3]  69/20 69/23 70/2
investigate [1]  70/8
investigating [1]  69/25
investment [2]  19/17 19/19
involving [1]  31/16
IOL [54]  4/21 5/9 9/6 9/9 9/12 11/1 11/7 13/3 13/23 14/19 14/22 15/3 15/10 15/11 16/5 16/13 18/9 18/13 18/21 19/1 19/4 21/24 22/14 23/1 23/2 25/21 25/21 26/21 26/22 26/23 27/22 27/25 30/3 30/17 30/18 30/18 30/19 30/20 30/21 31/3 36/13 38/21 44/24 48/20 52/13 52/25 59/24 60/3 62/5 62/9 63/5 68/17 73/12 77/7

IOLs [59]  4/1 4/7 4/11 4/14 4/19 4/21 10/1 10/17 10/18 10/23 13/8 14/19 15/9 16/3 18/4 18/5 18/20 19/5 19/21 21/5 21/9 23/4 31/2 31/3 31/16 31/21 31/24 43/5 43/25 45/15 47/8 47/9 47/10 47/12 47/24 48/8 50/17 51/12 51/14 51/18 51/19 51/22 52/1 52/2 52/3 52/5 52/13 54/22 55/2 56/13 59/12 61/2 67/6 67/24 68/12 68/14 68/18 72/2 73/14
ipse [1]  63/5
is [285]
isn't [2]  24/8 43/7
issue [15]  15/2 21/22 45/8 61/10 76/13
issues [2]  6/11 79/7
it [184]
it's [103]
item [1]  60/22
its [8]  56/9 58/14 60/14 63/1 63/15 65/13 70/24 71/13
itself [2]  21/9 62/24

**J**

J's [2]  27/25 59/22
JACK [2]  1/23 3/8
January [1]  1/13
JEANNE [2]  2/11 3/16 3/23
Jeanne Heffernan [2]  3/16 3/23
Jeff [1]  3/18
JMOL [1]  23/17
job [1]  41/8
JOHN [2]  2/8 3/15
John Shaw [1]  3/15
Joining [1]  3/15
Judge [1]  1/18
Julie [1]  15/16
July [1]  77/2
jump [1]  55/3
jumping [1]  55/6
jury [15]  14/21 15/3 21/25 22/23 23/16 38/5 38/24 44/12 44/18 45/2 45/6 50/7 52/24 66/1
just [65]  4/5 4/6 4/8 4/16 8/20 10/10 10/18 12/23 14/19 19/15 21/25 22/20 22/23 22/23 24/22 25/7 25/18 26/13 27/19 28/19 32/1 33/3 33/14 34/14 35/18 35/23 36/17 37/2 38/12 39/18 41/1 41/24 42/1 42/6 42/16 43/23 44/2 45/5 47/15 47/22 50/5 50/20 50/22 52/1 52/19 53/10 56/15 58/22 61/6 63/13 65/12 67/1 67/15 68/5 68/9 70/18 70/20 72/8 72/13 73/10 74/1 78/4 79/3 79/11 79/13
justification [1]  77/18
justified [1]  44/13

**K**

keep [2]  59/21 61/22
KELLER [1]  2/8
kettle [2]  22/4 22/15
kind [12]  5/4 6/6 9/15 9/25 22/19 29/20 35/17 42/14

**46**/14 50/10 57/2 68/6
King [1]  1/16
KIRKLAND [2]  2/11 3/16
knew [1]  73/13
know [57]  5/6 5/16 7/17 7/20 7/25 8/2 10/12 11/8 12/8 14/10 16/22 22/20 23/17 25/25 26/25 27/19 27/22 30/2 38/23 39/14 41/1 41/8 41/19 41/24 43/1 44/9 46/11 46/17 47/2 47/8 47/10 47/16 48/24 49/1 50/25 51/5 51/17 52/16 53/17 53/20 54/7 54/11 57/4 57/7 57/10 57/12 59/4 62/6 62/11 65/23 66/23 67/1 67/18 68/6 71/1 74/13 76/18

**L**

LABORATORIES [1]  1/8
lack [2]  43/24 66/8
Lamp [1]  33/22
language [4]  11/25 30/11 63/16 75/2
laser [2]  4/13 6/14
last [3]  4/24 64/14 78/2
later [5]  15/21 76/9
LATHAM [2]  2/3 3/9
law [21]  4/18 7/25 8/1 15/1 15/5 18/17 49/23 55/8 57/20 58/11 58/13 60/10 60/13 60/13 63/14 64/18 66/12 66/14 66/19 77/23 78/9
lawsuit [1]  19/14
lawsuits [1]  79/4
lawyering [1]  80/2
learned [3]  63/23 68/12 76/18
least [14]  34/24 35/1 36/11 36/14 37/10 37/20 38/1 44/12 44/17 44/20 45/3 45/11 49/20 50/5
leave [1]  48/10 64/14 79/13
leaves [1]  9/10
left [1]  52/11
legally [2]  13/21 44/13
legs [1]  7/18
length [1]  67/2
lens [1]  44/7
lenses [7]  4/13 10/3 36/23 36/23 37/4 47/1 47/22
LenSx [82]
Leonard [3]  20/7 20/8 55/9
less [5]  28/1 28/1 45/20 46/6 49/22
let [15]  4/15 5/8 10/10 11/2 11/21 20/7 21/25 22/23 27/21 28/5 36/16 39/16 61/8 68/5 78/4
let's [24]  3/20 11/19 11/20 16/15 17/13 18/4 23/2 33/5 37/2 38/11 42/6 42/7 47/4 50/22 50/23 52/19 52/20 52/20 56/2 59/14 68/21 72/22 75/14 79/14
letting [2]  54/7 54/11
level [8]  15/13 15/14 26/15 38/13 49/15 61/1 68/16 68/17
Level 2 [1]  49/15
leverages [1]  19/4
liberties [1]  74/9
liberty [1]  27/16

like [25]  4/24 7/22 8/7 9/5 9/19 9/21 14/15 16/8 22/16 22/18 25/18 30/3 30/9 31/9 33/11 33/16 36/4 36/22 36/25 42/22 44/21 46/21 47/1 61/17 79/1
likely [1]  29/14
limit [2]  23/3
limited [4]  25/21 31/5 40/8 52/13
limiting [1]  22/22
line [15]  8/5 15/6 21/12 21/13 47/18 53/20 53/23 53/24 54/10 54/24 54/25 60/2 61/15 61/15
line-drawing [1]  54/10 54/24
lines [2]  36/24 54/12
linked [1]  56/11
listed [1]  60/5
listing [1]  61/13
litigation [1]  77/2
little [6]  11/3 41/9 52/16 54/11 74/12 75/13
LLC [4]  1/3 1/4 1/7 1/8
LOCASCIO [2]  2/12 3/16
logic [1]  34/9
logical [1]  56/20
long [3]  57/19 71/9 79/7
long-term [1]  79/7
look [20]  11/13 14/12 29/4 30/4 30/14 34/24 35/5 36/3 37/23 38/3 39/13 42/7 46/12 53/3 55/9 66/23 67/4 76/2 78/7 78/17
looked [2]  69/21 69/22
looking [2]  27/7 43/3 53/3 70/6
loop [1]  4/19
lose [2]  22/19 39/11
lost [3]  34/3 34/8 34/14
lot [4]  31/18 45/20 46/6 55/24
lots [4]  9/7 29/6 31/18 58/18
lower [1]  28/6
loyalty [1]  29/6
Ls [2]  15/12 15/18
luggage [1]  30/2

**M**

machine [13]  6/13 6/15 7/8 9/1 9/5 9/14 9/20 9/22 10/9 13/4 13/4 13/6 26/5
machines [6]  6/19 6/24 9/2 9/4 23/7 54/21
made [11]  20/24 26/20 29/3 29/5 39/25 42/7 43/15 44/8 55/19 63/20 69/12
majority [2]  7/6 30/25
make [17]  9/8 21/17 22/6 22/21 23/22 24/11 25/23 45/2 49/12 60/17 61/2 62/5 64/1 64/10 67/19 72/8 77/4
making [8]  9/12 18/24 24/14 24/16 29/4 47/16 70/6 70/12
manual [4]  7/12 9/1 18/10 44/9
manually [2]  7/8 7/10
manufacturer [2]  9/14 9/20
manufacturer's [2]  6/14 6/18
manufacturers [1]  10/1
MANUFACTURING [1]  1/3

**M**

many [2] 64/11 64/19
margin [3] 61/6 63/19 64/3
margins [1] 64/4
market [2] 28/6 61/2
marketing [3] 19/11 21/23 30/11
marking [2] 9/5 54/21
material [1] 77/5
materials [1] 4/4
math [5] 27/2 27/8 42/14 43/11 43/16
matter [2] 16/8 29/19
matters [1] 34/23
may [17] 6/4 6/5 7/22 8/8 8/16 9/4 14/5 26/11 39/16 41/5 41/5 41/14 44/1 44/2 50/20 51/7 53/19
maybe [7] 6/18 22/20 32/12 33/21 47/14 70/21 78/10
McDonald [3] 70/10 70/14 74/19
McKinsey [12] 68/20 68/24 69/22 72/18 73/1 73/8 73/17 75/16 76/14 77/1 77/9 78/3
me [39] 3/9 3/15 4/15 4/19 5/8 10/10 11/2 11/21 14/9 15/7 15/7 15/7 20/3 20/7 22/21 25/7 27/21 28/5 31/5 31/12 32/12 33/11 33/17 36/16 37/18 37/21 39/16 40/22 41/1 42/16 47/20 58/23 59/13 61/8 67/16 67/19 75/15 78/4 79/5
mean [24] 8/14 17/5 20/11 20/22 20/23 21/9 23/21 31/9 32/3 32/18 32/19 37/2 37/5 38/4 42/12 45/19 46/11 48/3 48/12 48/25 57/9 59/5 67/18 67/20
meaning [1] 69/21
meaningfully [1] 63/3
means [3] 23/9 38/17 64/5
meant [1] 11/4
meet [5] 60/20 60/24 62/25 65/24 77/7
meeting [3] 44/10 44/11 61/23
MELD [1] 2/13
Melde [1] 3/17
mention [2] 50/24 51/1
mentioned [2] 50/16 68/15
merits [1] 13/17
met [1] 49/20
MICHAEL [1] 2/3
might [4] 6/4 37/19 47/13 56/22
Mike [1] 3/10
Mike Morin [1] 3/10
million [18] 12/6 12/19 13/10 22/6 22/11 22/12 29/1 29/2 29/16 30/16 35/1 43/16 43/19 50/14 52/15 52/15 53/5 57/1
millions [2] 59/23 65/14
mind [4] 19/12 42/7 52/24 78/17
minority [1] 26/6 26/6
minutes [2] 42/16 67/16
mischief [2] 56/22 57/1
misinterpreting [1] 26/12
misleading [1] 15/4

misstated [1] 25/25

**N**

moment [2] 6/16 39/11
money [1] 20/24
monofocal [2] 31/3 52/3
more [23] 5/7 6/6 8/22 19/17 19/18 30/3 31/13 33/15 33/16 37/22 39/6 44/17 55/3 55/24 58/22 59/1 64/11 71/2 71/22 72/1 74/16 78/4 78/10
moreover [1] 63/17
MORIN [2] 2/3 3/10
morning [1] 25/15
MORRIS [2] 1/22 3/8
most [3] 28/20 66/3 70/5
motion [22] 3/21 4/7 7/18 13/16 15/17 15/21 22/10 23/22 38/6 53/15 54/16 54/19 59/5 59/8 65/17 67/3 67/6 67/20 77/13 77/17 79/11 79/11
motions [1] 78/18
Motors [1] 8/8
move [5] 12/6 22/3 23/21 53/7 54/4
moving [3] 24/14 24/15 61/22
Mr. [8] 3/6 3/13 15/20 41/7 44/4 46/19 74/19 74/20
Mr. Blumenfeld [1] 3/6
Mr. Chamberlain [1] 74/20
Mr. Damle [4] 15/20 41/7 44/4 46/19
Mr. McDonald [1] 74/19
Mr. Shaw [1] 3/13
Ms. [45] 3/24 4/5 4/5 12/6 12/13 12/18 13/21 16/4 22/5 25/5 27/2 34/20 34/21 34/23 34/25 39/13 41/12 50/12 55/4 59/15 59/23 60/24 61/9 62/1 62/11 62/19 63/3 63/4 63/23 64/16 65/6 65/13 66/6 68/14 70/9 70/20 70/21 70/25 71/3 71/17 71/25 73/11 73/12 74/25 75/3
Ms. Blitzer [1] 59/15
Ms. Davis [23] 12/13 34/20 34/21 60/24 61/9 62/1 62/11 62/19 63/3 63/4 65/6 65/13 66/6 68/14 70/9 70/20 70/21 70/25 71/3 71/17 71/25 73/11 75/3
Ms. Davis' [6] 25/5 34/25 59/23 63/23 64/16 74/25
Ms. Stamm [8] 4/5 4/5 12/6 12/18 13/21 16/4 27/2 55/4
Ms. Stamm's [7] 3/24 22/5 34/23 39/13 41/12 50/12 73/12
much [15] 23/5 27/5 27/12 27/13 27/16 30/3 30/20 43/5 43/7 43/17 64/4 64/5 64/9 66/11 80/2
multibillion [1] 62/5
multiple [1] 7/13
must [2] 20/19 56/3
my [24] 5/14 6/24 11/10 21/17 23/24 24/20 25/10 27/15 31/6 42/7 42/9 50/9 50/10 50/11 52/24 53/11 59/15 59/21 63/25 64/22 65/9 67/4 75/20 80/9

myself [1] 22/17

**N**

namely [1] 71/24
narrow [2] 51/1 28/9
necessarily [2] 33/9 34/5
necessary [2] 33/5 33/7
need [5] 8/6 55/8 56/13 65/24 65/25
needed [2] 67/11 67/11
needs [4] 9/16 10/9 49/6 60/25
negligible [1] 43/18
neither [4] 5/4 15/10 53/16 68/16
never [4] 18/21 29/14 46/21 49/15
next [5] 78/22 78/23 79/23 79/25 80/1
nexus [23] 3/25 4/9 11/18 12/20 19/23 19/24 21/3 22/8 22/11 24/9 35/10 35/20 35/22 36/6 48/19 49/6 49/10 55/7 55/9 55/11 56/7 56/16 57/2
nexus' [1] 20/19
nice [3] 43/4 67/12 67/13
NICHOLS [2] 1/22 3/8
Ninth [3] 36/8 40/17 55/15
no [57] 1/6 4/13 8/15 10/16 10/17 11/24 12/1 12/16 12/16 12/16 12/16 12/16 14/19 16/9 18/7 18/7 18/11 18/19 19/5 19/13 24/2 24/22 24/23 25/24 25/24 25/24 32/5 35/1 36/13 36/19 38/11 38/11 38/11 38/11 45/20 46/23 46/23 47/3 48/1 50/21 55/7 58/2 61/5 62/19 62/19 63/6 63/7 63/7 65/13 65/13 65/23 67/10 74/24 75/10 76/9 78/6 79/23
NOAH [2] 2/12 3/17
not [130]
note [1] 63/13
notes [1] 80/9
nothing [9] 9/14 44/17 57/3 62/13 66/19
notion [1] 22/7
noun [1] 36/5
Novartis [2] 69/16 69/17
now [31] 5/14 6/8 10/10 11/8 14/9 14/20 14/24 15/22 16/22 17/13 23/5 26/1 31/7 31/22 34/19 38/12 40/12 40/12 42/25 43/9 47/9 61/8 62/4 62/22 63/10 63/20 64/23 70/20 71/1 75/13 78/20
number [24] 26/24 26/25 32/25 35/8 35/9 39/15 44/6 44/19 44/23 50/7 53/4 53/4 53/7 59/22 60/5 61/6 62/22 63/1 63/2 63/22 71/21 71/21 72/1 75/12
Number 1 [1] 35/8
Number 2 [1] 35/9
Number 3 [1] 59/22
numbers [10] 8/13 31/19 43/23 44/14 45/5 45/12 45/22 46/6 46/6 78/1

**O**

obviates [1] 56/21
obviously [2] 7/17 64/11
occurred [2] 4/22 5/11
off [5] 7/17 52/14 60/2 68/19 69/17
offer [1] 44/15
offering [2] 46/8 49/23
office [1] 37/3
officer [2] 69/13 69/13
Official [1] 80/12
often [1] 35/18
oh [11] 12/12 27/20 46/19 46/22 48/5 48/5 54/9 57/15 57/25 77/6 78/25
okay [63] 3/19 5/14 6/20 7/5 7/17 8/24 11/3 11/24 12/4 12/24 14/8 14/11 15/23 19/21 21/6 22/2 23/19 23/20 24/4 24/17 24/19 25/4 25/8 25/11 25/13 26/18 28/8 30/20 30/24 31/8 31/20 32/13 33/24 37/12 38/17 39/10 41/18 42/19 50/8 50/9 52/7 53/6 55/11 55/13 55/18 55/24 58/8 64/6 66/8 66/18 66/25 68/2 69/2 72/14 72/20 72/25 73/4 73/25 74/17 74/21 75/19 76/2 76/13
once [2] 19/23 31/14
one [31] 5/10 6/13 7/1 7/1 9/19 9/20 10/14 13/5 14/16 15/24 16/2 22/19 25/20 26/5 34/5 34/5 39/18 44/1 49/5 52/8 53/25 53/25 59/11 60/2 60/23 62/7 64/14 68/19 70/5 71/7 78/4
one-off [1] 68/19
only [43] 4/20 4/22 5/9 5/11 9/10 10/5 10/6 10/13 11/10 13/19 14/2 14/10 15/2 16/18 17/15 19/24 22/9 23/2 26/1 26/5 26/6 26/25 28/16 29/1 30/9 31/5 40/14 42/6 43/6 45/14 47/23 50/3 51/21 55/2 58/16 60/17 65/24 65/25 66/1 66/4 72/3 76/8 78/2
onsie [1] 49/7
onsie-twosie [1] 49/7
open [1] 78/17
opener [3] 34/1 34/2 34/3
opening [3] 41/12 42/20 73/23
operate [2] 32/14 33/4
operates [1] 33/1
operations [2] 5/16 5/17
ophthalmologist [1] 6/21
opine [3] 59/23 63/5 64/25
opining [1] 75/24
opinion [5] 4/17 4/20 34/24 73/5 73/7
opportunity [5] 25/10 65/4 65/6 65/11 70/23
opposite [2] 10/19 75/18
opt [1] 64/24
oral [5] 1/14 11/4 15/22 67/3 67/4
order [2] 26/15 67/4
other [41] 4/6 4/10 5/18 6/2 6/3 7/9 9/2 9/4 9/7 9/22 10/23 13/6 14/14 16/21 17/18 23/7

other... [25]  25/2 27/13 29/6
30/9 31/10 31/15 34/4 39/19
42/1 43/1 44/21 45/4 45/12
47/3 47/11 47/13 48/16 49/9
62/22 64/2 67/6 72/20 77/18
79/3 79/11
others [1]  61/3
otherwise [1]  21/7
our [30]  4/7 15/16 15/16
23/21 27/10 31/22 42/20
43/11 43/20 43/21 43/23 44/7
44/10 44/11 44/16 45/4 46/6
46/9 50/4 53/16 54/16 54/19
55/1 55/2 60/5 64/15 64/24
68/15 69/18 69/24
out [16]  5/8 8/15 18/20 19/21
20/8 20/23 23/16 30/11 38/24
47/11 50/6 51/16 61/13 63/21
64/25 65/12
outset [1]  10/4
outside [1]  56/1
over [5]  61/12 61/16 64/8
64/10 78/2
overall [4]  39/24 40/9 43/25
49/24
overly [1]  43/2
overreaching [1]  45/17
overshooting [1]  46/14
own [10]  19/3 21/16 21/20
21/22 24/8 29/23 37/24 52/21
64/24 65/13
owner [3]  16/17 16/25 17/15

P
p.m [3]  1/13 3/4 80/3
page [7]  4/19 4/24 13/25
26/19 30/14 69/4 69/9
Page 3 [1]  30/14
Page 8 [1]  69/4
Page 9 [2]  4/19 13/25
pages [2]  61/12 70/22
paid [1]  78/1
pair [1]  23/9
paired [1]  23/12
papers [6]  7/21 42/4 60/5
65/23 66/24 79/3
parameter [1]  56/20
parse [3]  8/15 46/16 49/15
parsing [2]  8/12 11/12
part [13]  4/7 9/3 9/8 20/1
20/22 23/21 29/15 29/15
32/16 47/5 68/25 69/1 70/15
partial [2]  38/1 38/1
partially [5]  36/11 36/14 37/10
37/13 37/20
participated [1]  55/21
particular [5]  8/8 10/8 15/18
19/1 39/2
parties [1]  56/5
parts [2]  8/9 30/1
past [3]  69/23 69/23 70/7
patent [2]  17/6 79/6
patents [1]  79/10
patient [7]  9/10 9/15 9/16 10/8
53/25 54/2 54/15
patient's [1]  10/8
PC [10]  30/17 30/18 30/21
31/2 38/21 51/12 51/22 52/1

52/5 52/13
PC lots [1]  51/12
penetration [5]  13/3 13/8
26/23 26/23 50/17
people [7]  19/13 21/23 29/14
29/15 29/16 29/18 44/9
per [1]  30/16
percent [68]  7/10 12/9 12/11
12/13 18/10 18/20 30/8 30/17
30/23 31/8 31/11 37/18 38/21
39/15 40/5 40/9 40/13 40/14
43/7 43/9 43/10 43/12 43/12
43/13 43/13 45/20 45/21
45/22 45/25 46/7 46/7 46/7
49/11 49/11 49/11 51/6 51/10
51/12 51/22 52/4 52/5 52/5
52/9 52/12 52/14 52/16 52/22
52/25 53/11 60/3 62/3 62/10
62/12 62/14 62/22 63/5 64/3
64/9 64/12 65/12 71/21 71/25
74/22 75/10 75/12 75/16
75/17 75/25
percentage [5]  12/10 26/25
28/16 43/24 52/13
perform [1]  22/13
performance [3]  69/18 69/23
70/7
performed [1]  71/15
performs [2]  13/15 61/5
perhaps [1]  33/18
period [5]  19/21 28/25 36/18
38/15 60/4
permits [1]  24/11
personnel [1]  61/18
phaco [6]  13/4 13/5 13/12
13/13 50/17 50/17
phacoemulsification [1]  9/4
pharma [1]  70/1
pick [1]  50/10
pie [2]  45/1 45/13
piece [4]  9/10 10/23 32/21
47/11
pieces [1]  9/7
place [3]  9/2 9/5 10/1
placed [4]  6/17 13/11 13/12
25/22
placement [3]  27/5 27/12
36/14
placements [1]  54/13
plaintiff [7]  2/5 28/23 39/22
40/8 55/23 59/19 60/15
plaintiff's [2]  29/20 40/4
plaintiffs [1]  1/5 3/9 20/18
25/16
planning [1]  49/19
play [4]  8/23 45/10 54/7 59/12
playing [1]  40/3
plea [1]  59/6
please [2]  3/5 6/11
point [21]  11/15 21/10 21/11
26/19 29/7 30/10 31/9 31/17
36/7 42/8 43/11 43/15 43/20
46/8 49/15 50/6 50/25 53/11
53/14 56/18 78/4
pointed [2]  48/3 64/25
points [3]  25/19 27/1 39/14
Polar [9]  36/8 39/19 39/21
55/14 55/14 56/3 56/10 56/18
56/24
Polar Bear [6]  39/19 39/21

56/3 56/10 56/18 56/24
56/24
portion [3]  31/22 41/3 41/22
posit [1]  18/12
posited [1]  18/12
position [3]  19/21 24/5 63/25
possibility [1]  26/8
possible [2]  6/5 42/10
postdated [2]  58/2 58/3
posture [1]  44/1
pot [1]  13/22
PowerPoint [4]  12/15 22/21
30/15 52/11
PowerPoints [1]  11/6
PP [1]  55/13
practical [2]  42/2 58/20
practice [8]  5/19 5/19 6/2 6/12
6/24 8/18 10/13 26/5
practices [2]  10/21 46/25
precedes [1]  16/24
precise [1]  28/5
precisely [1]  32/10
precision [1]  31/24
preclude [4]  24/14 24/15
24/18 77/18
predate [1]  58/1
predictive [1]  67/22
predicts [1]  67/24
preliminary [1]  63/15
premium [1]  56/10
prep [1]  79/18
prepared [7]  67/5 67/12 68/21
68/23 69/15 71/8 71/10
presbyopia [1]  51/14
presbyopia-correcting [1]
51/14
presence [1]  7/8
present [4]  16/18 17/15 44/20
44/22
presentation [14]  60/1 60/2
68/21 68/23 68/25 69/7 69/10
70/3 71/4 72/18 73/1 76/14
76/15 77/9
presentations [1]  70/5
presenting [1]  40/8
pretrial [1]  78/20
pretty [3]  6/1 67/18 70/19
prevent [1]  63/11
prior [8]  58/13 68/3 69/17
71/9 73/4 73/7 73/8 73/11
probably [5]  25/24 25/25
28/20 29/17 57/20
problem [6]  6/4 26/9 44/15
45/18 62/13 62/24
problems [1]  61/25
procedure [3]  9/3 59/25 28/17
procedures [2]  7/7 26/7
proceed [1]  79/16
proceeding [2]  67/17 80/10
proceedings [2]  3/3 80/3
process [1]  9/12
produce [1]  74/10
produced [13]  62/16 68/3 71/7
73/1 73/4 73/7 73/8 73/10
73/17 73/20 74/8 74/14 76/8
product [16]  8/5 15/11 15/13
32/8 34/1 34/2 34/3 34/4 34/6
34/15 34/15 34/18 40/20 43/3
43/4 68/16
products [7]  4/6 4/10 9/4 34/4
34/10 34/13 47/13

profit[8]  16/20 17/17 25/1
36/10 41/8 63/19 64/5 64/4
profits [24]  4/1 4/6 16/17
16/22 17/6 17/14 17/23 20/17
34/8 34/14 36/11 37/11 52/1
54/13 54/14 54/17 54/20
55/18 56/5 56/9 56/14 56/20
56/22 60/15
program [1]  58/13
programs [4]  57/22 58/6
58/11 58/12
Prokop [1]  3/18
pronounce [1]  5/23
proof [4]  16/18 17/10 17/15
35/13
proper [1]  49/18
properly [1]  64/15
proposal [1]  50/23
propose [1]  44/2
protectable [1]  58/12
prove [7]  16/19 17/16 19/25
47/21 63/7 66/20 77/25
proven [1]  60/18
provide [3]  36/10 39/24 78/3
provided [6]  62/2 62/3 62/7
74/5 75/5 77/1
providing [1]  60/20
proving [1]  61/24
provision [5]  57/24 58/1 58/2
58/5 58/13
publicly [1]  62/4
pull [3]  12/19 13/10 13/22
pull-through [3]  12/19 13/10
13/22
purchase [2]  4/22 5/11
purchased [4]  4/21 5/10 14/1
14/3
purchasing [5]  18/24 21/17
21/19 24/9 55/21
purport [1]  63/18
purpose [1]  15/19
purposes [1]  22/10
put [16]  8/11 11/2 14/16 14/21
14/24 15/3 18/4 28/23 30/2
34/19 40/10 40/18 47/21 50/6
51/1 52/24
puts [1]  43/6
putting [1]  49/1

Q
qualification [1]  66/2
quantify [1]  49/25
quarter [2]  45/15 50/3
question [28]  3/24 5/14 9/25
11/10 11/24 23/18 23/24
24/20 26/14 38/24 39/11
39/12 41/11 41/14 42/9 44/4
47/19 48/13 52/18 53/18
53/20 57/8 57/12 65/6 75/7
75/20 76/5 76/24
questioning [1]  70/20
questions [5]  48/12 50/10
58/17 58/18 70/22
quickly [2]  60/7 60/13
quintessential [1]  21/22
quite [1]  61/21
quote [3]  16/16 16/24 20/10
quoting [1]  20/13

**R**

RACHEL [2] 2/4 3/10
Rachel Blitzer [1] 3/10
ran [1] 28/25
range [1] 56/20
rather [2] 49/3 59/6
rational [1] 42/7
reaching [1] 45/3
read [11] 17/22 17/23 20/2
27/15 31/6 40/23 60/16 66/24
67/20 77/24 78/7
reading [1] 17/22
ready [1] 4/17
real [2] 62/15 78/1
reality [1] 19/15
really [14] 5/3 15/1 18/8 26/18
27/2 27/10 27/11 28/18 30/13
32/18 38/22 40/14 60/21 75/1
reason [3] 56/21 59/22 67/5
reasonable [5] 6/1 29/10
31/23 35/12 36/4
reasonably [9] 17/24 18/1
18/3 18/6 18/14 18/16 20/4
20/12 35/24
reasoning [1] 28/22
reasons [2] 29/6 60/6
rebuttal [11] 73/11 73/24 74/3
74/6 74/9 74/15 74/23 75/5
75/9 76/1 76/9
recognition [1] 58/6
recognized [1] 57/23
record [6] 3/23 4/9 10/18
51/17 69/2 76/17
recover [5] 3/25 16/25 17/6
34/3 56/9
recovery [1] 20/17
reduce [1] 75/24
referenced [2] 24/6 64/2
referred [2] 12/23 71/5
referring [1] 51/11
reflects [1] 69/3
regardless [1] 64/1
regards [1] 30/5
rejected [1] 29/8
relate [1] 60/18
related [4] 17/24 18/1 18/3
20/12
relationship [5] 26/21 29/10
31/24 35/12 37/6
reliability [11] 61/25 66/3 66/8
66/9 66/15 66/17 70/24 71/4
77/16 77/20 77/22
reliable [3] 70/5 70/13 71/20
reliance [1] 22/6
relied [1] 72/4
relies [2] 62/11 72/15
relying [2] 76/8 76/14
remain [3] 64/8 64/10 64/13
remove [1] 65/9
RENEE [1] 2/4
reply [2] 12/25 73/22
report [25] 5/4 12/25 25/6
37/24 39/14 40/23 41/8 41/13
42/20 50/13 61/12 63/16
63/16 63/24 73/11 74/3 74/6
74/9 74/15 74/23 75/5 75/9
75/16 76/1 76/9
REPORTER [2] 80/6 80/12
reporting [1] 63/17

reports [2] 31/6 65/14
represent [1] 30/19
represents [1] 30/15
reputation [1] 29/6
request [1] 77/5
requests [1] 77/6
require [1] 78/13
required [9] 3/25 4/14 16/17
16/19 17/15 17/16 42/23
64/17 71/10
requirement [4] 36/10 65/25
66/2 66/3
requires [3] 9/15 60/14 78/9
RESEARCH [1] 1/8
respectfully [2] 46/10 48/24
respectively [1] 30/6
response [3] 26/19 34/24
40/25
responsibility [1] 10/23
responsive [3] 69/6 69/8
73/21
result [2] 17/1 48/21
retail [2] 56/1 56/2
return [3] 69/19 69/24 70/2
revenue [41] 8/2 8/13 8/17
14/2 14/12 14/25 16/18 16/23
17/16 20/11 20/20 20/25 24/6
24/12 27/4 27/5 27/9 27/17
29/12 29/16 34/16 35/2 35/6
35/9 36/17 38/15 38/22 40/9
40/11 40/19 40/19 46/15
46/23 46/24 47/17 54/18
58/24 60/3 63/6 71/14 78/15
revenue' [1] 20/11
revenues [11] 8/4 13/23 17/23
22/14 25/21 28/24 36/14
39/23 39/25 48/22 56/12
right [138]
rise [1] 4/16
robust [1] 48/11
room [4] 7/1 7/1 7/4 57/16
row [1] 3/17
rule [4] 56/21 65/17 66/13
77/17
Rule 26 [1] 77/17
Rule 702 [1] 65/17
run [4] 33/5 33/7 33/9 54/15
rush [1] 67/2
RYAN [2] 2/13 3/17
RYAN MELD [1] 2/13
Ryan Melde [1] 3/17

**S**

said [37] 5/6 18/13 22/16
26/11 27/8 29/8 29/9 29/13
29/15 33/17 34/7 38/3 38/5
40/17 40/18 42/25 43/16
43/17 43/18 43/24 45/24
46/22 46/22 53/11 55/17
55/24 56/3 65/8 67/5 68/18
68/19 74/10 74/11 77/12
77/14 77/16 78/8
sake [4] 13/16 37/3 42/6 61/8
sale [4] 26/21 32/9 35/14 44/7
sales [53] 1/4 4/21 5/10 9/24
11/7 11/7 12/19 14/19 14/22
14/22 15/3 16/14 17/5 17/7
18/20 19/4 20/24 20/25 21/24
23/1 23/2 25/21 26/21 27/22
27/25 28/24 29/4 29/12 32/7

32/8 33/12 34/3 34/17 37/13
37/14 39/23 40/5 40/10 40/11
78/12 43/25 44/24 45/15 47/4
48/20 48/21 50/4 52/25 54/21
55/19 56/1 56/2 56/12
salesperson [1] 10/22
same [5] 18/9 29/7 30/18 32/2
34/9 39/4 42/10 52/11 74/6
SARANG [1] 2/4
satisfied [2] 29/9 29/20
save [1] 4/23
saw [3] 55/20 67/3 79/3
say [53] 5/4 9/13 12/20 13/10
13/14 18/20 19/3 19/5 19/6
20/14 24/8 24/22 26/2 28/4
28/5 28/16 38/23 40/13 40/15
42/6 42/7 42/8 43/5 44/7
44/12 44/17 44/23 44/24 45/2
45/4 45/11 47/4 49/8 49/19
49/24 50/2 50/3 50/5 50/7
50/24 56/18 64/6 64/8 65/6
67/18 72/11 74/4 74/14 77/9
77/17 77/18 78/12 78/15
saying [8] 21/2 21/16 21/24
22/25 41/22 57/25 72/7 75/9
says [25] 4/20 5/5 8/1 13/22
16/16 16/24 20/4 20/10 20/16
22/11 30/15 31/10 41/15 42/5
42/21 43/2 43/6 43/8 43/10
52/12 64/20 66/13 66/19 67/4
69/10
schedule [1] 50/12
schedules [1] 61/13
scrambled [1] 68/13
screen [3] 14/17 61/5 69/3
seated [1] 3/5
second [14] 3/17 5/14 9/25
17/13 20/11 20/22 25/7 26/14
59/5 59/8 59/12 60/10 71/5
71/7
Section [1] 60/16
Section 504 [1] 60/16
see [21] 8/6 11/3 16/1 16/14
26/10 29/19 30/7 33/7 37/17
38/12 47/13 48/17 48/24 50/6
50/20 61/4 68/22 71/21 77/10
78/23 79/23 79/25
seeing [2] 9/16 29/17
seek [4] 37/11 45/13 52/1
52/2
seeking [8] 39/22 39/24 54/13
54/14 54/17 54/20 54/22
60/15
seeks [2] 4/5 61/1
seem [2] 46/9 48/18
seems [6] 6/1 21/21 33/17
37/17 40/20 47/20
seen [8] 18/23 24/3 29/14
63/8 63/9 66/6 66/7 76/25
sell [2] 10/22 43/5
selling [3] 5/18 17/5 47/14
sense [5] 27/15 48/25 49/2
53/20 64/11
senses [1] 4/1
sentence [7] 16/23 16/24
17/13 17/22 22/19 59/24
59/25
sentencing [1] 59/5
separate [3] 10/25 15/9 79/9
serves [1] 56/19

32/8 33/2 34/3 34/7 37/13
service [2] 14/5 54/18
servicing [1] 54/18
serving [1] 73/11
set [2] 13/1 79/4
seven [2] 67/16 69/12
seven minutes [1] 67/16
share [1] 28/6
SHAW [4] 2/8 2/8 3/13 3/15
she [68] 5/2 5/5 5/9 12/15
12/19 12/22 12/25 13/2 13/7
13/15 22/9 22/11 22/13 26/22
26/24 27/7 27/8 41/13 41/15
41/19 41/21 41/25 42/5 42/8
42/17 42/21 43/6 43/6 43/7
43/10 43/17 43/17 43/23
44/20 45/9 45/11 45/12 50/6
50/13 50/15 50/16 51/6 53/11
55/5 55/6 60/1 60/25 61/1
61/5 61/11 61/12 61/14 62/20
63/8 64/18 64/20 64/24 64/25
65/8 70/10 71/5 72/2 72/4
72/6 72/15 73/12 74/19 75/1
she's [6] 6/1 12/14 42/4 45/2
63/7 76/7
shift [3] 11/14 11/18 19/25
shifting [1] 49/16
shifts [3] 28/15 34/18 49/9
ship [1] 61/3
should [13] 14/20 14/24 15/2
19/18 22/23 23/25 31/8 32/12
44/20 60/6 65/2 67/5 74/3
shoulders [1] 56/10
show [35] 12/1 12/2 13/22
15/7 19/7 22/9 24/25 31/23
34/25 34/25 37/7 37/9 37/17
38/10 38/18 39/23 39/25 40/2
40/2 40/3 40/5 40/6 40/9
40/11 43/17 43/24 47/23
48/19 55/19 55/20 56/2 56/13
56/15 62/17 68/18
showed [3] 43/24 61/20 63/24
showing [7] 29/20 31/21
35/10 35/11 35/14 37/6 39/14
shown [3] 35/14 47/24 57/2
shows [4] 35/1 40/14 64/4
69/9
side [7] 10/24 11/5 43/1 45/4
47/3 49/9 79/11
side's [1] 45/12
sides' [1] 9/13
similar [1] 40/12
simplistic [1] 43/2
simply [1] 63/1
since [2] 24/17 79/12
single [8] 21/2 44/7 59/24
59/25 59/25 61/20 62/6 71/8
site [2] 7/7 8/23
sits [1] 25/12
situation [4] 32/2 32/5 32/10
40/12
situations [2] 31/13 31/14
six [1] 69/12
Sixty [1] 75/18
Sixty-two [1] 75/18
slide [5] 30/15 52/11 63/25
69/3 71/22
slides [1] 59/20
slight [1] 72/8
smaller [1] 64/5
Smith [1] 10/13

**S**

so [132]
soft [2] 53/25 54/4
soft-fit [1] 53/25
sold [11] 13/8 16/5 31/25
33/13 34/1 34/10 34/13 34/16
46/25 51/22 52/6
solely [2] 77/19 77/21
solution [2] 36/24 44/16
solve [3] 44/15 45/8 45/18
some [33] 7/9 7/13 8/22 11/14
12/1 14/19 14/22 18/22 21/10
21/11 23/16 31/10 32/25
36/10 37/7 37/9 38/13 42/4
44/9 44/9 47/10 53/20 55/4
55/5 57/2 59/20 60/18 65/1
67/7 67/9 67/20 71/22 79/3
somebody [2] 29/5 47/15
something [12] 7/2 11/4 23/25
38/18 44/13 47/21 58/20
62/12 62/15 63/22 65/25 78/9
sometimes [1] 33/19
somewhat [1] 8/13
somewhere [1] 73/21
soon [1] 78/18
sorry [5] 55/14 56/21 58/5
65/5 69/8
sort [4] 19/7 23/16 26/14
40/12
sorts [1] 6/3
sounds [2] 36/4 74/16
source [7] 4/13 32/13 32/24
33/4 33/14 57/5 58/1
speak [2] 41/10 64/12
specific [6] 7/7 41/11 46/3
64/17 78/10 78/14
specifically [3] 6/16 15/18
55/3
specificity [1] 60/18
spend [1] 5/7
spin [1] 69/16
spoke [2] 46/18 61/11
spreadsheet [4] 64/12 74/25
75/11 78/3
spreadsheets [1] 61/17
spun [1] 69/16
Stamm [11] 3/20 4/5 4/5 12/6
12/18 13/21 16/4 27/2 42/21
55/4 73/21
Stamm's [10] 3/24 4/20 22/5
34/23 39/13 41/12 50/12 65/2
73/12 73/23
stand [2] 19/4 25/10
standard [1] 60/23
standards [1] 61/23
standing [1] 57/7
stands [1] 65/12
start [11] 25/18 27/20 29/2
30/8 36/17 41/2 46/23 50/15
50/22 50/23 69/25
started [4] 38/21 42/5 51/6
52/20
starting [8] 30/10 31/9 39/22
41/19 42/8 42/11 50/24 53/11
starts [2] 31/14 50/16
statement [1] 45/16
statements [1] 60/20
STATES [2] 1/1 1/18
statistical [1] 35/13

statute [13] 8/11 8/16 11/13
17/4 16/15 16/22 17/22 20/1
48/14 56/19 58/8 77/24 78/15
stayed [1] 79/7
steady [2] 64/8 64/10
Stemtech [3] 20/7 20/8 55/9
stenographic [1] 80/9
step [6] 11/18 20/16 22/14
27/21 48/21 75/14
Step 1 [1] 48/21
stepped [1] 26/11
still [6] 7/17 23/5 41/21 58/16
58/23 79/10
stop [2] 4/15 25/9
Street [1] 1/16
stretching [1] 18/8 7/22
strong [1] 58/24
structure [1] 8/14
struggling [1] 46/12
stuck [1] 6/6
studied [1] 67/2
subject [6] 15/17 54/16 54/19
55/1 55/2 71/15
subset [4] 45/7 48/20 51/18
51/19
substantiate [2] 63/22 64/3
success [1] 55/25
such [1] 10/12
suffered [1] 17/1
sufficient [2] 52/24 63/13
sufficiently [1] 71/20
Sunset [1] 33/22
supplier [2] 10/14 31/13
supply [1] 10/12
support [1] 65/13
suppose [4] 45/23 52/19
52/20 52/20
supposed [1] 5/2
supposedly [1] 64/2
sure [15] 6/12 10/20 15/25
19/10 20/6 30/14 30/23 39/17
39/20 41/6 41/12 48/5 52/18
53/18 68/8
surely [1] 62/7
surgeries [3] 7/10 7/12 7/12
surgery [20] 5/25 6/3 6/15
6/18 7/7 8/23 9/2 9/3 9/8 9/17
10/2 13/3 18/5 18/10 18/13
23/6 23/7 47/12 47/15 47/25
surgical [2] 10/24 26/7
surprised [1] 78/16
Swiss [4] 71/10 71/12 71/12
71/16
Sy [3] 3/10 25/15 57/15
Sy Damle [2] 3/10 25/15
Sy's [1] 57/13

**T**

table [3] 3/9 3/15 50/23
take [8] 4/7 19/20 27/16 39/17
40/13 52/21 74/9 78/7
takes [1] 12/13
taking [2] 42/14 45/7
talk [5] 10/21 21/19 28/19
29/23 39/18 45/22 60/7
talked [1] 46/2
talking [4] 18/18 20/17 46/4
60/13
talks [2] 34/8 51/11
Tally [1] 35/16

tax [7] 43/12 71/17 71/13
71/13 71/13 71/16 71/18
team [1] 70/15
technology [2] 9/6 52/2
tell [6] 4/16 14/9 14/20 15/7
15/7 44/18
telling [2] 23/1 75/15
tells [1] 49/5
ten [1] 32/22
tend [2] 34/10 34/13
tends [1] 34/15
term [1] 79/7
terms [6] 13/8 15/8 16/4 48/1
58/14 68/14
test [2] 20/4 36/8
testified [2] 40/4 70/10
testify [1] 71/2
than [18] 4/25 16/21 17/18
21/9 25/2 27/9 28/6 37/22
39/6 39/15 44/17 45/20 46/7
49/3 55/24 74/12 76/9 78/10
Thank [13] 3/7 3/11 3/12 3/19
25/14 50/8 58/21 59/3 59/17
66/18 79/19 79/21 80/2
Thanks [2] 59/2 66/11
that [399]
that's [82]
their [45] 4/19 7/13 10/2 10/21
11/4 13/25 15/17 19/17 19/23
20/24 21/16 21/19 21/20 24/8
24/9 26/19 26/20 27/11 27/14
27/22 27/23 28/18 29/23
34/22 37/24 39/22 40/14
40/16 43/2 44/11 44/14 45/23
49/20 52/21 53/2 55/21 62/7
62/9 62/13 65/23 70/8 70/23
71/13 77/23 77/25
theirs [1] 53/17
them [33] 6/5 7/16 10/5 10/25
13/2 14/13 23/8 23/19 24/11
24/14 24/16 24/18 28/6 28/15
28/16 34/18 37/4 42/9 42/25
44/11 45/3 52/2 52/23 55/18
56/14 59/14 60/8 61/2 61/3
64/21 64/25 65/9 65/10
themselves [1] 4/1
then [58] 3/17 4/18 4/25 5/1
5/25 6/4 7/17 7/19 8/16 11/12
12/8 14/9 15/2 17/11 17/16
19/24 20/22 21/6 21/25 22/18
22/24 23/8 24/21 24/21 28/9
28/15 30/8 32/13 34/16 34/18
37/21 39/2 45/19 47/2 49/9
50/6 51/25 55/13 55/23 59/13
62/15 64/19 65/4 65/5 65/16
69/10 72/6 72/20 74/18 75/6
76/5 77/15 78/24 79/3 79/9
79/12 79/14 79/16
theory [3] 56/9 56/10 65/16
there [44] 4/15 8/13 8/15 8/19
9/7 11/3 11/25 13/10 13/11
14/18 17/10 17/19 18/21 22/7
23/24 24/8 24/22 25/9 29/10
29/14 31/17 31/23 32/15 40/2
42/17 45/21 47/11 54/24 56/3
61/15 62/15 63/15 63/21
64/11 64/19 65/12 65/22 68/2
70/2 71/14 74/10 77/9 78/9
79/6
there's [32] 8/22 10/17 11/4

than [43] 13/12 14/21 16/9 18/11
18/22 24/22 37/10 53/9 36/13
42/7 43/6 47/2 47/11 48/4
48/7 50/20 52/10 52/12 63/20
66/2 66/21 67/9 70/2 71/12
77/18 78/12 79/6 79/9
therefore [3] 23/2 64/8 65/2
these [23] 5/15 5/16 5/16 6/12
8/12 21/14 31/12 31/13 34/10
34/13 46/13 49/1 50/3 64/13
64/20 64/20 65/7 65/8 67/2
71/3 78/1 78/2 78/13
they [104]
they'd [1] 29/9
they'll [1] 10/20
they're [18] 4/18 6/6 7/19 7/22
10/6 10/7 10/7 15/13 18/20
19/15 20/12 22/25 23/1 34/19
35/13 48/8 61/5 71/15
they've [6] 20/23 24/2 34/21
38/5 62/7 78/1
thing [12] 4/16 13/19 26/10
30/18 39/4 42/10 44/1 49/3
49/5 51/5 77/11 78/5
things [6] 6/3 29/7 36/21 44/9
think [78] 4/18 4/23 6/4 6/9
7/18 7/22 8/7 8/11 11/6 11/12
14/22 14/25 15/4 15/20 16/3
16/14 17/4 17/21 17/24 20/6
23/5 25/9 25/20 26/13 27/19
28/8 28/20 29/22 30/4 30/22
30/22 30/25 31/6 33/11 33/15
33/16 34/20 34/21 36/13
36/25 38/2 38/3 38/22 39/8
41/7 42/14 43/21 44/4 45/9
45/18 46/12 46/15 46/17 47/2
48/1 48/10 48/12 48/14 49/5
49/18 52/17 52/23 55/15
55/25 56/17 56/17 58/19
58/22 59/1 59/10 59/15 61/21
66/13 66/14 68/22 74/7 74/10
75/2
thinking [5] 5/1 19/14 19/15
19/16 31/8
Third [5] 20/9 28/22 35/16
48/15 55/10
this [124]
those [36] 4/9 4/21 6/10 9/2
9/19 11/25 12/1 12/7 12/22
13/1 13/7 13/9 14/2 15/18
19/6 19/10 22/5 22/6 28/11
28/13 30/14 37/17 45/15 46/2
46/5 48/6 51/22 54/12 60/17
64/7 65/1 68/3 68/4 68/5
79/13 79/15
though [11] 11/11 22/19 23/19
23/24 35/19 39/5 50/23 52/10
53/10 53/19 77/10
thought [8] 4/25 4/25 24/13
42/23 59/7 61/14 64/14 75/7
three [1] 42/14
through [11] 12/19 13/10
13/22 33/15 35/12 50/10
50/19 55/24 60/7 64/16 64/18
throws [1] 4/19
tied [2] 9/19 34/5
time [16] 4/8 5/7 18/10 28/25
46/13 59/16 63/12 63/23 64/8
64/10 68/11 68/12 71/9 73/13
74/6 75/4

**T**

today [3] 31/12 59/20 76/18
together [4] 34/10 34/13 43/6 49/2
told [1] 68/11
too [6] 11/8 11/11 23/5 27/16 44/4 75/13
took [1] 43/12
top [4] 60/3 69/12 70/5 76/15
total [2] 27/22 33/1
totally [3] 10/25 13/1 70/13
tracks [2] 15/10 68/16
trade [11] 39/25 40/2 40/2 40/3 40/5 40/6 40/9 40/11 55/19 55/20 56/2
traded [1] 62/4
transcript [2] 76/3 80/9
trial [8] 7/12 24/8 24/10 65/10 71/3 78/18 79/14 79/18
tried [2] 26/20 45/23
tries [1] 75/1
troves [2] 62/8 62/8
true [4] 44/9 45/16 65/7 80/8
truly [1] 5/1
trusts [1] 71/4
try [4] 24/25 56/14 59/21 60/2
trying [6] 37/11 42/1 45/5 58/19 74/9 75/11
TT [3] 28/24 49/3 49/4
TTs [1] 29/12
TUNNELL [1] 1/22
two [14] 5/11 6/19 13/7 14/1 20/16 34/10 34/13 42/16 44/13 68/10 70/22 75/18 76/8 79/10
two minutes [1] 42/16
two weeks [1] 68/10
two-step [1] 20/16
twosie [1] 49/7
type [2] 30/19 66/20

**U**

U.S [6] 12/11 30/16 71/10 71/13 71/16 80/13
ultimately [1] 29/1
undefined [1] 46/16
under [14] 15/5 20/16 21/14 31/22 52/16 56/9 58/9 58/13 60/7 61/24 63/14 64/17 66/1 66/16
undercuts [1] 22/14
underlie [1] 62/2
underlying [3] 46/8 63/8 63/9
understand [2] 41/13 45/16
understood [3] 18/17 58/11 58/12
undisputed [1] 55/20
UNITED [2] 1/1 1/18
universe [1] 22/22
unless [5] 18/22 19/22 23/16 31/9 47/23
unreasonable [1] 50/3
unrelated [1] 36/24
unreliable [5] 60/10 62/25 63/14 65/21 66/4
untestable [1] 60/11
until [1] 13/25
up [32] 4/8 6/5 7/20 9/8 12/9 22/17 25/10 26/17 26/24 27/8

38/3 39/3 42/5 42/7 43/1 43/15 46/6 47/16 49/7 49/1 49/21 50/13 50/20 50/25 58/20 63/2 63/12 68/6 68/22 70/12 78/21
update [1] 65/10
upfront [1] 67/8
us [5] 23/1 44/10 49/6 49/17 51/4
USA [1] 1/3
use [18] 8/1 10/5 15/17 20/16 31/15 38/15 40/15 45/25 46/1 46/5 47/8 53/3 54/1 58/10 63/21 65/14 66/20 70/13
used [24] 8/9 10/6 10/7 10/7 11/25 16/6 18/5 18/10 18/13 26/6 28/16 32/13 37/25 43/23 47/10 47/12 47/24 53/4 54/15 54/22 63/17 64/6 71/5 72/2
uses [4] 35/22 35/24 47/15 60/1
using [4] 12/22 29/9 31/14 45/11

**V**

vast [1] 7/6
Verion [1] 54/21
versus [3] 13/12 46/4 50/18
very [19] 18/6 27/9 28/4 33/14 44/5 45/2 49/1 49/12 58/24 60/17 60/23 64/1 66/11 67/12 67/13 77/25 78/14 78/14 80/2
video [1] 40/3
viewed [3] 41/13 42/21 44/10
viewing [1] 49/23
violates [1] 65/20
VISION [1] 1/7
Volkswagen [12] 28/19 31/23 32/1 32/3 32/3 32/5 32/19 33/18 35/16 41/16 42/22 42/23
VW [1] 48/15

**W**

wait [4] 4/25 26/11 37/2 57/25
walk [1] 59/13
walked [2] 38/2 64/16
waltz [1] 38/14
want [23] 4/8 6/15 7/16 11/4 12/8 14/10 16/1 21/12 21/12 26/2 33/17 40/13 41/4 41/18 42/4 43/2 51/1 56/14 64/1 64/14 69/24 69/25 71/13
wanted [2] 34/2 35/23
wants [2] 71/1 71/13
was [91]
washer [1] 34/1
wasn't [5] 30/1 30/1 32/16 74/9 75/5
watches [1] 56/12
watching [1] 29/5
WATKINS [2] 2/3 3/10
way [13] 4/17 6/7 8/15 14/18 18/5 18/16 41/22 50/10 62/13 62/25 63/6 63/7 77/8
ways [1] 19/16
we [132]
we'll [6] 15/20 23/3 71/2 78/23 79/2 79/23
we're [15] 8/2 11/12 20/17

22/9 25/20 37/11 45/6 45/6 45/7 45/16 50/2 50/4 67/2 70/17 73/8
we've [10] 15/24 20/22 37/15 37/25 39/5 43/21 50/1 60/5 77/6 78/20
wearing [1] 36/22
Wednesday [3] 79/24 79/25 80/1
week [2] 78/22 78/23
weeks [2] 12/10 68/10
weighs [1] 7/15
well [52] 4/6 5/1 5/25 6/4 7/18 7/21 8/6 8/16 11/19 19/10 21/11 22/23 23/11 23/24 24/13 24/17 26/17 27/18 28/16 30/4 33/15 33/21 36/16 37/2 37/5 37/24 39/16 40/13 42/5 45/4 45/20 46/11 47/4 47/5 47/5 48/1 53/23 55/24 57/22 58/18 59/13 62/23 64/7 64/25 65/21 66/16 67/23 72/5 74/13 74/16 78/7 78/25
went [7] 43/9 43/11 43/12 55/23 56/18 68/17 70/11
were [33] 19/11 19/13 19/16 28/16 29/14 29/18 31/25 36/14 39/24 40/10 41/2 48/20 48/20 49/19 55/19 57/22 58/12 61/14 63/4 64/23 65/1 65/7 65/8 67/12 68/2 68/3 72/25 73/4 73/6 73/6 73/13 76/8 79/7
weren't [1] 19/14
what [90]
what's [15] 16/3 26/1 26/2 27/22 27/25 32/7 37/12 38/8 40/20 42/19 45/14 47/6 54/7 65/16 77/12
whatever [7] 12/9 36/5 39/2 49/6 49/12 49/18 59/11
when [18] 10/5 10/6 10/7 15/15 26/10 33/19 43/11 43/15 46/16 50/2 57/23 60/15 61/11 65/10 75/20 75/23 77/2 78/8
When's [1] 78/21
whenever [2] 54/15 79/1
where [27] 5/3 6/8 8/6 8/9 13/11 13/12 13/21 15/5 16/14 21/11 22/19 22/22 31/14 33/25 35/4 35/5 41/2 47/17 47/18 48/10 48/21 50/13 53/21 54/12 55/19 61/5 62/16
whether [7] 3/24 7/8 9/1 49/11 53/14 64/13 76/13
which [56] 4/1 6/13 9/12 11/12 12/5 15/16 17/23 19/23 20/1 20/17 20/25 22/11 22/15 23/9 26/15 30/3 31/10 31/12 31/24 33/22 33/22 35/12 35/13 36/9 36/9 37/25 43/7 44/25 45/1 45/15 46/3 46/6 46/10 46/21 50/24 51/15 51/23 52/14 53/25 54/21 55/4 55/10 55/14 57/23 58/10 64/4 64/17 68/20 68/21 69/3 73/11 74/11 76/8 78/9 78/10 79/10
who [16] 4/21 5/10 7/11 7/12 10/22 12/13 22/1 23/25 24/8

29/14 46/17 46/18 71/2 71/18 76/18 78/21
who's [1] 70/14
Whoa [1] 26/11
Whoever's [1] 59/14
whole [3] 22/15 49/8 56/18
why [24] 5/6 12/5 15/15 16/7 16/7 16/11 21/25 22/2 30/8 34/23 36/20 37/4 37/22 39/6 48/17 58/19 60/6 60/6 62/6 62/16 65/16 67/5 72/2 77/11
will [21] 4/7 8/13 24/8 24/10 24/10 38/24 44/7 44/17 45/9 45/11 45/17 49/14 49/24 61/22 63/13 65/9 66/24 76/2 79/1 79/14 79/17
Wilmington [1] 1/16
without [5] 22/17 29/17 41/19 42/11 42/14
witness [2] 50/4 71/2
witnesses [1] 24/8
won't [2] 33/8 45/10
wondering [1] 22/23
word [2] 35/22 58/10
words [6] 5/18 14/14 30/9 32/22 32/25 42/1
work [6] 5/16 16/21 17/18 25/2 31/15 61/9
worldwide [1] 7/10
worth [3] 27/20 37/13 59/4
worthwhile [1] 67/15
would [50] 14/17 17/21 18/19 18/20 20/25 21/6 21/7 21/8 21/9 24/3 24/5 28/4 30/3 31/17 33/19 34/11 34/17 35/2 36/5 36/21 36/23 36/23 36/25 38/4 38/4 38/23 41/23 44/1 44/11 44/12 44/15 45/8 45/18 46/21 47/3 47/3 47/14 48/10 49/14 50/6 50/25 51/1 51/21 52/23 53/14 57/11 59/8 59/11 72/8 78/4
wouldn't [2] 38/6 51/3
Wow [1] 19/20
wrangle [1] 56/5
wrap [1] 63/12
wristwatches [1] 39/23
write [1] 4/17
wrong [2] 59/9 63/7
wrongly [1] 15/5
wrote [2] 22/17 22/17

**Y**

yeah [15] 11/23 17/11 17/11 27/15 27/24 32/18 36/7 46/20 51/5 51/9 53/9 57/14 72/10 74/5 74/7
year [3] 30/16 71/8 71/15
years [2] 60/4 68/3
yes [29] 5/24 6/22 8/21 12/11 14/5 18/22 18/22 24/10 28/6 30/19 33/5 33/6 34/9 35/22 42/3 57/17 57/17 65/8 65/18 66/10 67/23 72/15 72/19 73/3 73/6 73/19 75/17 76/6 76/10
you [214]
you'd [2] 38/22 47/22
you'll [4] 7/11 9/13 39/11 67/1
you're [23] 5/18 10/12 10/13 17/4 19/14 19/20 21/22 23/19

## Y

you're... [15]  24/13 24/17
24/21 24/22 34/14 39/10
39/11 45/5 49/12 57/15 57/25
65/8 72/7 75/9 75/15
you've [15]  9/1 10/13 11/6
21/22 31/9 35/4 38/12 38/12
38/14 38/14 38/17 39/5 47/24
56/7 77/11
your [66]  3/7 3/14 3/22 4/17
5/13 6/7 7/18 7/21 8/15 8/20
9/25 10/13 11/11 12/5 12/23
13/18 13/19 14/5 14/12 15/7
19/3 19/19 20/2 21/22 21/23
22/2 23/10 24/5 24/5 24/10
25/15 26/8 26/13 28/4 29/22
30/8 30/9 34/14 37/12 38/4
40/23 41/5 42/13 43/9 44/1
44/3 44/4 44/16 45/8 48/11
48/24 49/22 50/13 51/7 51/11
53/3 53/19 54/7 58/16 58/21
59/10 59/18 67/14 74/1 79/19
79/21
Your Honor [11]  12/23 13/18
13/19 14/5 24/10 26/8 26/13
44/1 44/16 53/19 58/16
Your Honor's [1]  51/11

## Z

zero [1]  21/13